# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA; STATE OF
NEW YORK; STATE OF
CONNECTICUT; STATE OF
COLORADO; STATE OF
DELAWARE; DISTRICT OF
COLUMBIA; STATE OF HAWAI'I;
STATE OF ILLINOIS; STATE OF
MAINE; STATE OF MARYLAND;
COMMONWEALTH OF
MASSACHUSETTS; STATE OF
MICHIGAN; STATE OF
MINNESOTA; STATE OF NEVADA;
STATE OF NEW JERSEY; STATE OF
NEW MEXICO; STATE OF NORTH
CAROLINA; STATE OF OREGON;
JOSH SHAPIRO, IN HIS OFFICIAL
CAPACITY AS GOVERNOR OF THE
COMMONWEALTH OF
PENNSYLVANIA; STATE OF
RHODE ISLAND; STATE OF
VERMONT; STATE OF
WASHINGTON; STATE OF
WISCONSIN,

       *Plaintiffs*,

  v.

U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; ROBERT
F. KENNEDY JR., in his official
capacity as Secretary of the U.S. Health
and Human Services; CENTERS FOR
MEDICARE AND MEDICAID
SERVICES; DR. MEHMET OZ, in his
official capacity as Administrator of the
Centers for Medicare and Medicaid
Services,

       *Defendants*,

Case No.:

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

1.      In a December 4, 2024, interview about his plans following the inauguration of President Donald Trump, House Speaker Michael Johnson was asked about whether he would "axe" Planned Parenthood.[1]  He responded: "I would like to, that's for sure."[2]

2.      Speaker Johnson's plans are just the latest in a years-long effort by the President and members of Congress to punish Planned Parenthood Federation of America (PPFA) and its member health centers (Planned Parenthood health centers) for their advocacy for reproductive choice in this country.  And now, Congress has done so, by passing legislation stripping federal Medicaid funding from the Planned Parenthood health centers in retribution for PPFA and the Planned Parenthood health centers' constitutionally protected advocacy.

3.      In so doing, Congress has conscripted the States to enforce its unconstitutional targeting of PPFA and the Planned Parenthood health centers.  Because Medicaid is a state-federal partnership in which the states administer claims from medical providers for Medicaid reimbursements, the states—not the federal government—would ultimately be required to ensure that the Planned Parenthood health centers are effectively excluded from federal funding under the Defund Provision.  And in so doing, Congress has also forced the States to harm themselves, by either 1) crippling the States' medical healthcare ecosystems as Planned Parenthood health centers close or reduce hours and services, thereby increasing the States' long-term medical care costs, or 2) using the States' own funds to keep those health centers operating—and thereby foregoing matching federal funds.

---

[1] House Speaker Michael Johnson, *Speaker Johnson Joins The Story with Martha MacCallum*, YouTube (Dec. 4, 2024), https://www.youtube.com/watch?v=VOM5wRs1WFc (hereinafter Speaker Johnson Interview Dec. 2024).
[2] *Id.*

4.    The Plaintiff States of California, Colorado, Connecticut, Delaware, District of Columbia, Hawaiʻi, Illinois, Maine, Maryland, the Commonwealth of Massachusetts, Michigan, Minnesota, Nevada, New Jersey, New Mexico, New York, North Carolina Oregon, Rhode Island, Vermont, Washington, and Wisconsin, and Governor Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania (collectively, Plaintiff States) now bring this action to avoid being compelled to participate in Congress's unconstitutional conduct. To that end, the States bring this challenge to Section 71113 of "An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14" (the Defund Provision).

5.    The Defund Provision is a stand-alone provision that eliminates the use of federal funds for any health care obtained at Planned Parenthood health centers.  Congress specifically designed the Defund Provision to target and punish PPFA and the Planned Parenthood health centers for advocating for abortion access.  The Defund Provision will prevent Planned Parenthood health centers from providing healthcare to millions of Americans who rely on Medicaid for their essential healthcare needs.  As explained below, the Defund Provision also incidentally sweeps in a couple of additional healthcare entities who provide abortion care. These entities are just collateral damage in Congress's unconstitutional targeting of the Planned Parenthood health centers.  But those health centers also provide critical healthcare, and so their "defunding" only contributes to the devasting effects of Congress's action.

6.    To be clear, this is not about abortion funding. Under longstanding federal law, federal funds may not be used to provide abortions, except in extremely narrow circumstances. Instead, the Defund Provision denies access to health centers that provide essential, lifesaving care, such as cancer screening and prevention, testing and treatment for sexually transmitted infections (STI), and family planning services, all in the name of retribution for PPFA and

Planned Parenthood health centers' political advocacy. And the result is devasting consequences for those who will be denied care in the Plaintiff States, as well as negative impacts to the Plaintiff States themselves.

7. The Defund Provision is unconstitutional in several respects. It contains several ambiguous elements, leading to uncertainty about who determines whether an entity qualifies as a "prohibited entity," whether an entity qualifies as a "prohibited entity," and the timing of the provision. And through its targeting of PPFA and Planned Parenthood health centers, the Defund Provision violates the First Amendment's protections for freedom of speech and freedom of association and Article I's prohibition on bills of attainder. The Plaintiff States should not be co-opted into participation in these unconstitutional acts.

8. The Plaintiff States seek a declaration that the Defund Provision is unconstitutional as well as an injunction against enforcement of the Defund Provision by Defendants U.S. Department of Health and Human Services; Robert F. Kennedy, Jr., in his official capacity as Secretary of the U.S. Department of Health and Human Services; Centers for Medicare and Medicaid Services; and Dr. Mehmet Oz, in his official capacity as administrator for the Centers for Medicare and Medicaid Services (collectively, Defendants).

## JURISDICTION AND VENUE

9. This Court has jurisdiction pursuant to 28 U.S.C. § 1331.

10. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), because this is a judicial district in which Massachusetts resides, and this action seeks relief for Massachusetts against federal agencies and officials acting in their official capacities.

**PARTIES**

11.     Plaintiff the State of California, by and through Attorney General Rob Bonta, brings this action. The Attorney General is the chief law enforcement officer of the State of California and head of the California Department of Justice.  He has the authority to file civil actions to protect California's rights and interests and the resources of this state.  Cal. Const., art. V, § 13; Cal. Gov't Code §§ 12510-11, 12600-12; *see Pierce v. Superior Court*, 1 Cal. 2d 759, 76162 (1934) (The Attorney General "has the power to file any civil action or proceeding directly involving the rights and interests of the state . . . and the protection of public rights and interests.").

12.     Plaintiff the State of Colorado is a sovereign state in the United States of America.  Colorado is represented by Phil Weiser, the Attorney General of Colorado.  The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

13.     Plaintiff the State of Connecticut is a sovereign state of the United States of America.  Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

14.     Plaintiff the State of Delaware is a sovereign state of the United States of America. This action is brought on behalf of the State of Delaware by Attorney General Kathleen Jennings, the "chief law officer of the State." *Darling Apartment Co. v. Springer*, 22 A.2d 397, 403 (Del. 1941). Attorney General Jennings also brings this action on behalf of the State of Delaware pursuant to her statutory authority. Del. Code Ann. tit. 29, § 2504.

15.      Plaintiff the District of Columbia is a municipal corporation organized under the Constitution of the United States.  It is empowered to sue and be sued, and it is the local government for the territory constituting the permanent seat of the federal government.  The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

16.      Plaintiff the State of Hawai'i is a sovereign state of the United States of America. Hawai'i is represented by and through its chief legal officer and chief law enforcement officer, Attorney General Anne E. Lopez, who is authorized under Hawai'i Revised Statutes § 28-1 to pursue this action.

17.      Plaintiff the State of Illinois, represented by and through its Attorney General Kwame Raoul, is a sovereign state of the United States of America.  Attorney General Raoul is authorized to pursue this action under Illinois law. *See* 15 ILCS 205/4.

18.      Plaintiff the State of Maine represented by and through its Attorney General Aaron M. Frey, is a sovereign state of the United States.  As the State's chief law officer, the Attorney General is authorized to act on behalf of the State in this matter pursuant to 5 Me. Rev. Stat. Ann. § 191.

19.      Plaintiff the State of Maryland is a sovereign state of the United States of America.  Maryland is represented by Attorney General Anthony G. Brown, who is the chief legal officer of Maryland.

20.     Plaintiff the Commonwealth of Massachusetts is a sovereign state of the United States of America.  Massachusetts is represented by Attorney General Andrea Joy Campbell, the Commonwealth's chief legal officer.

21.     Plaintiff the State of Michigan is a sovereign state of the United States of America.  Michigan is represented by Attorney General Dana Nessel, who is the chief law enforcement officer of Michigan.

22.     Plaintiff the State of Minnesota is a sovereign state of the United States. Minnesota is represented by and through its chief legal officer, Minnesota Attorney General Keith Ellison, who has common law and statutory authority to sue on Minnesota's behalf.

23.     Plaintiff State of Nevada, represented by and through Attorney General Aaron D. Ford, is a sovereign State within the United States of America.  The Attorney General is the chief law enforcement of the State of Nevada and is authorized to pursue this action under Nev. Rev. Stat. 228.110 and Nev. Rev. Stat. 228.170.

24.     Plaintiff the State of New Jersey is a sovereign state in the United States of America.  New Jersey is represented by Attorney General Matthew Platkin, who is the chief law enforcement officer of New Jersey.

25.     Plaintiff the State of New Mexico is a sovereign state in the United States of America.  New Mexico is represented by Attorney General Raúl Torrez, who is the chief law enforcement officer of New Mexico authorized by N.M. Stat. Ann. § 8-5-2 to pursue this action.

26.     Plaintiff the State of New York represented by and through its Attorney General Letitia James, is a sovereign state of the United States of America.  The Attorney General is New York State's chief law enforcement officer and is authorized to pursue this action pursuant to N.Y. Executive Law § 63.

27.     Plaintiff State of North Carolina is a sovereign state of the United States of America.  North Carolina is represented by Attorney General Jeff Jackson, who is the chief law enforcement office of North Carolina.

28.     Plaintiff the State of Oregon is a sovereign state of the United States of America.  Oregon is represented by Attorney General Dan Rayfield, who is the State's chief legal officer and is authorized to pursue this action on behalf of the State of Oregon. Or. Rev. Stat. § 180.060(1), (6), (7).

29.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania.  The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2. The Governor oversees all executive agencies in Pennsylvania and is authorized to bring suit on their behalf. 71 P.S. §§ 732-204(c), 732-301(6), 732-303

30.     Plaintiff State of Rhode Island is a sovereign state in the United States of America.  Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

31.     Plaintiff State of Vermont is a sovereign state of the United States of America.  Vermont is represented by Attorney General Charity Clark, who is authorized to initiate litigation on Vermont's behalf.

32.     Plaintiff the State of Washington, represented by and through its Attorney General Nicholas Brown, is a sovereign state of the United States of America.  The Attorney General is Washington's chief law enforcement officer and is authorized under Wash. Rev. Code § 43.10.030 to pursue this action.

33.     Plaintiff the State of Wisconsin is a sovereign state in the United States of America.  Wisconsin is represented by Joshua L. Kaul, the Attorney General of Wisconsin. Attorney General Kaul is authorized under Wis. Stat. § 165.25(1m) to pursue this action on behalf of the State of Wisconsin.

34.     Defendant U.S. Department of Health and Human Services is a department of the executive branch of the United States government.

35.     Defendant Robert F. Kennedy, Jr., is the Secretary of the U.S. Department of Health and Human Services.  He is sued in his official capacity.

36.     Defendant U.S. Department of Health and Human Services and Defendant Kennedy shall collectively be referred to as "HHS."

37.     Defendant the Centers for Medicare & Medicaid Services (CMS) is an agency within HHS that is responsible for administering the Medicaid Act.

38.     Defendant Dr. Mehmet Oz is the Administrator for the Centers for Medicare & Medicaid Services.  He is charged with administering the Medicaid Program and the Defund Provision.[3]  He is sued in his official capacity.

39.     Defendant CMS and Defendant Oz shall collectively be referred to as "CMS."

## BACKGROUND

### I.    THE FEDERAL-STATE HEALTHCARE PARTNERSHIP

#### A.    The Medicaid Program

40.     Millions of people rely on health services and benefits provided by Medicaid, the federal-state cooperative health programs serving low-income individuals and families.  These

---

[3] *See* H.R. Con. Res., 119th Cong. § 71113(c) (2025) (hereinafter Section 71113) (appropriating funds "to the administrator of the Centers for Medicare & Medicaid Services" "[f]r the purposes of carrying out this section").

critical health coverage programs serve millions of families, children, pregnant individuals, adults without children, seniors, and people living with disabilities. As of October 2024, 72 million people across the U.S. were covered by Medicaid and relied on this essential program.[4]

41.    Medicaid operates as a state and federal partnership with states administering the programs and the federal government covering a substantial portion of the costs, reimbursing states between 50 and 90 percent of expenditures on eligible children and adults. Such reimbursements incentivize states to further the primary goal of the program: providing health services and benefits to low-income individuals and families.

42.    Medicaid affords "substantial discretion" to participating states. *Alexander v. Choate*, 469 U.S. 287, 303 (1985). That commitment to state discretion is apparent from the text and structure of the Medicaid statute itself. States can choose whether to participate in Medicaid in the first place. *See* 42 U.S.C. § 1396a. And even after states sign up, Medicaid is not a take-it-or-leave-it proposition. Instead, the statute affords each participating state "substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage." *Alexander*, 469 U.S. at 303.

43.    Although states' participation in Medicaid is voluntary, once they choose to participate, states must comply with federal statutory and regulatory requirements, including the creation of a State Plan outlining the administration of their respective Medicaid programs. 42 C.F.R. § 431.10. State Plans provide assurances that states will abide by federal rules to claim federal matching funds; indicate which optional groups, services, or programs states have chosen

---

[4] *See* Ctrs. for Medicare & Medicaid Servs., *October 2024: Medicaid and CHIP Eligibility Operations and Enrollment Snapshot*, Medicaid.gov 8 (Jan. 15, 2025), https://www.medicaid.gov/resources-for-states/downloads/eligib-oper-and-enrol-snap-october2024.pdf

to cover or implement; and describe the state-specific standards to determine eligibility, methodologies for providers to be reimbursed, and processes to administer the program.

44.     Congress requires states to include several broad categories of benefits and services in their Medicaid programs, such as inpatient hospital services, outpatient hospital services, laboratory and x-ray services, nursing facility services, family planning services, physician services, nurse-midwife services, and nurse-practitioner services.[5] 42 U.S.C. §§ 1396a(a)(10), 1396d(a)(1)-(5), (17), (21).  Within those categories, states retain discretion to include specific services in the State Plan.

45.     Congress has also excluded certain services from Medicaid by prohibiting the use of federal money to pay for the service.  The Hyde Amendment, for example, generally prohibits the use of federal funds for abortions, with certain exceptions. *See, e.g.,* Pub. L. No. 94–439, § 209, 90 Stat. 1418, 1434 (1976) (initial version).

46.     Beyond these Congressionally mandated categories of inclusions and specific exclusions, Congress has delegated policy decisions about what services should be covered to participating states by allowing them to develop their own State Plans that specify, among other things, the particular covered services within the broad categories of inclusions in the Act.  42 U.S.C. § 1396a(a)(10); 42 C.F.R. § 431.10.

47.     Each state thus specifies the nature and scope of its Medicaid program through its State Plan.  42 C.F.R. § 430.10.  States retain discretion to provide medical services not specifically delineated in the Act, such as dental services, prosthetics, and prescription drugs.  42 U.S.C. §§ 1396a(a)(10)(A), 1396d(a).  States are also free to provide coverage through their own

---

[5] *See also* Ctrs. for Medicare & Medicaid Servs., *Mandatory & Optional Medicaid Benefits*, Medicaid.gov, https://www.medicaid.gov/medicaid/benefits/mandatory-optional-medicaid-benefits (last visited July 22, 2025).

funds for any medical services or categories of enrollees that the federal government does not fund.

48.    The Medicaid Act provides that any individual eligible for assistance under a state Medicaid program may choose any provider "qualified to perform the service or services required . . . who undertakes to provide him such services," other than "a person or entity convicted of a felony under Federal or State law for an offense which the State agency determines is inconsistent with the best interests of beneficiaries under the State plan."  42 U.S.C. § 1396a(a)(23).  Because it does not define the term "qualified," the Act leaves substantial discretion to states—exercising their traditional role regulating health and safety—in determining providers' qualifications for inclusion in their Medicaid programs.  *See Medina v. Planned Parenthood South Atlantic*, 606 U.S. --- (2025).

49.    Pursuant to Social Security Act sections 1128 and 1156, Defendants have limited authority to determine which providers may participate in Medicaid programs as qualified providers, mainly based on their commission of crimes or other violations of federal law. Neither section authorizes HHS to exclude providers from participation in Medicaid based solely on their provision of abortions—or any type of care—outside the Medicaid program.

50.    If HHS seeks to exclude a provider based on these sections, it must provide specific process to the provider as set forth in the Social Security Act and implementing regulations.  Such process includes but is not limited to issuance of a Notice of Intent to Exclude and an opportunity to respond to and challenge any determinations by HHS.  Any exclusion may be appealed to an Administrative Law Judge (ALJ) and decisions by an ALJ may be appealed to the HHS Departmental Appeals Board.  42 C.F.R. § 1001.2007(c).

51.     Each state must develop a process by which providers may enroll in Medicaid as covered or participating providers, and through which each state approves or rejects providers for enrollment.  *See* 42 C.F.R. § 455.410.  Such processes must follow all screening and categorization procedures outlined in the regulations.

52.     Beyond Congress's decision to exclude providers based on commission of crimes or other violations of federal law outlined in Social Security Act sections 1128 and 1156, Congress has never conditioned Medicaid funding on the exclusion of specific providers.

53.     Indeed, to the contrary, Congress guarantees Medicaid beneficiaries their free choice of provider as set forth in the plain text of Social Security Act.  42 U.S.C. §1396a(a)(23); *see also* 42 C.F.R. § 431.51 ("Free Choice of Providers").  This longstanding provision of the Medicaid program has existed for nearly 60 years.

54.     And CMS has reiterated that this provision prohibits states from refusing to reimburse providers of family planning services because of their conduct outside of the Medicaid program.[6]  States are also required to inform beneficiaries of their right to a free choice of provider for family planning services.  *See id.*

55.     In general, to access federal matching Medicaid funds, states provide estimates of their Medicaid expenses for each financial quarter to CMS.[7]  CMS in turn provides matching federal funds at the federal medical assistance percentage (FMAP), which is the percentage of

---

[6] *See* Ctr. for Medicaid, CHIP & Survey & Certification, *CMCS Informational Bulletin* (June 1, 2011), https://downloads.cms.gov/cmsgov/archived-downloads/CMCSBulletins/downloads/6-1-11-Info-Bulletin.pdf ("longstanding federal law" prohibits states from excluding providers from Medicaid because they provide abortions outside of the Medicaid program, without using federal dollars); *see also* Letter from Vikki Wachino, Director of Center for Medicaid & CHIP Services, to State Health Officials, *Re: Medicaid Family Planning Services and Supplies* (June 14, 2016), https://www.medicaid.gov/federal-policy-guidance/downloads/sho16008.pdf.

[7] U.S. Gov. Accountability Office, *Medicaid: Primer on Financing Agreements* 4 (July 14, 2020), https://www.gao.gov/assets/gao-20-571r.pdf.

the cost paid by the federal government to each state Medicaid program.[8]  The FMAP varies by

the type of service performed and the type of Medicaid enrollee who has received the services.[9]

States then use a combination of the federal funds provided by CMS and funds provided by the

state to pay claims that Medicaid providers submit during that financial quarter.[10]  After the state

Medicaid programs have paid the claims, CMS and the states engage in a reconciliation process

based on the states' actual expenditures, with states paying back the federal government for

over-payments or seeking additional matching funds for underpayments.[11]

### B.    State Medicaid Programs

56.    The Plaintiff States participate in federal Medicaid programs.  Access to health

insurance through Medicaid increases utilization of preventative healthcare, limits the spread of

communicable illnesses, and minimizes financial burdens on healthcare providers. For example,

Medicaid coverage for children enhances health in childhood and adulthood and improves

educational outcomes, all of which contribute to higher rates of employment and earnings as

adults.[12]  These and other benefits lead to immediate and long-term health improvements for

Plaintiff States' residents, and lower healthcare costs incurred by the Plaintiff States through

their Medicaid programs.

57.    **California:**  Medi-Cal is California's Medicaid program.  The California

Department of Health Care Services (DHCS) manages Medi-Cal and is responsible for provider

enrollment, claims processing, program design, and responding to the public.  Medi-Cal covers

---

[8] *Id.*

[9] *Id.* at 3.

[10] *Id.* at 4.

[11] *Id.*

[12] *See* Rose C. Chu, et al., *Issue Brief: Medicaid: The Health and Economic Benefits of Expanding Eligibility* (Issue Brief HB-2024-18), ASPE.HHS.gov (Sept. 2024), https://aspe.hhs.gov/sites/default/files/documents/effbde36dd9852a49d10e66e4a4ee333/medicaid-health-economic-benefits.pdf

almost 15 million Californians—over a third of California's population.  Most Medi-Cal enrollees are covered though a state contract with a managed care plan.  California's FMAP is 50 percent for most services and for most enrollees, while certain services and enrollees, including family planning services, are eligible for an FMAP of up to 90 percent.  Overall, federal funds cover around 60 percent of total Medi-Cal program expenditures.

58.    The Medi-Cal program provides coverage for comprehensive sexual and reproductive health services, covering all health care services required by federal law as well as many optional benefits that are eligible for federal matching funds.  For beneficiaries who access care through a managed care plan, sexual and reproductive health care services, including for family planning and abortion, are available both in- and out-of-network as sensitive services. California also provides coverage using state-only funds for certain health care services that are not eligible for federal funds, including abortion, and for certain populations whose care is not eligible for federal matching funds.

59.    This scope of coverage is particularly important to California due to the characteristics of its residents who are enrolled in Medi-Cal.  Of those covered by Medi-Cal, 36.6 percent are 20 years of age or younger.  Nearly 35 percent (34.3 percent) of Medi-Cal enrollees are a part of the Affordable Care Act's (ACA) expansion of Medicaid coverage to adults between the ages of 19 and 64 years of age who have incomes up to 138 percent of the federal poverty limit.  In short, a significant percentage of California Medi-Cal recipients are in age brackets that need access to full-scope reproductive healthcare.  To provide that coverage, California has a comprehensive family planning services program, the Family Planning, Access, Care, and Treatment Program (Family PACT or FPACT).  The federal government provides 77.5 percent of FPACT's funding.  FPACT provides coverage for contraceptive and family

planning-related services, along with client-entered health education and counseling, at no cost to Californians of reproductive age with low incomes. The FPACT Program is designed to assist individuals who have a medical necessity for family planning services, so that they can establish the timing, number, and spacing of their children, and maintain optimal reproductive health. FPACT serves over 600,000 income-eligible people of childbearing age. About 70 percent of healthcare services reimbursed by FPACT are provided by California-based Planned Parenthood health centers.

60.    **Colorado:**  Colorado's Medicaid program is Health First Colorado, which is administered by the Colorado Department of Health Care Policy and Financing. Health First Colorado covers individuals up to 133 percent of the federal poverty level (FPL), families up to 142 percent of the FPL, and pregnant persons up to 195 percent of FPL. Health First Colorado has approximately 1.2 million members. Colorado also offers Child Health Plan Plus (CHP+), which provides comprehensive health care benefits to uninsured children up to age 19 and pregnant people who do not qualify for Medicaid and meet income criteria (up to 260 percent of the FPL). As of January 2025, over 93,000 children and pregnant people were covered by CHP+.

61.    Both Health First Colorado and CHP+ are jointly funded by the federal government and Colorado state government, at different rates depending on the individual and population. On average, about 60 percent of all funding for Colorado Department of Health Care Policy and Financing's budget, including Health First Colorado, CHP+, other programs and administration comes in the form of federal matching funds.

62.    In Fiscal Year 2024, Colorado's total expenditures for Health First Colorado and CHP+ were approximately $15.1 billion total funds, including $4.5 billion general State funds.

63.     **Connecticut:**  The state program in Connecticut, HUSKY Health, provides comprehensive health coverage to all qualifying Connecticut residents and includes Connecticut's partially federally funded Medicaid and CHIP programs.  HUSKY Connecticut provides free or low-cost coverage to approximately 945,000 children, parents and relative caregivers, pregnant women, disabled individuals, and some single individuals with lower incomes.

64.     The rate of federal funding for individuals enrolled in either Medicaid or CHIP through HUSKY varies.  The federal match rate for Medicaid is normally 50 percent but for certain participant populations may be as high as 90 percent.  In Fiscal Year 2024, Connecticut's total expenditures for federal Medicaid and CHIP were approximately $ 8.3 billion, which was 23.6 percent of total state expenditures.

65.     Connecticut's Department of Social Services (DSS) is Connecticut's single state Medicaid agency and functions as one of the largest health coverage providers in Connecticut.  It is a leader in ensuring Connecticut residents have access to high-quality, affordable healthcare, and it is committed to whole-person care, integrating physical and behavioral health services for better results and healthier communities in Connecticut.  DSS provides healthcare for over 1 million state residents annually through HUSKY.  DSS also administers some state funded healthcare programs, including the State HUSKY program for certain individuals who are ineligible for Medicaid, and fully state funds certain healthcare services, including abortion.

66.     **Delaware:**  Delaware administers two programs pursuant to the federally funded Medicaid program: Diamond State Health Plan (DSHP) and Diamond State Health Plan Plus (DSHP+).  In state fiscal year 2026, approximately 25 percent of the Delaware's population was covered under Medicaid.  Delaware funds 100 percent of the cost of abortion care for

participants of the Delaware Medicaid program.  Except for few Hyde Amendment cases, abortion care is always provided on a fee-for-service basis and is billed and paid separately from other covered and federally funded health care services.

67.    Most family planning services in Delaware billed to Medicaid are eligible for a 90 percent federal match rate.  This means that for those medical exams, procedures, or other services for those covered by Delaware's Medicaid program, the federal government pays 90 percent, and the state pays the remainder.  Some reproductive healthcare services are not eligible for the 90 percent match rate, such as sexually transmitted infection testing and treatment.  Those services are eligible for a federal match rate of approximately 60 percent.

68.    **District of Columbia:**  District of Columbia Medicaid (DC Medicaid) is a joint federal-state health insurance program that provides health care coverage to low-income and disabled adults, children and families.  DC Medicaid covers various family planning services, including those provided at the District's Planned Parenthood provider.  To date in fiscal year 2025, DC Medicaid and DC Medicaid Managed Care Organizations have provided over $500,000 in reimbursements to the District's Planned Parenthood provider.

69.    **Hawai'i:**  Hawai'i's Medicaid program, Med-QUEST, is administered by the Med-QUEST Division of the Department of Human Services.  Med-QUEST provides low-income individuals with medical assistance for comprehensive healthcare coverage and access to affordable, integrated, and high-quality healthcare at no or low cost.  Med-QUEST provides coverage for reproductive health care, including family planning services, maternity and newborn care, pregnancy-related services, contraceptives, and the diagnosis and treatment of sexually transmitted diseases.  Med-QUEST also covers various cancer screenings, including breast, cervical, and prostate cancer screening.  Currently, about 415,000 people are enrolled in

Med-QUEST.  This constitutes nearly 1/3 of Hawaiʻi's population.  Of those enrolled, about

112,000 people are between the ages of 20 to 39 years old, the age bracket most likely to require

reproductive health services.  In fiscal year 2024, the total Medicaid spending in Hawaiʻi was

just over $3 billion, of which 65 percent was paid by the federal government.

70.    **Illinois:**  The Illinois Department of Healthcare and Family Services (IHFS) is

responsible for administering Illinois's Medical Assistance Program, which covers health care

for individuals who meet eligibility requirements for the program.  Medicaid is a component of

this program, and Illinois healthcare providers enroll in the Medical Assistance Program to serve

Illinois Medicaid customers.  At the end of state fiscal year 2024, IFHS, through the Illinois

Medical Assistance Program, was covering over 3.4 million eligible individuals across the State

of Illinois. This includes comprehensive coverage for nearly 1.5 million children, and 1.6 million

adults between the ages of 19 and 65.  As of April 1, 2025, the Illinois Medical Assistance

Program serves over 800,000 women ages 15 to 49.  The federal funds Illinois receives to

administer Medicaid are critical to ensuring that the program can continue to deliver essential

healthcare services.

71.  **Maine:**  MaineCare is the state of Maine's Medicaid program.  MaineCare covers

medically necessary services, including primary care visits, family planning services,

prescription medications, and behavioral health.  MaineCare plays a critically important role in

ensuring that rural Mainers have access to care.  Adults and children living in rural areas,

including most of Maine, are more likely to rely on MaineCare or than adults and children who

live in urban areas.  Indeed, more than half of Medicaid enrollees in Maine live in rural areas.

72.    **Maryland:**  As of May 2025, Maryland's Medicaid Program, Maryland Medicaid, covered 1,522,680 people, accounting for 25 percent of the state's population. Maryland Medicaid is administered by the Maryland Department of Health.

73.    **Massachusetts:**  In Massachusetts, the Massachusetts Executive Office of Health and Human Services (EOHHS) administers the Medicaid program and CHIP through a single program called MassHealth, pursuant to federal law and regulations as well as the terms of federally approved State Plans and a Section 1115 Demonstration Project.  EOHHS is the single state agency responsible for administering MassHealth

74.    MassHealth provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. MassHealth's coverage includes medical, dental, mental health and substance use treatment, long-term services and supports, and long-term care.  MassHealth's mission is to improve the health outcomes of its members and their families through services which sustainably and equitably promote health, well-being, independence, and quality of life.  MassHealth insures approximately 2 million people, including close to 500,000 people of childbearing age, over 720,000 children, and approximately 525,000 seniors and people with disabilities.  Among the broad array of services it covers for its members, MassHealth covers comprehensive sexual and reproductive health care services, including family planning, cancer and STI screenings, and critical preventative care.

75.    The costs of Medicaid and CHIP services provided through MassHealth are shared between the state and federal government at an FMAP that varies, by service and by member type, between 50 percent and 90 percent, with an average of 55 percent FMAP overall.

76.     **Michigan:**  The Michigan Department of Health and Human Services (MDHHS) administers Michigan's Medicaid program—a comprehensive healthcare coverage program for low-income Michiganders.  MDHHS also administers Michigan's Medicaid expansion program, Healthy Michigan Plan (HMP).  Together, Michigan's Medicaid program and HMP are referred to as "Michigan Medicaid."  In addition to Michigan Medicaid, MDHHS administers CHIP, known in Michigan as "MIChild."  MIChild provides healthcare coverage to children in families that make too much to be eligible for Medicaid, but too little to afford private care.  Children enrolled in MIChild are considered Medicaid beneficiaries and are entitled to all Medicaid covered services.

77.     Michigan Medicaid provides enrollees with access to affordable, integrated, high-quality healthcare at little to no cost.  Coverage includes medical, dental, mental health, substance use disorder treatment, long-term care, family planning services, and family-planning-related services.  Michigan Medicaid and MIChild are authorized and funded in part through a federal-state partnership.  MDHHS administers the programs pursuant to broad federal requirements, as well as the terms of its CMS-approved State Plan.  Most Michigan Medicaid and MIChild enrollees are eligible for coverage paid for by joint federal and state funding. Michigan draws 65.13 percent FMAP for its Medicaid program, 90 percent FMAP for HMP, and 75.59 percent FMAP for MIChild.  Family planning services, however, are eligible for an enhanced FMAP of 90 percent.

78.     Michigan Medicaid and MIChild insure approximately 2.6 million people, including over 1 million children—almost half of Michigan's children.  This amounts to more than 25 percent of Michigan's population.  Of this, over 1.8 million enrollees on average are eligible for reproductive healthcare services.  Those who do not qualify for Michigan Medicaid

or MIChild may still obtain coverage for family planning services through Michigan's Plan First program. Plan First is a limited Medicaid benefit that covers a broad range of family planning services, including annual wellness exams, contraception, sexually transmitted infection testing and treatment, vaccines, pregnancy testing and counseling, and more. Plan First enrollees may obtain covered family planning services from any qualified Medicaid-enrolled provider. On average, Plan First serves over 130,000 Michiganders. Michigan draws the enhanced 90 percent FMAP for services provided to individuals enrolled in Plan First.

79.     In the first six months of fiscal year 2025, Michigan's Medicaid program received 212,074 claims for reproductive healthcare services and paid $17,534,343 in reimbursements. With limited exception—consistent with the federal Hyde Amendment and Michigan's state-law counterpart—Michigan's Medicaid programs do not provide coverage for abortion care.

80.     **Minnesota:** Minnesota's Medicaid program, Medical Assistance, provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost. The Minnesota Department of Human Services (MDHS), through its Health Care Administration, is responsible for administering Medical Assistance. MDHS is responsible for provider enrollment, claims processing, program design, and responding to the public. Today, Medical Assistance provides health coverage for more than 1.2 million Minnesotans, or approximately one in every five state residents.

81.     Medical Assistance in Minnesota is a federal-state partnership, wherein the costs of services, including sexual and reproductive health services, provided through Medical Assistance are shared between the state and federal government. The rate of federal funding for individuals enrolled in Medicaid through Medical Assistance varies between 50 percent and 90 percent. In state fiscal year 2025, total Medical Assistance payments in Minnesota are projected

to exceed $20 billion. Of that amount, 57 percent is paid by the federal government, 42 percent is paid by the state, and 1 percent is paid by other entities including counties and school districts. The estimated cost to the State of Minnesota of fully covering the services offered by Planned Parenthood is approximately $9 million.

82.    **Nevada:**  Nevada Medicaid is funded from a combination of state and federal sources to provide quality health care coverage to low-income families, Supplemental Security Income (SSI) recipients, certain Medicare beneficiaries, and recipients of adoption assistance, foster care and some children aging out of foster care.  Currently, Nevada's FMAP is about 60 percent.

83.    The Division of Nevada Medicaid, Nevada Health Authority administers the Medicaid program and the Nevada Check Up (NCU) program, Nevada's version of CHIP.  NCU provides health care benefits to uninsured children from low-income families who are not eligible for Medicaid but whose family income is at or below 200 percent of the Federal Poverty Level.  Medicaid eligibility is currently determined by the Division of Social Services, formerly the Division of Welfare and Supportive Services.  Approximately, 920,547 people are currently enrolled in Nevada Medicaid.

84.    **New Jersey:**  NJ FamilyCare is a federal- and state-funded health insurance program created to help qualified New Jersey residents of any age access affordable health insurance.  NJ FamilyCare includes, but is not limited to, Medicaid and CHIP, which are funded by both the federal government and the State.  NJ FamilyCare facilitates access to free doctor visits, prescriptions, vision, dental care, mental health, substance use services, and hospitalizations for qualified NJ residents of any age.  Currently more than 1.8 million people, or approximately 19.8 percent of New Jersey's population, are enrolled in NJ FamilyCare.

85.    NJ FamilyCare also administers the Plan First Program, which provides family planning services to individuals who do not have access to such services through insurance.  The Plan First Program covers many family planning needs, including, but not limited to, birth control; family planning counseling; pregnancy tests; condoms; family planning lab tests; and vasectomies for men 21 years of age or older.  Typical enrollees in Plan First are low income but are ineligible for NJ FamilyCare.

86.    **New Mexico:**  New Mexico's Medicaid program, which is administered by the state Health Care Authority (HCA), provides healthcare coverage for approximately 840,000 New Mexicans, over 40 percent of the state population.  In New Mexico, full-scope Medicaid gives beneficiaries access to primary and preventive care, dental health care, inpatient and outpatient hospital treatment, prescription drugs, behavioral health care, home health care, and other vital services.

87.    In addition, New Mexico funds more limited scope healthcare programs that offer more targeted services to specific populations.  For example, New Mexico provides access to family planning services, including contraceptives and reproductive health exams, under the state's Family Planning Program; and helps low-income New Mexicans who qualify for Medicare with out-of-pocket costs, such as premiums, deductibles, and co-insurance.

88.    **New York:**  New York's Medicaid program, which is overseen by New York Department of Health (DOH), provides comprehensive health coverage to more than 7 million New Yorkers (as of December 2023).  Medicaid pays for a wide range of services, depending on the enrollee's age, financial circumstances, family situation, or living arrangements through a large network of health care providers.

89.     The costs of services, including sexual and reproductive health services, provided through New York's Medicaid programs, are shared between the state and federal government, with a FMAP that varies but is 50 percent for most services and up to 90 percent for defined Family Planning services.  Covered services include, sexual and reproductive health care services, including for family planning/contraception, sexually transmitted infection screenings, diagnosis and treatment and primary and preventative health care.  Abortion is 0% federally funded.

90.     Many New Yorkers have a personal need for sexual and reproductive health services.  In 2022, the most recent year where data are available, there were 3,881,117 females of childbearing age (15 to 44 years old) in the state, and 29.6% were under 20 years old. Whether enrolled in Medicaid, or any non-Medicaid health plan, New Yorkers need access to sexual and reproductive health services across our state.

91.     In 2023, the most recent year for which complete data are available, approximately 88,500 individual Medicaid enrollees sought care at Planned Parenthood members across the state, with approximately 156,000 claims for services provided to Medicaid members processed.

92.     New York provides sexual and reproductive health service coverage to Medicaid-eligible individuals and an expanded population through its Family Planning Benefit Program (FPBP), a public health insurance program for New Yorkers who need family planning services only.  FPBP is intended to increase access to confidential family planning services and to enable teens, women, and men of childbearing age to prevent and/or reduce the incidence of unintended pregnancies.  Individuals may be eligible if they meet residential, citizenship, and income requirements, and are not already enrolled in Medicaid.

93.    **North Carolina:**  North Carolina's Medicaid program provides affordable health coverage to more than 3 million North Carolinians.  North Carolina's Medicaid program is jointly funded at the state and federal level and is administered by the North Carolina Department of Health and Human Services (NCDHHS).

94.    **Oregon:**  The Oregon Health Plan (OHP) is Oregon's Medicaid program.  The Oregon Health Authority (OHA) administers OHP.  About 1.4 million Oregonians—over one-third of the population—have Medicaid coverage through OHP.  OHP provides comprehensive medical coverage for eligible individuals.  Eligibility is based on income and residency requirements.  Generally, to be eligible for OHP, adults must be residents of Oregon and have household income at or below 138 percent of the federal poverty level.  Most OHP members access health care through a Coordinated Care Organization.

95.    Among other services, OHP covers comprehensive family planning and reproductive health care services, including annual wellness visits, contraception, pregnancy testing, prenatal care, sexually transmitted infection testing, and voluntary sterilization.  The cost of care for all OHP members is shared between the federal government and Oregon.  Most family planning services billed to Medicaid are eligible for a federal match rate of 90 percent. For other services that do not qualify for that match rate, such as STI testing, the base federal match rate applies, which is under 60 percent.  Oregon provides coverage to OHP members using state-only funds for certain services and populations that are not eligible for coverage under Medicaid.  Abortion care is one example.  Under Oregon law, individuals have a fundamental right to make decisions about their reproductive health care, including whether to keep or terminate a pregnancy.  Or. Rev. Stat. § 435.210.  Federal funds are not used for any abortion care services in Oregon.

96.     In addition to OHP, Oregon operates a second Medicaid program called Oregon ContraceptiveCare (CCare).  CCare is a section 1115 family planning Medicaid demonstration waiver that makes family planning services available to individuals who are not enrolled in OHP.  Individuals with incomes up to 250 percent of the federal poverty level are eligible for coverage under CCare.  CCare is provided through a network of providers, each of which is certified by the Oregon Health Authority's Reproductive Health Program.  Individuals enrolled in CCare may access care from any CCare provider, and they may enroll in CCare at the provider clinic at the time of an appointment.  CCare covers office visits for contraceptive management services, STI screening services in the context of contraceptive visits, and contraceptive devices and supplies.  The federal match rate for CCare services is 90 percent.  In state fiscal year 2025, CCare reimbursed 14,081 family planning visits or encounters provided to 8,779 unique Oregon residents.

97.     **Pennsylvania:**  In Pennsylvania, Medicaid is known as Medical Assistance, or MA.  As of May 2025, MA covers 2,982,975 million Pennsylvanians.  Most MA enrollees are covered though a state agreement with a managed care plan.  The Pennsylvania Department of Human Services manages the Medical Assistance program and is responsible for provider enrollment, claims processing, program design, and responding to the public.  For beneficiaries who access care through a managed care plan, sexual and reproductive health care services, including family planning services, are available both in- and out-of-network as sensitive services.  Planned Parenthood facilities are a significant provider of sexual and reproductive health care services to Pennsylvanians through MA.

98.     Consistent with the federal-state partnership structure of Medicaid, the cost of care under the MA program is shared between Pennsylvania and the federal government.

Pennsylvania's FMAP is 55.09 percent for most services and for most enrollees, while certain services, including family planning services, are eligible for an FMAP of up to 90 percent.

99.     The MA program provides coverage for comprehensive sexual and reproductive health services, covering all health care services required by federal law as well as certain optional benefits that are eligible for federal matching funds.  This scope of coverage is particularly important to Pennsylvania due to the characteristics of its residents who are enrolled in MA.  Of those covered by MA, as of May 2025, 1,733,542 individuals are 20 years of age or younger.  Nearly 750,000 MA enrollees are part of the Affordable Care Act's expansion of Medicaid coverage to adults between the ages of 19 and 64 years of age who have incomes up to 138% of the Federal Poverty Limit.  In short, a significant percentage of MA recipients are in age brackets that need access to full-scope reproductive healthcare.

100.     Pennsylvania also provides coverage through the state plan family planning option afforded by section 2303 of the Patient Protection and Affordable Care Act (Pub. L. No. 111-148), known as the Family Planning Services program, or FPS.  FPS provides coverage of family planning and certain family planning-related services, pharmaceuticals and supplies at no cost to Pennsylvanians of reproductive age who are not otherwise eligible for MA and have income at or below 215 percent of the Federal Poverty Limit and who are not pregnant.  Family planning-related services are medical diagnosis and treatment services provided in a family planning setting as part of, or as follow-up to, a family planning visit and includes services for the prevention and treatment of sexually transmitted diseases.  FPS is designed to assist individuals who have a medical necessity for family planning services, so that they can establish the timing, number, and spacing of their children, and maintain optimal reproductive health.

Planned Parenthood facilities are a significant provider of services to Pennsylvanians as part of the FPS program.

101.    **Rhode Island:**  Nearly one-third of all Rhode Islanders—more than 300,000 people—are covered by Rhode Island's Medicaid program. Medicaid provides critical health insurance coverage for low-income Rhode Island families with children, pregnant women, older adults (age 65 and over) and people with disabilities and special needs who otherwise might not be able to pay for or obtain access to affordable health care.  The Medicaid program in Rhode Island is administered by the Rhode Island Executive Office of Health and Human Services.

102.    **Vermont:**  Vermont's Department of Vermont Health Access (DVHA) is responsible for administering Vermont's Medicaid program.  Vermont Medicaid provides low-income individuals with comprehensive healthcare coverage and access to affordable, integrated, high-quality healthcare at no or low cost.  Vermont Medicaid coverage includes coverage for reproductive health and preventative services.

103.    DVHA is one of the largest healthcare payers in Vermont with Medicaid covering 32 percent of the state's population. In total Vermont Medicaid insures approximately 200,000 people.  Vermont Medicaid is authorized and funded in part through the Medicaid federal-state partnership.  Vermont administers Vermont Medicaid pursuant to broad federal requirements as well as the terms of its CMS-approved State Plan, and its 1115 Global Commitment Demonstration waiver approved by CMS.

104.    In state fiscal year 2024, Vermont's total expenditures for federal Medicaid and CHIP were approximately $ 2.4 billion, accounting for approximately 27 percent of the Vermont state budget.  In state fiscal year 2024, total federal participation accounted for approximately 62 percent of overall Medicaid spending in Vermont.

105.    **Washington:**  Apple Health is the umbrella term in Washington for Medicaid and CHIP.  Apple Health provides free or low-cost health insurance coverage to qualifying individuals and families, including children, pregnant women, adults, seniors, and individuals with disabilities.  The Washington State Health Care Authority (HCA) is responsible for administering Medicaid, which HCA does under its CMS-approved State Plan.  HCA is the largest healthcare purchaser in Washington, as Medicaid and other Apple Health programs cover about 20 percent of the state's population.  In total, Medicaid insures approximately 1.9 million people including approximately 850,000 children.  In 26 of Washington's 39 counties, more than half of all children are covered by Medicaid.  Most Apple Health enrollees are eligible for coverage paid for by joint federal and state funding.  The state uses federal dollars to pay for a significant portion of its Apple Health costs – approximately 67 percent, with the state covering the remaining costs.

106.    **Wisconsin:**  Wisconsin has multiple state Medicaid programs that help nearly 1.3 million Wisconsin residents obtain quality healthcare.[13]  The most common Wisconsin state Medicaid program is BadgerCare Plus.  Generally, federal funds account for roughly 60 percent of the funding for services covered by Wisconsin's Medicaid programs.  Federal funding, however, accounts for roughly 90 percent of Wisconsin's Medicaid coverage for family planning services.  In fiscal year 2023, Wisconsin's state spending on its Medicaid programs amounted to over $3 billion.

107.    The Wisconsin Department of Health Services is responsible for administering Wisconsin's Medicaid programs.  Wisconsin law requires the Department of Health Services to

---

[13] A complete list of Wisconsin's Medicaid programs is available here: https://www.dhs.wisconsin.gov/publications/p02383.pdf (last visited July 15, 2025).

pay allowable charges for family planning services and supplies under its Medicaid program. Wis. Stat. § 49.46(2)(a)4.f.

108.    Separate from its responsibility for administering Wisconsin's Medicaid programs, Wisconsin law also requires the Department of Health Services to maintain a maternal and child health program that promotes the reproductive health of individuals and the growth, development, health and safety of children.  Wis. Stat. § 253.02(2).  Wisconsin law further requires the Department to submit a state plan for maternal and child health services to federal authorities that is designed to secure the maximum amount of federal aid which can be secured for Wisconsin.  Wis. Stat. § 253.03.

## II.    THE DEFUND PROVISION IN THE 2025 BUDGET BILL

109.    On May 22, 2025, the U.S. House of Representatives passed a massive budget bill, H.R. 1, referred to as the "Big Beautiful Bill" and the "budget reconciliation bill" (hereinafter, "budget bill").  On July 1, 2025, the Senate passed a modified version of the budget bill, which the House of Representatives subsequently adopted.  On July 4, 2025, President Trump signed the budget bill.

110.    The budget bill was passed during the reconciliation process, in which Congress can bypass the Senate's typical 60-vote supermajority requirement, allowing the reconciliation bill to be passed with a simple majority in the Senate.  Provisions related only to spending or revenue changes are allowed in a reconciliation bill.

111.    The Defund Provision, which is included in the budget bill, bars federal Medicaid funds from being "used to make payments" to a "prohibited entity" "for items and services furnished during the 1-year period beginning on the date of the enactment of this Act [i.e., July 4, 2025]."  Pub. L. No. 119-21, § 44126, 138 Stat. 482 (2025).  Despite prohibiting payments

starting on July 4, 2025, the Defund Provision applies only to entities that meet the statutory definition of "prohibited entities" "as of the first day of the first quarter beginning after the date of enactment of this Act," i.e., October 1, 2025.

112.    The Defund Provision defines a "prohibited entity" as an entity, "including its affiliates, subsidiaries, successors, and clinics," that meets four criteria (Prohibited Entity(ies)):

   a.    It "provides for abortions," other than abortions in the case of rape or incest or when the woman's life is in danger;

   b.    It "is an organization described in section 501(c)(3) of the Internal Revenue Code . . . and exempt from tax under section 501(a) of such Code";

   c.    It "is an essential community provider described in" 45 C.F.R. § 156.235 "that is primarily engaged in family planning services, reproductive health, and related medical care;" and

   d.    "for which the total amount of Federal and State expenditures under the Medicaid program . . . in fiscal year 2023 made directly, or by a covered organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000."

113.    In sum, the Defund Provision prohibits the use of any federal Medicaid funds to reimburse for care and services provided by Prohibited Entities—regardless of whether the particular care provided, such as cancer and STI screening, would otherwise be covered by Medicaid.

### III.    THE DEFUND PROVISION IMPERMISSIBLY TARGETS PLANNED PARENTHOOD HEALTH CENTERS

114.    The Defund Provision specifically targets PPFA and the Planned Parenthood health centers for their political advocacy in support of abortion rights.  By virtue of its four criteria, the Defund Provision applies to the overwhelming majority of Planned Parenthood health centers but excludes from its scope almost all other abortion providers.  In fact, according to the federal government, the Defund Provision purportedly may apply to all Planned Parenthood member health centers in the country, regardless of whether they individually received more than $800,000 from Medicaid in fiscal year 2023 or provide abortion care, simply because they are associated with PPFA.[14]

115.    The facts show that the Defund Provision was aimed at PPFA and the Planned Parenthood health centers, due to their advocacy for abortion rights and access:

      a.    In 2015, then candidate-Trump stated that he would support "get[ting] rid of Planned Parenthood money."[15]  That same year, he stated that he was "not supporting Planned Parenthood" and would be "totally opposed to funding" Planned Parenthood as long as they provided abortion care.[16]  A few months later, he stated that he "would defund [Planned parenthood] as long as they're doing abortion."[17]

      b.    In 2016, Trump stated that he would "defund" Planned Parenthood "because [he's] pro-life."[18]  That same year, he stated that he was "committed to . . . [d]efunding Planned Parenthood as long as they continue to perform abortions."[19]

      c.    In 2017, President Trump again called for the "Defunding" of Planned Parenthood.[20]  Heeding that call, Congress tried (but failed) to pass

legislation nearly identical to the Defund Provision on multiple occasions.
*See* American Health Care Act of 2017, H.R. 1628, 115th Cong. (2017);
S. Amend. 267, 1115th Cong. (2017).  The proposed provisions in those
bills did not explicitly name Planned Parenthood, but during
Congressional debates several Congressional members made clear that
PPFA and its health centers were the target, with Representative Matt
Gaetz "implor[ing] [his] conservative colleagues to vote for his bill"
because it would "defund[] Planned Parenthood,"[21] and Representative
Kevin Brady stating, "I am proud to defund Planned Parenthood once and
for all."[22]

---

[14] *See* Defs.' Opp. to Pls.' Mot. for a Prelim. Inj. at 27-30, *Planned Parenthood Fed'n of Am. v. Kennedy*, No. 1:25-cv-11913-IT (D. Mass. July 14, 2025), ECF No. 53.

[15] *Hugh Hewitt Interview with Donald Trump*, YouTube (Aug. 3, 2015), https://www.youtube.com/watch?v=Nhpd1WTlgHE at 00:05:56-00:06:30; *Interview: Hugh Hewitt Interviews Donald Trump on His Syndicated Radio Show – Aug. 3, 2015*, Roll Call (Aug. 3, 2015), https://rollcall.com/factbase/trump/transcript/donald-trump-interview-hugh-hewitt-august-3-2015/.

[16] *The O'Reilly Factor*, Internet Archive (Sept. 8, 2015), 8:07 PM – 8:08 PM) https://archive.org/details/FOXNEWSW_20150909_030000_The_OReilly_Factor/start/540/end/600

[17] *Donald Trump Interviewed by Chuck Todd on NBC's Meet the Press* (NBC television broadcast on Feb. 21, 2016, 00:02:51-00:03:52) *available at* https://rollcall.com/factbase/trump/transcript/donald-trump-interview-nbc-meet-the-press-february-21-2016/#38 (hereinafter Trump Meet the Press Interview).

[18] Trump Meet the Press Interview.

[19] Natasha Korecki, *A Timeline of Trump's Many, Many Positions on Abortion*, NBC News (Apr. 8, 2024), https://www.nbcnews.com/politics/donald-trump/trumps-many-abortion-positions-timeline-rcna146601.

[20] Letter from Donald J. Trump to Pro-Life Leader (Sept. 2016), sbaprolife.org, https://sbaprolife.org/wp-content/uploads/2016/09/Trump-Letter-on-ProLife-Coalition.pdf

[21] 163 Cong. Rec. H2373, H2409 (daily ed. Mar. 24, 2017) (statement of Rep. Matt Gaetz).

[22] *Id*. at H2433 (statement of Reg. Kevin Brady).

d.       In 2018, President Trump's HHS Secretary revoked guidance that had prohibited states from excluding providers from eligibility for Medicaid reimbursement because they provided abortions.

e.       Project 2025, a "governing agenda" for the Trump Administration, encouraged Congress to pass the "Protecting Life and Taxpayers Act," which "would accomplish the goal of defunding abortion providers such as Planned Parenthood."[23]

f.       With President Trump heading back into office, House Speaker Johnson confirmed in 2024 that "defunding" Planned Parenthood continued to be a priority.[24]  He stated that he was planning to "axe" funding for Planned Parenthood, and then stated that the "one big beautiful bill . . . is going to redirect funds away from Big Abortion."[25]

g.       In 2025, Representative Andy Harris stated that "[w]e shouldn't be paying for institutions whose primary purpose is to do abortions,"[26] even after stating the week before that defunding Planned Parenthood "doesn't save

---

[23] The Heritage Found., *Mandate for Leadership: The Conservative Promise* 472 (Paul Dans & Steven Groves eds., 2023), https://static.heritage.org/project2025/2025_MandateForLeadership_FULL.pdf.

[24] Speaker Johnson Interview Dec. 2024.

[25] Susan B. Anthony Pro-Life America, *Speaker Mike Johnson at the SBA Pro-Life America Gala 2025*, YouTube (Apr. 29, 2025), https://youtu.be/vZFDkKzIfq4?si=TZrNGsZRJ9Oigsct&t=794.

[26] Alice Ollstein, *Knives Are Out for Planned Parenthood. In All 3 Branches of Government*, POLITICO (Feb. 13, 2025), https://www.politico.com/newsletters/politico-nightly/2025/02/13/knives-are-out-for-planned-parenthood-in-all-3-branches-of-government-00204234.

money."[27]  And Representative Christopher Smith likewise advocated for the "Defunding of Planned Parenthood."[28]

116.    As these statements demonstrate, the passage of the Defund Provision was the culmination of a years-long campaign to eliminate funding for Planned Parenthood health centers because of the centers' and PPFA's unique role with regard to abortion rights and access across the country.

117.    What this repeated messaging ignores is that Planned Parenthood health centers do <u>not</u> have as their "primary purpose" to "do abortions":  in 2023, Planned Parenthood health centers provided 9,450,743 services, less than 5 percent of which were abortion services (402,230 abortion services).[29]

118.    The perception that Planned Parenthood health centers "primarily" exist to provide abortion care stems from PPFA's and the Planned Parenthood health centers' public support for and advocacy to advance the right to obtain abortion care.  Through the Defund Provision, Congress and the President seek to punish that support and advocacy by starving Planned Parenthood health centers of funding for the vast majority of the healthcare services that they provide, and that Medicaid typically covers, such as STI testing and treatment, contraceptive services, cancer screenings, and other reproductive, non-abortion healthcare.

119.    In fact, the specific and narrow criteria to qualify as a "prohibited entity" under the Defund Provision reveals that the purpose is to withhold essential federal funds from just Planned Parenthood health clinics, with only a few additional clinics swept in as cover to avoid

---

[27] Oriana González, *The Mission to Defund Planned Parenthood Likely Won't Make It Into Reconciliation*, NOTUS (Feb. 7, 2025), https://www.notus.org/policy/republicans-reconciliation-planned-parenthood.

[28] 171 Cong. Rec. 255 (2025) (statement of Rep. Christopher Smith).

[29] Planned Parenthood Fed'n of America, Inc., *A Force for Hope: Annual Report 2023-2024* 23 (2024) (hereinafter 2023-2024 PPFA Annual Report).

survive the Senate's reconciliation procedure.  Only two entities that are not Planned Parenthood health centers have been publicly announced as also purportedly falling within the "prohibited entities" definition if they continue to provide abortion care on October 1, 2025: Maine Family Planning in Maine, and Health Imperatives in Massachusetts.  As discussed herein, however, it is unclear whether any final determination by CMS is definitive, or whether the final determination falls to the states.

120.    The Defund Provision retaliates against the Planned Parenthood health centers for their support for and advocacy to advance reproductive rights, including abortion care. Accordingly, the Defund Provision violates the First Amendment's protection for freedom of speech.  The Defund Provision also violates the Fourteenth Amendment's equal protection guarantees, which prohibit government retaliation for the exercise of constitutional rights.

121.    The Defund Provision also punishes the Planned Parenthood health centers' associations with each other and with PPFA, in violation of the First Amendment's protections for associational rights.  Using language that PPFA uses to describe its relationship with its member health centers, the Defund Provision sweeps any "affiliate" of a Prohibited Entity into the definition of "prohibited entity," even if that affiliated entity does not independently qualify under the Defund Provision.  Given the narrow scope of the Defund Provision, and the evidence showing that PPFA and its members are the clear target of the legislation, the Defund Provision effectively punishes PPFA and its members for associating with each other.  Given that their association stems from their outspoken support and advocacy for abortion rights, that affiliation is expressive.  As such, the Defund Provision infringes on the free association rights guaranteed by the First Amendment.

122.    Because the Defund Provision punishes the Planned Parenthood health centers with a severe consequence, namely full-scale ineligibility for federal Medicaid reimbursement, without the protections of a trial and concomitant due process, the Defund Provision also violates Article I's prohibition on bills of attainder.

123.    As the history of the Defund Provision reveals, the incidental inclusion of other health centers in the "prohibited entity" definition is the result only of Congress's attempt to overcome its own procedural hurdles to target the Planned Parenthood health centers.  For example, in 2017, Congress almost passed a nearly identical bill, H.R. 1628, except that the prohibition would apply only to a network of health centers who collectively received $350 million from the Medicaid program—i.e., the amount that Planned Parenthood health centers had collectively received.  After the Senate Parliamentarian ruled that the provision improperly targeted a single entity and could not be passed through the reconciliation process, the Senate tried to pass a version with a $1 million condition, thus sweeping in an additional entity and permitting Congress to go after its true target: the Planned Parenthood health centers.  With the Defund Provision, the Senate lowered the amount of received Medicaid funding to $800,000 to further ensure that the Senate Parliamentarian proved no obstacle.  Throughout the process, however, Congress has been clear that it was unconstitutionally targeting PPFA and the Planned Parenthood health centers.

124.    Because of the federal-state nature of Medicaid, this provision ultimately requires the Plaintiff States to carry out this unconstitutional agenda.  To ensure federal dollars are not spent through a "State Plan under title XIX of the Social Security Act or a waiver of such plan," whether through "a contract or other arrangement between a State and covered organization," the Plaintiff States will be required either to exclude the Planned Parenthood health centers from

participation in a State Plan and/or terminate or alter existing contracts and agreements with

Planned Parenthood health centers, or lose federal reimbursements by funding Planned

Parenthood health centers exclusively out of state funds.

125.    This provision presents the Plaintiff States with an untenable choice: exclude the

Planned Parenthood health centers from any state Medicaid program and lose critical healthcare

infrastructure, or, for those States that can, to choose to fully or partially fund services obtained

at Planned Parenthood health centers using only state dollars—foregoing hundreds millions of

dollars in reimbursement that otherwise would, and should, be provided by the federal

government under the Medicaid Act.

126.    The Defund Provision thus conditions the Plaintiff States' receipt of federal

Medicaid funds for the services that the Planned Parenthood health centers provide on the

Plaintiff States' willingness to force their Medicaid program enrollees to forego services from

Planned Parenthood health centers and attempt to obtain covered services from alternative

healthcare providers, which may or may not be available in their area.  As such, to obtain those

federal Medicaid funds, the Defund Provision requires the Plaintiff States to effectuate

Congress's and the President's unconstitutional retaliation against the Planned Parenthood health

centers, resulting in harm to the Plaintiff States through either the diversion of millions of state

dollars from other state programs or through long-term increases in state Medicaid expenses

from the delays in care that will result from the closure of Planned Parenthood health centers.

127.    Because the Defund Provision targets Planned Parenthood health centers, the

Plaintiff States have some sense of the scope of the providers who qualify as Prohibited Entities.

But, on its face, the legislation tasks Plaintiff States with excluding Prohibited Entities without

providing guidance as to how Plaintiff States are to determine which multi-state entities meet the

definition on October 1, 2025.  Plaintiff States do not have records of Medicaid payments made to multi-state healthcare entities by other states' Medicaid programs or whether those entities provide abortions within their scope of care.  Absent such information, Plaintiff States may not be able to ascertain whether a multi-state healthcare entity that fails to meet the definition of "prohibited entity" because it received less than $800,000 from the State's Medicaid program and/or does not provide abortion care nonetheless must be excluded because it is an "affiliate" of an entity that received greater than $800,000 in total from all States in which it operates and/or provides abortion care.

## IV.    THE DEFUND PROVISION NEGATIVELY IMPACTS THE PLAINTIFF STATES

128.    The Defund Provision unquestionably causes injury to the Plaintiff States because it prevents the Plaintiff States from making payments to Planned Parenthood health centers through their State Medicaid programs using federal Medicaid dollars.  Each of the Plaintiff States was permitted to make such payments to Planned Parenthood health centers, and did make such payments, before the Defund Provision was enacted.  By targeting Planned Parenthood health centers (and incidentally purportedly sweeping in a couple of other abortion providers to survive the Senate reconciliation procedure), the Defund Provision has already impacted many Plaintiff States by imposing administrative burdens to facilitate Congress's unconstitutional targeting of the Planned Parenthood health centers.  The Defund Provision will also impose additional public healthcare costs on the Plaintiff States.  By targeting Planned Parenthood health centers, which are the largest providers of contraception; screening for cancers, such as breast and cervical cancer; screening and treatment for sexually transmitted infections; as well as pregnancy care, the Defund Provision effectively strips that care from Medicaid enrollees, many of whom will likely go without care—including cost-saving preventative care—until they have

no choice.  The result will be, among other things, delayed diagnoses of cancer and STIs and increased unintended pregnancies, which will result not only in widespread and devastating effects on the health of vulnerable residents of the Plaintiff States, but also in increased costs to the Plaintiff States' Medicaid programs, which fund care for those individuals.

A.    **The Defund Provision Puts States' Medicaid Funding at Risk**

129.    States are the entities tasked with enforcing the Defund Provision by screening Medicaid reimbursement claims submitted by Prohibited Entities and directing Medicaid program enrollees to healthcare providers other than providers who qualify as "prohibited entities," as defined in the provision.

130.    The Defund Provision, however, does not provide adequate guidance, definition, or notice to Plaintiff States as to which entities satisfy the conditions of the Defund Provision such that an entity may be permitted to continue to receive restricted Medicaid funding.  The Defund Provision is also ambiguous about the timing for enforcement of its prohibitions on federal Medicaid funding for "prohibited entities."  The Defund Provision requires that Prohibited Entities stop receiving federal Medicaid funding as of the date of enactment, which is July 4, 2025.  But the definition of Prohibited Entity turns on whether an entity satisfies all four criteria as of "the first day of the first quarter beginning after the date of enactment of th[e] Act," which is October 1, 2025.

131.    The Defund Provision nevertheless tasks Plaintiff States with excluding Prohibited Entities from their Medicaid programs.  But it is silent as to whether Plaintiff States are to make the initial determination of who to exclude, or whether that decision must be made by CMS.  Plaintiff States do not have access to claims data for other states, which is necessary to determine whether healthcare entities received more than $800,00 in Medicaid payments in

fiscal year 2023, or to information concerning the types of services provided by a healthcare organization in other states to determine whether the organization is "primarily engaged in family planning services, reproductive health, and related medical care."  And if the Plaintiff States are not correct in their determinations, they risk either losing out on federal funding for critical services for their residents, or they risk cutting off funding for entities that should receive federal funding and thereby endangering healthcare access for their residents.

### B.    The Defund Provision Administratively Burdens Plaintiff States

132.    The Defund Provision imposes administrative burdens on many Plaintiff States, which must educate their Medicaid providers about the Defund Provision and adjust their claims processing infrastructure to segregate out any claims from Planned Parenthood health centers and the few additional impacted providers so that those claims are not submitted for federal reimbursement.  Those impacts have already imposed harm on many Plaintiff States and will continue to do so while the Defund Provision remains in force.  For instance:

133.    In California, DHCS, which is tasked with ensuring Medi-Cal complies with the requirements of the Defund Provision, has had to restructure its policies and systems to segregate any claims submitted by an entity affected by the Defund Provision to ensure that DHCS does not fund those claims using federally provided dollars.  That restructuring has required staff time and resources, which constitute harm.  Nor is the restructuring a self-inflicted harm:  if they failed to incorporate the necessary infrastructure changes, DHCS and the Medi-Cal program would have to return any federal funds used to pay claims submitted by entities defined under the Defund Provision, thereby placing the costs directly onto California and reducing federally provided matching Medicaid funds.

134.    DHCS has also had to issue guidance to California-based Medicaid providers, and drafting, reviewing, and issuing these sets of guidance-imposed harms on California through the expense of staff time and resources.  Due to the ambiguity regarding the entities that qualify as Prohibited Entities and the timing of when the Defund Provision actually takes effect, DHCS will likely face inquiries from potentially affected entities, which will also take staff time and resources.  In short, California has already suffered and will continue to suffer economic harm through the expense of staff time and resources to enforce the Defund Provision.

135.    In another example, the Colorado Department of Health Care Policy and Financing, which administers Colorado's Medicaid program, will need to expend significant staff and contractor time to ensure compliance with the requirements of the Defund Provision. Colorado's compliance with the Defund Provision will require, at a minimum: (1) developing and deploying a system to ensure the state does not make any fee-for-service physical health payments to Planned Parenthood; (2) communicating to 5,000 Medicaid members who use Planned Parenthood as a primary care medical provider that Planned Parenthood is no longer contracted with Colorado's manage care entities as a primary care medical provider; (3) disaffiliating Planned Parenthood from managed care networks; (4) determining which Colorado grants Planned Parenthood may receive as an integrated behavioral health provider; (5) evaluating alternative payment methodologies to determine whether any bundled payments or other alternative payments can reimburse Planned Parenthood for medically necessary services; (6) evaluating the modification of pharmacy payment systems to exclude Planned Parenthood; (7) identifying alternative sources of care and assisting with referrals for Health First Colorado and/or CHP+ members previously seen at Planned Parenthood for healthcare visits; and (7)

evaluating potential conflicts with Colorado statues and regulations to ensure alignment with the Defund Provision.

136.    Given the significant work required to comply with the Defund Provision, Colorado is still determining how to provide payment guidance to our managed care entities, providers and, most importantly, Health First Colorado and/or CHP+ members.

137.    For Connecticut, regardless of whether it is able to allocate state funds to cover the lost federal reimbursements for Planned Parenthood health centers or is forced to require participants in all state administered medical assistance programs to forego care at Planned Parenthood health centers, Connecticut will incur administrative costs to implement the Defunding Provision. In either scenario, DSS will need to make alterations to its Medicaid program, potentially excluding Planned Parenthood health centers from its Medicaid program through a State Plan amendment, altering their current new provider agreement, or both.

138.    If Connecticut is able to allocate state funds to cover the lost federal reimbursement for Planned Parenthood health centers, DSS will need to make systematic and programmatic changes to segregate claims from the health centers to ensure that no claims are submitted to the federal government for reimbursement.  DSS will need to expend time and funds to modify computer systems, update reporting, provide guidance to providers, and train staff.  If DSS does not take these steps, and claims from Planned Parenthood health centers are submitted to CMS for reimbursement, then the State could be required to return those funds to the CMS.

139.    If Connecticut is unable to allocate state funds to cover the lost federal match and is forced to exclude Planned Parenthood health centers from its medical assistance programs, then DSS will need to take steps to ensure that any claims from Planned Parenthood health

centers under federally funded Medicaid programs are rejected.  DSS will also need to expend time and resources on guidance to inform Medicaid participants that they can no longer receive care at Planned Parenthood health centers under HUSKY and to help participants identify and access alternate providers for care.

140.    Hawaiʻi's Med-QUEST Division, in turn, has already been administratively burdened by the Defund Provision.  Med-QUEST has had to ensure that all managed care organizations hold any claims from Planned Parenthood health centers until Med-QUEST has determined how to comply with the Defund Provision.  Besides the managed care plans, Med-QUEST has had to work with their own fiscal agent to identify all Planned Parenthood health centers and hold all their claims until determining how to comply.  The fiscal agent must now re-process claims manually.

141.    It is also not clear how the Defund Provision will affect other essential community health care providers, in addition to Planned Parenthood.  This uncertainty has led to difficulty for the Med-QUEST Division in determining how to comply with the Defund Provision.

142.    In response to threats made to reproductive rights coming from Defendants and other federal officials, Massachusetts has been forced to identify state funds to support uninterrupted access to sexual and reproductive health care and other essential services at Planned Parenthood in Massachusetts.  Specifically, in July 2025, Governor Maura Healey announced that $2,000,000 appropriated by the Legislature for this purpose would be made available to the Planned Parenthood League of Massachusetts to help defray the cost of critical non-abortion services—such as cancer screenings, breast exams, contraception and STI testing and treatment critical—that the federal government will no longer cover.

143.    Additionally, Planned Parenthood is not the only organization in Massachusetts that delivers abortion services and non-abortion services; a comprehensive, multi-service organization called Health Imperatives does as well.  And though MassHealth initially determined that Health Imperatives does not meet the definition of "prohibited entity" within the Defund Provision, HHS has assumed the opposite position in separate litigation involving Planned Parenthood.  Yet Defendants have not published guidance to assist states in making that determination or said whether it is the state's determination to make.  This added uncertainty harms Massachusetts because 1) absent clear guidance on how to implement the law, MassHealth may be at risk of applying the law differently than HHS and 2) even if the determination is Massachusetts's to make, the state will have to take on the new administrative burden of developing an approach for gathering relevant data and information about providers to support such determination

144.    For Minnesota, whether or not the state is able to allocate state funds to cover the lost federal reimbursements for Planned Parenthood health centers, Minnesota will suffer administrative burdens if the Defund Provision is allowed to continue.  The definition of Prohibited Entities will be difficult to apply because it is vaguely defined, and Minnesota will be required to invest staff time and resources in order to create a process to filter out such providers. For example, the Defund Provision includes that the Prohibited Entity be an essential community provider that "primarily engages in family planning services, reproductive health, and related medical care."  MDHS has never had to determine what type of services its participating providers "primarily engage in," nor does the statute set out criteria for making that determination.  If MDHS fails to comply with the Defund Provision, though, MDHS could face significant penalties from CMS for noncompliance, such as a claw back of funds issued to a

Prohibited Entity or stalled federal funding.  In sum, MDHS will have to expend time and resources to implement the Defund Provision or risk significant penalties from CMS.

145.    New Jersey's Department of Human Services ("NJDHS"), which administers New Jersey's Medicaid program, must ensure that NJ FamilyCare complies with the Defund Provision.  This will impose a significant administrative burden on the state.

146.    The definition of Prohibited Entities is unworkable and vague.  New Jersey does not have a system in place that can identify and exclude only certain providers from Medicaid participation based on the criteria specified in the Defund Policy.  NJDHS will need to exclude Planned Parenthood health centers from its Medicaid program by building and applying individual provider-based blocks to billing in its FFS and managed care systems.  This will impose an additional administrative burden on the state and NJDHS.

147.    New Jersey has not budgeted for these contingencies.  Nevertheless, if NJDHS does not promptly take steps to comply with the Defund Provision, the state could be subject to federal audits, claw back demands, or set offs of future payments

148.    New York will similarly suffer administrative burdens if the Defund Provision remains in effect because the definition of Prohibited Entities is unworkable, and no infrastructure currently exists to filter out such providers.  New York's DOH, which administers the State Medicaid program, currently has no system in place to identify and exclude only certain providers from Medicaid participation based on the criteria specified in the Defund Policy.  Implementing the Defund Policy would cost money and time as DOH would be required to build a new enforcement system from scratch to identify and remove providers that violate the policy.  The Medicaid Management Information System (MMIS), the system that manages

claims, payments, and other related data for the state's Medicaid program, is approximately 30 years old and is extremely inflexible. Minor changes to this system often take over 12 months.

149.    DOH will struggle to identify providers who qualify as Prohibited Entities because the term Prohibited Entity is vaguely defined.  Specifically, the statute includes among its criteria that the Prohibited Entity be an essential community provider that "primarily engages in family planning services, reproductive health, and related medical care."  As with Minnesota's MDHS, New York's DOH likewise has never had to determine what type of services its participating providers "primarily engage in," nor does the statute set out criteria for making that determination.

150.    For example, the Defund Provision does not specify whether "primarily engage in" is assessed by self-designation of the entity in question, which DOH does not currently ask for, or whether the State is to make that determination itself.  And if it is the latter, the Defund Provision does not describe how the State should go about doing so; the Defund Provision does not specify what universe the "primarily engage in" criterion is measured against—whether it is limited to the universe of Medicaid billing or whether it includes services billed to private insurance or private pay, which data the New York does not collect.  And assuming it can even be determined under the Defund Provision's vague terms which entities are considered prohibited, New York will also have to provide guidance to participating providers about whether they are or are not considered prohibited.

151.    DOH must comply in order to ensure that federal dollars are spent consistently with federal law, with significant penalties for noncompliance.  CMS is authorized to defer, disallow, or claw back funds that were issued to a Prohibited Entity.  A failure to spend federal Medicaid dollars in accordance with federal strictures is grounds for negative audits and

penalties from federal authorities.  Worse yet, CMS could invalidate the program, pull back awards, or stall funding if compliance could not be validated.

152.    Because participating providers have 90 days to submit bills to Medicaid, DOH will have to provide guidance to existing participating providers who may fall under the category of Prohibited Entities as to how the restrictions impact billing for services already provided and currently being provided, and communicate with Prohibited Entity providers to direct them not to bill for any services because the provision has ostensibly gone into effect.  N.Y. Comp. Codes R. & Regs. tit. 18, § 540.6.

153.    In sum, New York State DOH will have to expend time and resources creating a new system to determine which entities are considered prohibited, collect data it does not currently collect, and create resources, materials, and communications that do not currently exist, in order to comply with the Defund Provision, at risk of significant penalties from CMS.

154.    North Carolina's NCDHHS, which administers North Carolina's Medicaid program, in turn will need to retool its Medicaid claims processes in order to ensure that Prohibited Entities do not submit claims or receive reimbursements. NCDHHS will need to expend considerable time and resources implementing these changes, retraining staff, and redirecting NC Medicaid participants to alternative providers where available.

155.    In Oregon, OHA, which is tasked with ensuring the state Medicaid programs comply with federal law, has been forced to devote significant staff time and resources to adjusting its Medicaid payment review and processing systems to account for the Defund Provision.  OHA's Reproductive Health Program, which administers CCare, and OHA's Medicaid program, which administers OHP, have had to coordinate across programs to develop unique guidance for Coordinated Care Organizations and Planned Parenthood health centers to

instruct them about how to process claims in compliance with OHP and CCare as well as the Defund Provision.  Further, OHA has been required to develop entirely new processes for all claims from all Planned Parenthood health centers to be held and then reviewed manually to determine whether the services provided are eligible for federal Medicaid funds.  Before the Defund Provision, both OHP and CCare claims were processed in a streamlined, efficient, and automated way.  The efforts to comply with the Defund Provision have cost OHA extensive staff time and resources.  Oregon has suffered and will continue to suffer harm by spending staff time and resources to implement the Defund Provision.

156.    Like many states, Vermont is facing federal funding cuts impacting a broad range of essential state programs and services.  State budgets are not infinite, and Vermont will ultimately be required to make extremely difficult decisions about which impacted programs and services it will be able to step in and support using those resources.  Regardless of whether Vermont is able to allocate state funds to cover the lost federal reimbursements for Planned Parenthood health centers or is forced to require participants in all state-administered medical assistance programs to forego care at those health centers, Vermont will incur administrative costs to implement the Defunding Provision.

157.    In Washington, in federal fiscal year 2023, Planned Parenthood health centers received approximately $23.8 million in Apple Health funding, which includes approximately $11.8 million in federal funding.  Planned Parenthood is an important Apple Health provider, offering services such as preventative care and cancer screenings.  Given Planned Parenthood's important role in the Apple Health program, Washington Governor Bob Ferguson, on July 9, 2025, agreed to make state funding available to cover any lost federal funds if litigation challenging the Defund Provision is unsuccessful.  This will ensure that Washingtonians

continue to have access to medically necessary care.  However, this funding will come at the expense of other essential state services.

158.    Washington's HCA, which is tasked with ensuring that the State complies with the Defund Provision, still has needed to expend significant time and resources to comply with the Defund Provision and ensure that HCA does not use any federal funds to pay for any claims submitted by entities affected by it.  For example, HCA has restructured its policies and systems to segregate any affected claims.

159.    In addition, HCA and its contracted actuarial consultants will need to expend significant time and resources to update HCA's payment rates to managed care organizations (MCOs) for calendar year 2025.  HCA has contracts with five MCOs who ensure the provision of services to Apple Health clients; HCA will need to amend those contracts.  In particular, HCA will need to remove the cost experience for claims from affected entities from the payment rates.  HCA also will need to amend the rate certification, which is required by federal rules.

160.    In Wisconsin, the Defund Provision will administratively burden the Wisconsin Department of Health Services.  The Department will have to reconfigure its system to ensure that federal funds are not paid to those providers in Wisconsin who would satisfy the criteria for a "prohibited entity."  Currently, the Wisconsin Department of Health Services does not maintain information on whether an essential community provider, as described in 45 C.F.R § 156.235, is primarily engaged in family planning services, reproductive health, and related medical care, or whether an entity provides for abortions other than those enumerated in the Defund Provision.  The Wisconsin Department of Health Services will need to invest system and staff resources into verifying and maintaining this information, and it will need to expend time and resources to modify impacted systems to accommodate these changes.

C. **The Defund Provision Imposes Economic Harm and Burdens Public Health**

161.    In addition to administrative burdens, the Defund Provision will force Plaintiff States either to use states funds to keep Planned Parenthood health centers operating and forgo matching federal funds, or exclude the Planned Parenthood health centers from any state Medicaid program and lose critical healthcare infrastructure.  Plaintiff States are also facing an unprecedented number of federal funding cuts impacting a broad range of essential state programs and services.  State budgets are not infinite, and many Plaintiff States will ultimately be required to make extremely difficult decisions on which programs and services they will be able to step in and support using those finite resources.

162.    For Plaintiff States that cannot fully fund Medicaid services at Planned Parenthood health centers with their state funds, the Defund Provision will result in those health centers predictably having to close or significantly limit their services.  Those restrictions in turn will have widespread negative impacts on the public health of vulnerable residents of the Plaintiff States, resulting in increased public health expenses to the Plaintiff States that cannot afford to fully fund the Medicaid services at the clinics.  And it will frustrate the interests of the Plaintiff States who have, within their sovereign authority to regulate public health and welfare, chosen to promote widespread access to the full range of reproductive health care services, including cancer screening, STI screening and treatment, and access to family planning services.

1. **Planned Parenthood Health Centers Provide Highly Specialized Healthcare and Have Particular Expertise that Cannot Be Replicated with Existing Healthcare Centers**

163.    PPFA estimates that the Defund Provision risks the closure of nearly 200 Planned Parenthood health centers throughout 24 states,[30] with the few additional health centers

---

[30] *BREAKING: New CBO Report Shows "Defunding" Planned Parenthood Would Cost*

(continued…)

incidentally swept into the provision also potentially shutting down.  PPFA further estimates that "more than 1.1 million patients could lose access to care."[31]

164.    In California, losing access to Medicaid reimbursements will mean California Planned Parenthood health centers will lose nearly two-thirds of their funding.[32]  California's Planned Parenthood health centers are critical to the Medi-Cal program's sexual and reproductive health care provider network:  they annually provide approximately $425 million of services to patients covered by Medi-Cal and its related programs, with $328 million (i.e., 77 percent) paid by federal funds.[33]  In 2024, Planned Parenthood health centers provided care to 800,000 Medi-Cal members, resulting in 2.2 million submitted claims for the healthcare services they provided.  California's Planned Parenthood health centers serve residents throughout the state, in rural, suburban, and urban areas, often as one of the few—if not only—location to provide healthcare in their areas.  One California Planned Parenthood member estimates that 80 percent of its current patients will no longer be able to access healthcare.[34]  Already, Planned Parenthood Mar Monte, a California member, has announced the closure of five of its clinics.[35]

165.    In Connecticut, which provides coverage for comprehensive family planning services through HUSKY, Planned Parenthood health centers play an essential role in providing those services.  Planned Parenthood health centers provided 72 percent of all contraceptive

---

*Taxpayers $52 Million Over 10 Years*, Planned Parenthood Action Fund (June 29, 2025), https://www.plannedparenthoodaction.org/pressroom/breaking-new-cbo-report-shows-defunding-planned-parenthood-would-cost-taxpayers-52-million-over-10-years.
      [31] *Id.*
      [32] Decl. of Jenna Tosh in Supp. of Pls.' Emergency Mot. for Temp. Restraining Order & Prelim. Inj., *Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, No. 1:25-cv-11913 (D. Mass. July 7, 2025) (hereinafter Tosh Decl.), ¶46.
      [33] *Id.* ¶38.
      [34] *Id.* ¶46.
      [35] NeEddra James, *Medicaid Cuts Hit Mar Monte Planned Parenthood*, KALW (July 24, 2025), https://www.kalw.org/bay-area-news/2025-07-24/medicaid-cuts-hit-mar-monte-planned-parenthood.

services at publicly funded clinics in the state. Overall, Planned Parenthood health centers provide care to over 26,000 patients through Husky each year in Connecticut.

166.    For Fiscal Year 2024, the state paid Planned Parenthood health centers $11.9 million for services provided to HUSKY participants. Of that total, $3.6 million was for fully state-funded services and $29,000 was for fully state-funded program participants. For the remaining $8.3 million, the state paid $2.2 million, and the federal government paid $6.1 million. The average federal reimbursement rate for CHIP participants receiving care at Planned Parenthood health centers in Connecticut was 65 percent and for all other participants in federally funded Medicaid programs was 74 percent.

167.    Maine's family planning care network consists of 18 Maine Family Planning (MFP) health centers, 4 Planned Parenthood Northern New England (PPNNE) health centers, 32 Federally Qualified Health Centers, and 8 School-based health centers. MFP is a Maine non-profit that offers a range of family planning, reproductive health, and primary care services.

168.    MFP directly operates 18 health care centers in Augusta, Bangor, Belfast, Calais, Damariscotta, Dexter, Ellsworth, Farmington, Fort Kent, Houlton, Lewiston, Machias, Norway, Presque Isle, Thomaston, Rumford, Skowhegan, and Waterville. MFP also has a mobile health clinic. MFP provides funding through subcontracts that support 44 additional sites. Two MFP clinics are listed as an "essential community provider" in the family planning category on the HHS Rolling Draft Essential Community Provider (ECP) List for the Federally-facilitated Marketplace (the "ECP List"). By definition, essential community providers serve "predominantly low-income, medically underserved individuals." 45 C.F.R. § 156.235(c). In calendar year 2024, MFP clinics served over 8,000 patients, including 7,215 family planning patients. Family planning patients had over 10,000 visits and primary care patients had over

2,000 visits.  In calendar year 2024, 49.8% of patients who received services other than abortion care at MFP were enrolled in MaineCare.  Without MaineCare, many of these patients could not afford to see a health care provider and might postpone or forgo care altogether.

169.    MFP provides a range of critical family planning and reproductive health care services, including contraceptive services; pregnancy testing and options counseling; family planning (or preconception) counseling; referrals for adoption; prenatal consultation; gynecological biopsies; annual wellness visits; gynecological exams; breast exams; pap tests; colposcopies; screening for cervical and breast cancer; screening, diagnosis, and treatment of STIs, vaginal infections, and urinary tract infections; intrauterine insemination; vasectomy; consultations and prescriptions for HIV pre-exposure prophylaxis; miscarriage care; gender-affirming health care; and family support services for pregnant women, new mothers, and their families.

170.    In the 2024 fiscal year, 27 percent of the 7,100 patients who received care at PPNNE health centers in Maine were on MaineCare.  PPNNE's health centers in Maine provided care for these patients for more than 2,800 visits.  PPNNE's health centers offer a broad range of essential health care services to Maine patients, including well-patient checkups with some primary care services; annual gynecological exams; screening for cervical, colorectal and breast cancer; family planning counseling; erectile dysfunction treatment; birth control and contraception services; preconception consultation; screening, diagnosis and treatment of urinary tract, vaginal, and sexually transmitted infections; biopsies for gynecological issues; vaccines for influenza, human papilloma virus, and monkeypox; perimenopause and menopause care; and miscarriage and abortion care.

171.    Maine patients already face significant barriers to care, including financial and logistical challenges of accessing providers, challenges that are particularly acute in the more rural areas of the state.  Maine also faces a shortage of heath care providers, including primary care providers.  PPNNE does not currently receive state family planning funding.  Medicaid funding is essential to both PPNNE Maine and MFP health centers and allows PPNNE and MFP to serve low-income patients in Maine.

172.    Massachusetts's MassHealth paid Planned Parenthood League of Massachusetts approximately $4.8 million in Medicaid payments during federal fiscal year 2023.  Of those payments, $1.8 million were for non-abortion family planning and related services.  MassHealth claimed 90 percent federal reimbursements on the non-abortion services.  While MassHealth claims federal reimbursement for expenditures for family planning services and other non-abortion reproductive health care, it covers abortion care at all state cost whether provided fee-for-service or by the Commonwealth's contracted managed care entities.

173.    Minnesota's Medical Assistance program provides coverage for comprehensive sexual and reproductive health services.  A significant percentage of Medical Assistance recipients need access to full-scope reproductive healthcare.  Planned Parenthood health centers play an essential role in providing those services.  Overall, Planned Parenthood health centers provide care to over 24,000 patients through Medical Assistance each year in Minnesota.  The estimated cost to the State of Minnesota of fully covering the services offered by Planned Parenthood is approximately $9 million.

174.    In New Jersey, there are two Planned Parenthood members: Planned Parenthood of Northern, Central, and Southern New Jersey and Planned Parenthood of Metropolitan New Jersey.  These two members operate 20 centers across the state.  Both NJ FamilyCare enrollees

and Plan First participants access services at Planned Parenthood locations in the state.  In FY

2023, for example, approximately 28,990 NJ FamilyCare enrollees received care at New Jersey

Planned Parenthood clinics.  The two New Jersey Planned Parenthood members collectively

billed $6.9 million to NJ FamilyCare in FY 2023 for fee-for-service and managed care services.

New Jersey paid approximately $1.4 million of those claims, and the federal government paid

$5.4 million.

175.    Nevada's Medicaid program provides coverage for comprehensive family

planning services.  Planned Parenthood locations in Nevada provide early pregnancy

management including pregnancy testing, miscarriage management, diagnosis of ectopic

pregnancies, postpartum counseling, and contraception; STI testing and treatment; education;

and other necessary family planning services to recipients of Nevada Medicaid.  The loss of 60

percent FMAP for these services will cause financial and health care related harms to Nevada

and Nevada Medicaid recipients.

176.    In New York, New York's Medicaid program, which is overseen by New York

Department of Health (DOH), provides comprehensive health coverage to more than 7.5 million

New Yorkers (as of December 2023).  Medicaid pays for a wide range of services, depending on

the enrollee's age, financial circumstances, family situation, or living arrangements through a

large network of health care providers.

177.    The costs of services, including sexual and reproductive health services, provided

through New York's Medicaid programs are shared between the state and federal government,

with a Federal Medical Assistance Percentage that varies, but is 50% for most services and up to

90% for defined Family Planning services.  Covered services include, sexual and reproductive

health care services, including for family planning/contraception, sexually transmitted infection

screenings, diagnosis and treatment and primary and preventative health care. (Abortion is 0% federally funded.)

178.    Many New Yorkers have a personal need for sexual and reproductive health services.  In 2022, there were 3,881,117 women of childbearing age (15 to 44 years old) in the state.  Whether enrolled in Medicaid, or any non-Medicaid health plan, New Yorkers need access to sexual and reproductive health services across our state.

179.    In 2023, the most recent year for which complete data are available, approximately 88,500 individual Medicaid enrollees sought care at Planned Parenthood members across the state, with approximately 156,000 claims for services provided to Medicaid members processed.

180.    New York provides sexual and reproductive health service coverage to Medicaid eligible individuals and an expanded population through its Family Planning Benefit Program (FPBP), a public health insurance program for New Yorkers who need family planning services only.  FPBP is intended to increase access to confidential family planning services and to enable teens, women, and men of childbearing age to prevent and/or reduce the incidence of unintended pregnancies.  Individuals may be eligible if they meet residential, citizenship, and income requirements, and are not already enrolled in Medicaid.  However, an individual who already has health coverage through Medicaid may still apply for only the family planning services.

181.    The estimated additional cost to the State of New York of fully covering the services offered by Planned Parenthood health centers, if matching federal funds cannot be accessed, is $21 million.  Those funds are not allocated in the current fiscal year budget, which was finalized on May 9, 2025.  New York was not aware, nor could it have anticipated that Congress would take the unprecedented step of eliminating Medicaid funding to a specific

category of providers.  In order to cover the shortfall, New York would have to reallocate State funding from other budget allocations not yet spent, or possibly convene a special session of the state legislature to attempt to pass a budget amendment if sufficient funds from existing allocations cannot be identified.

182.    In North Carolina, for State Fiscal Year 2024, Planned Parenthood health centers in North Carolina received over $862,000 in Medicaid reimbursements.  The majority of these reimbursements covered services such as annual exams, pap smears, birth control (including IUDs and vasectomies), labs, preventative screenings, colposcopies, and vaccinations.

183.    Two Planned Parenthood members that operate health centers in Oregon are both enrolled providers under OHP and certified providers under CCare.  They are Planned Parenthood of the Columbia Willamette (PPCW) and Planned Parenthood of Southwestern Oregon (PPSO).  PPCW and PPSO are the only providers in Oregon subject to the Defund Provision.  Together, PPCW and PPSO operate 11 health centers in Oregon and one in Vancouver, Washington, which is across the river from Portland.  In state fiscal year 2025, OHP reimbursed PPCW and PPSO for 56,989 family planning and reproductive health visits or encounters provided to 35,096 unique patients.  In that same time period, CCare reimbursed PPCW and PPSO for 8,466 family planning visits or encounters provided to 5,730 unique CCare patients.  Together, PPCW and PPSO health centers provide a substantial portion of all Medicaid-funded reproductive health care and family planning services in Oregon.  For example, PPCW and PPSO health centers served 65 percent of unique CCare patients in state fiscal year 2025

184.    In Rhode Island, Planned Parenthood Rhode Island is one of fifteen health centers operated by Planned Parenthood Southern New England, Inc.  Planned Parenthood Rhode Island

provides essential health services, including sexual and reproductive health care services, family planning, cancer screenings and testing, treatment and preventative care for sexually transmitted infections to over 10,000 patients.  Approximately a quarter of those patients are Medicaid enrollees.

185.    The cost of services provided through the Rhode Island Medicaid program are shared by the State of Rhode Island and federal government, with the federal government covering the majority of these costs.  The elimination of this FMAP for services provided by Planned Parenthood would representative a significant funding shortfall for the state. In order to ensure the continued delivery of care for the Medicaid population in Rhode Island and compensate for this sudden loss of funding for services that the state was expecting to be covered pursuant to its FMAP, Rhode Island's General Assembly would have to reconvene to determine a reallocation of state monies, away from other services and programs that were deemed necessary and essential to the well-being of Rhode Islanders.

186.    Beyond the direct monetary harm that will befall Rhode Island as a result of this cancellation of promised Medicaid funds, Rhode Island's health care delivery system would be overwhelmed by the sudden closure of a facility that currently provides basic, essential primary care services to over 10,000 patients per year.  Rhode Island is experiencing a crisis in lack of access to primary care.  Many Rhode Islanders lack primary care providers and are forced to access care for acute needs through alternative sites, such as urgent care centers and emergency departments.  Other facilities, such as clinics and pharmacies, provide critically important screenings, vaccinations and other routine, preventative and essential health care services that would otherwise be unavailable to Rhode Islanders in light of the severity of the persevering primary care shortage.  Rhode Island's health care delivery system cannot absorb the 10,000

patients who would be displaced by a failure of Planned Parenthood Rhode Island to continue the services they provide.

187.    If the Defund Provision goes into effect, the impact for Wisconsinites will be dramatic.  Planned Parenthood plays a central and critical role in Wisconsin's reproductive healthcare system. Planned Parenthood serves over 47,000 patients in Wisconsin annually at over 20 health centers, and the overwhelming majority of the care it provides (roughly 90 percent) involves contraception and STI services.[36]  In 2021, one in five female Wisconsin Medicaid patients aged 15 to 49 received family planning services at Planned Parenthood.[37]

188.    Other Wisconsin providers would not likely be able to absorb Planned Parenthood's patient caseload. For example, the Guttmacher Institute estimates that without Planned Parenthood clinics, other Wisconsin community health centers would have to increase their contraceptive patient caseload by 144 percent.[38]

189.    Moreover, the Wisconsin Department of Health Services anticipates that the Defund Provision would increase spending in other benefit areas, such as transportation services and medical costs, because Wisconsin Medicaid members may need to seek these necessary covered services at providers outside of their geographic area or may forgo critical preventative care, which can result in a need to seek more costly medical treatment or emergency services.

190.    Likewise, in California, the California Primary Care Association, which represents community clinics in California, has stated its belief that California does not have

---

[36] U.W. Core Collaborative for Repro. Equity, *Core Brief: Removing Family Planning Orgs. From Medicaid Would Harm Tens of Thousands of Wisconsinites* (June 2025), Removing-family-planning-orgs-from-Medicaid_June-2025.pdf.

[37] *Id.*

[38] Press Release, Guttmacher Institute, *Federally Qualified Health Centers Could Not Readily Replace Planned Parenthood* (May 13, 2025), https://www.guttmacher.org/news-release/2025/federally-qualified-health-centers-could-not-readily-replace-planned-parenthood (hereinafter Guttmacher FQHC Research) (144 percent reflected on hyperlinked spreadsheet).

sufficient Medicaid provider capacity to absorb the patients that Planned Parenthood health centers will not be compensated for treating.

191.    Nor are these circumstances unique.  For example, the current medical care ecosystem for Medicaid enrollees, which is already stretched thin,[39] is unlikely to be able to absorb the contraceptive care patients that Planned Parenthood health centers will no longer serve.  According to research by the Guttmacher Institute, "[n]ationwide, Planned Parenthood clinics served 1.6 million (33 percent) of the 4.7 million contraceptive clients served by safety-net family planning centers in 2020."[40]  Each Planned Parenthood health center serves an average of approximately 2,600 female contraceptive clients per year.[41]

192.    Alternatives to Planned Parenthood, such as federally qualified health centers (FQHCs), public health departments, and hospital-based centers, lack that specialization, focusing instead on primary care for their patients, as evidenced by their care statistics.  According to research by the Guttmacher Institute, FQHCs annually serve an average of approximately 330 female patients seeking contraception; public health department sites serve an average of approximately 320 such patients; hospital-based centers serve an average of approximately 640 such patients; and centers operated by other types of agencies serve an average of approximately 410 such patients.[42]

193.    The Guttmacher Institute determined that excluding Planned Parenthood health centers from federal programs such as Medicaid, would require these other types of health

---

[39] The Commonwealth Fund, *Community Health Centers' Progress and Challenges in Meeting Patients' Essential Primary Care Needs* (Aug. 8, 2024), https://www.commonwealthfund.org/publications/issue-briefs/2024/aug/community-health-centers-meeting-primary-care-needs-2024-FQHC-survey.

[40] Guttmacher FQHC Research, *supra* note 38.

[41] *Id.*

[42] *Id.*

centers to "*dramatically* increase their contraceptive client caseloads to serve the patients currently obtaining contraceptive services at Planned Parenthood health centers.[43]  FQHCs "offering contraceptive care would have to increase their capacity to provide these services by 56 percent, or an additional one million contraceptive clients"; "[h]ealth department sites offering contraceptive care would have to increase their capacity to provide these services by 28 percent, or an additional 168,000 contraceptive clients"; "[h]ospital sites offering contraceptive care would have to increase their capacity to provide these services by 53 percent, or an additional 344,000 contraceptive clients"; and "[o]ther sites offering contraceptive care, such as those operated by independent agencies, would have to increase their capacity to provide these services by 55 percent, or an additional 189,000 contraceptive clients."[44]

194.    Experience with state-based exclusion of Planned Parenthood health centers from receiving public funds demonstrates the likely devastating impacts.  For example, research in Texas following that state's exclusion of Planned Parenthood health centers from receiving public funds for healthcare shows that alternative healthcare entities are unlikely to absorb their patient population.  Looking at the two years before and after Texas' exclusion of Planned Parenthood health centers from public funding, researchers found that significant decreases in the number of Medicaid claims for long-acting, reversible contraceptives (35.5 percent decrease) and for injectable contraception (31.1 percent decrease).[45]  Medicaid-covered childbirths increased by 1.9 percentage points.[46]

---

[43] *Id.* (emphasis added).

[44] *Id.*

[45] Amanda J. Stevenson et al., *Effect of Removal of Planned Parenthood from the Texas Women's Health Program*, 374 N. Eng. J. Med. 853, 853 (2016), https://www.nejm.org/doi/full/10.1056/NEJMsa1511902 (hereinafter Stevenson et al.).

[46] *Id.*

195.     The reduction in access to these critical services will mean that many Medicaid enrollees are denied access to care altogether.  This will dramatically increase the costs to the Plaintiff States' public fisc and frustrate their ability to effectuate their public policy of providing widespread access to the full range of reproductive health care services.

**2.     Patients' Lack of Access to Cancer Screening and Treatment as a Result of the Defund Provision Will Negatively Impact Plaintiff States**

196.     Because Planned Parenthood health centers are a crucial structure in the medical ecosystem for low-income and vulnerable populations, the Defund Provision will have widespread impacts on the public health in the Plaintiff States and will result in increases in the Plaintiff States' costs to provide medical care for those residents.

197.     First, the Defund Provision severely curtails access to cancer screening and prevention.  Planned Parenthood health centers and other abortion providers in the Plaintiff States provide clinical breast exams and screening for both cervical and breast cancer.[47]  Their in-clinic services not only screen for reproductive cancers but can actually help prevent those cancers, such as through treatment of pre-cancerous cervical lesions to help prevent development of those lesions into cervical cancer.  The clinics also provide the HPV vaccine, which effectively reduces the likelihood of developing cervical cancer.  Indeed, in 2023, nationwide Planned Parenthood clinics provided 426,268 cancer screening and prevention services, including 191,197 breast care services; 173,397 Pap tests; 40,247 HPV vaccinations; 11,513 colposcopy procedures; 1,321 LEEP procedures; 1,626 cryotherapy procedures; and 6,967 other cancer diagnostic procedures.[48]  In 2024, California's Planned Parenthood health centers provided nearly 100,000 cancer screenings.

---

[47] 2023-2024 PPFA Annual Report, *supra* note 29, at 23.
[48] *Id*.

198.    Breast and cervical cancer screenings and prevention are particularly effective at reducing deaths, with breast cancer screenings resulting in 28 to 30 percent fewer deaths from breast cancer and 80 to 87 percent fewer deaths from cervical cancer.[49]  Both types of screenings also detect the cancers earlier, when they are easier and less expensive to treat.[50]

199.    Patients who would otherwise have received cancer screenings and preventative services at Planned Parenthood health centers are unlikely to access such cancer screenings and preventative services at other health centers.  Research from Texas following its 2021 exclusion of Planned Parenthood health centers from its Medicaid program found that Medicaid enrollees who previously had used Planned Parenthood health centers "faced difficulties accessing care elsewhere, including same-day appointments and on-site medications."[51]  "Consequences included delayed or forgone reproductive health care, including contraception, and emotional distress."[52]  Similarly, after Iowa tried to replace publicly-funded Planned Parenthood health centers with a state-funded family planning program, there was an "85 percent decline in individual use" of the program.[53]

---

[49] Simar Bajaj, *Here's What You Need To Know About Cancer Screening*, N.Y. Times, July 4, 2025, https://www.nytimes.com/2025/07/02/well/cancer-screening-guidelines.html.

[50] Ctrs. for Disease Control, *Health & Econ. Benefits of Cervical Cancer Interventions* (July 11, 2024), https://www.cdc.gov/nccdphp/priorities/cervical-cancer.html (hereinafter CDC Cervical Cancer Intervention Benefits); Ctrs. for Disease Control, *Health & Econ. Benefits of Breast Cancer Interventions* (July 11, 2024), https://www.cdc.gov/nccdphp/priorities/breast-cancer.html (hereinafter CDC Breast Cancer Intervention Benefits).

[51] Anna Chatillon, et al., *Access to Care Following Planned Parenthood's Termination from Texas' Medicaid Network: A Qualitative Study*, 128 Contraception 110141, 110141 (2023), https://www.sciencedirect.com/science/article/abs/pii/S0010782423002354 (hereinafter Chatillon, et al.).

[52] *Id.*

[53] Michaela Ramm, *Iowa's Family Planning Serv. Use Plummets 85 Percent After Switch to New Program*, The Gazette (Dec. 10, 2019), https://www.thegazette.com/health-care-medicine/iowas-family-planning-service-use-plummets-85-percent-after-switch-to-new-program/ (hereinafter Iowa's Family Planning Service Use)

200.    As a result of patients forgoing these cancer screenings and preventative treatments, many of those patients will not receive reproductive cancer diagnoses until such cancers have further progressed and are much harder—and more expensive—to treat.[54]  In light of the fact that the majority of Planned Parenthood health centers patients qualify for Medicaid, for Plaintiff States that cannot fund these health centers without federal matching funds, those Plaintiff States are likely to face increased healthcare costs in their Medicaid programs as a result of those later-diagnosed reproductive cancers.  In other words, instead of the Plaintiff States making smaller payments through their Medicaid programs in the short-term for cancer screenings and preventative treatments that result in early diagnoses and less expensive treatment plans, the Defund Provision will cause the Plaintiff States to pay larger amounts in the long-term for more expensive cancer treatments due to delayed diagnoses.

### 3. Patients' Lack of Access to STI Screenings and Treatments as a Result of the Defund Provision Will Negatively Impact Plaintiff States

201.    In addition to cancer screening and prevention, Planned Parenthood and other abortion providers also provide crucial access to STI screening, treatment, and prevention.  In 2023, nationwide, Planned Parenthood clinics provided 5,132,330 STI tests and treatments, consisting of 4,330,310 STI tests (such as for gonorrhea and chlamydia); 769,851 HIV tests; 16,824 genital warts (HPV) treatments; and 15,345 other STI prevention and treatments.[55]  The vast majority of Planned Parenthood clinics also provide pre-exposure prophylaxis (PrEP) and post-exposure prophylaxis (PEP), medications that effectively reduce the chances of HIV-negative individuals from acquiring HIV.  In 2024, California Planned Parenthood health centers provided 2.6 million tests for STIs and provided PrEP and PEP to more than 6,000 patients.

---

[54] CDC Cervical Cancer Intervention Benefits, *supra* note 50; CDC Breast Cancer Intervention Benefits, *supra* note 50.

[55] 2023-2024 PPFA Annual Report, *supra* note 29, at 23.

202.    Patients who would otherwise have received STI screenings and treatments at Planned Parenthood health centers are unlikely to access such STI screenings and treatments at other health centers.  Iowa, for example, not only saw a significant decrease in residents accessing family planning care after removing Planned Parenthood health centers from public funding, but the state also saw spikes in the rates of gonorrhea, chlamydia, and syphilis.[56]

203.    As a result of patients forgoing STI screenings and treatments, a certain percentage of those patients are likely to not receive diagnoses of STI until the diseases have progressed and are much harder—and more expensive—to treat.[57]  For example, untreated chlamydia and gonorrhea infections in women can result in pelvic inflammatory disease, which in turn can significantly impact fertility by causing scar tissue that blocks fallopian tubes as well as causing ectopic pregnancies.[58]  Untreated syphilis infections can result in numerous negative health outcomes.  Because STIs are contagious, patients forgoing screenings and treatments due to the closure of Planned Parenthood health centers will most likely have the effect of increasing the spread of STIs in Plaintiff States.

204.    This increased prevalence of STIs coupled with the fact that the majority of Planned Parenthood health centers' patients qualify for Medicaid will result in Plaintiff States who cannot fully fund the health centers out of state funds having to pay increased healthcare costs in their Medicaid programs.  In other words, instead of the Plaintiff States making smaller payments through their Medicaid programs in the short-term for STI screenings and early STI treatments that result in less expensive treatment plans, the Defund Provision forces the Plaintiff

---

[56] Iowa's Family Planning Service Use, *supra* note 53.

[57] Ctrs. for Disease Control, *About Chlamydia* (Jan. 31, 2025), https://www.cdc.gov/chlamydia/about/index.html (hereinafter CDC About Chlamydia); Ctrs. for Disease Control, *About Gonorrhea* (Jan. 31, 2025), https://www.cdc.gov/gonorrhea/about/index.html (hereinafter CDC About Gonorrhea)

[58] CDC About Chlamydia, *supra* note 57; CDC About Gonorrhea, *supra* note 57.

States to pay larger amounts in the long-term for more expensive STI treatments due to delayed

diagnoses and healthcare.

### 4. Patients' Lack of Access to Contraceptive Care as a Result of the Defund Provision Will Have Negative Impacts on Plaintiff States

205.    Planned Parenthood health centers are crucial providers of contraceptive care,

particularly to the vulnerable patient populations that constitute Medicaid enrollees.  As detailed

above, in 2020, for example, Planned Parenthood health centers nationally served 1.6 million (33

percent) of the 4.7 million contraceptive clients served by safety-net family planning centers in

2020.[59]

206.    Defunding Planned Parenthood will cause many of these clients to lose access to

high-quality contraceptive care with devastating consequences for individual patients and the

Plaintiff States.

207.    Contraceptives are among the most widely used medical products in the United

States, with 99 percent of sexually active women having used at least one type of contraception

in their lifetimes.[60]

208.    The benefits afforded women who can control their reproductive choices are

monumental.  Due to the positive impact of contraception for women and society, the Centers for

Disease Control and Prevention (CDC) concluded that family planning, including access to

modern contraception, was one of the ten greatest public health achievements of the 20th

century.[61]

---

[59] Guttmacher FQHC Research, *supra* note 38.

[60] *Contraceptive Use in the United States by Demographics*, Guttmacher Inst. (May 2021), https://www.guttmacher.org/fact-sheet/contraceptive-use-united-states (hereinafter Guttmacher Contraceptive Use)

[61] *Ten Great Public Health Achievements -- United States, 1900-1999*, 48 Morbidity & Mortality Wkly Rep. 241 (Apr. 2, 1999), https://www.cdc.gov/mmwr/preview/mmwrhtml/00056796.htm.

209.    In contrast, unintended pregnancy has negative health, fiscal, and societal impacts across the United States.  In 2019, an estimated 41.6 percent of all pregnancies in the United States were unintended.[62]  Unintended pregnancies are associated with increases in maternal and child morbidity, including increased odds of preterm birth, low birth weight, and the potentially life-long negative health effects of premature birth, all of which affect public health and in turn have impacts on Plaintiff States' public fiscs.[63]  Significantly, the risk of unintended pregnancy is greatest for the most vulnerable women:  young, low-income, minority women without a high school or college education—a group that also makes up a significant percentage of the Plaintiff States' Medicaid enrollees.[64]

210.    The use of contraception has resulted in lower unintended pregnancy and abortion rates in the United States.  The Guttmacher Institute has found that the two-thirds of women who are at risk for unintended pregnancy and use contraception consistently account for only 5 percent of unintended pregnancies.[65]  Another study showed that, from the early 1990s to early

---

[62] Ctrs. for Disease Control, *Unintended Pregnancy* (May 15, 2024), https://www.cdc.gov/reproductive-health/hcp/unintended-pregnancy/index.html#:~:text=Overview,2010 percent20to percent2035.7 percent20in percent202019.

[63] *See* Heidi D. Nelson et al., *Ass'ns of Unintended Pregnancy with Maternal & Infant Health Outcomes*, 328 J. of the Am. Med. Ass'n 1714, 1714 (Nov. 2022), https://pmc.ncbi.nlm.nih.gov/articles/PMC9627416/#REF-JOI220115 (hereinafter Nelson et al.); Adam Sonfield, et al., *The Public Costs of Births Resulting from Unintended Pregnancies: National & State-Level Estimates*, 43 Persp. on Sexual & Repro. Health 94, 98 (May 19, 2011), https://pubmed.ncbi.nlm.nih.gov/21651708/ (hereinafter Sonfield et al.).

[64] *See Unintended Pregnancy in the United States*, Guttmacher Inst. (Jan. 2019), https://www.guttmacher.org/sites/default/files/factsheet/fb-unintended-pregnancy-us.pdf; Drew Desilver, *What the Data Says about Medicaid*, Pew Rsch Ctr (June 24, 2025), https://www.pewresearch.org/short-reads/2025/06/24/what-the-data-says-about-medicaid/; Conor Ryan & Meghan McMonagle, *Medicaid Coverage & Educ.*, Am. Action F. (May 1, 2014), https://www.americanactionforum.org/wp-content/uploads/files/serialized_products/Medicaid_Coverage_and_Education.pdf

[65] Guttmacher Contraceptive Use, *supra* note 60.

2000s, increased rates of contraceptive use by adolescents were associated with a marked decline in teen pregnancies, with contraception use accounting for 86 percent of the decline.[66]

211.    Increased access to contraceptives has resulted in the rate of abortions being at an all-time low.  A 2018 report from the CDC shows that the national abortion rate declined 26 percent between 2006 and 2015, hitting the lowest level that the government has on record.[67] The CDC credits access to healthcare services and specifically access to contraception as a significant factor influencing the decrease.[68]

212.    Further evidencing the benefits of contraception to the Plaintiff States and their residents, with the decrease in unintended pregnancies, there is also a corresponding decrease in the risk of maternal mortality, adverse child outcomes, behavior problems in children, and negative psychological outcomes associated with unintended pregnancies for both mothers and children.[69]

213.    Significantly, access to contraceptive coverage helps women to delay childbearing and pursue additional education, spend additional time in their careers, and have increased earning power over the long-term.  Contraceptive use also allows for spacing between pregnancies, which is important because there is an increased risk of adverse health outcomes for pregnancies that are too closely spaced, and is especially critical for the health of women with

---

[66] John S. Santelli, *Explaining Recent Declines in Adolescent Pregnancy in the United States: The Contribution of Abstinence and Improved Contraceptive Use*, 97 Am. J. of Pub. Health, 150, 153-54 (Jan. 2007), https://pmc.ncbi.nlm.nih.gov/articles/PMC1716232/
[67] Tara C. Jatlaoui et al., *Abortion Surveillance — United States, 2015*, 67 Morbidity & Mortality Wkly. Rep. 1, 1 (Nov. 23, 2018), https://www.cdc.gov/mmwr/volumes/67/ss/ss6713a1.htm.
[68] *Id.*
[69] Nelson et al., *supra* note 63; Sonfeld et al., *supra* note 63; Clair A. Enthoven et al., *Reducing Behavior Problems in Children Born After an Unintended Pregnancy: The Generation R Study*, 59 Soc. Psychiatry & Psychiatric Epidemiology, 2247, 2257 (May 31, 2014), https://link.springer.com/article/10.1007/s00127-024-02693-3#:~:

certain medical conditions.  There are additional benefits of contraceptive use for treating

medical conditions, including menstrual disorders and pelvic pain, and long-term use of oral

contraceptives has been shown to reduce women's risk of endometrial cancer, pelvic

inflammatory disease, and some breast diseases.[70]

214.    Contraceptive use unsurprisingly achieves significant cost savings to states, due

in large part to the fact that contraceptives are much less costly than maternal deliveries.  In

2002, the direct medical cost of unintended pregnancy in the United States was nearly $5 billion,

with contraception use saving an estimated $19.3 billion.[71]  Nationwide, in 2010, the

government expended an estimated $21 billion to cover the medical costs for unplanned births,

miscarriages and abortions.[72]  And in California, 48 percent of all pregnancies were unintended

in 2010.  Of those unplanned pregnancies that resulted in births, 64.3 percent of those births

were publicly funded, costing California $689.3 million on unintended pregnancies.

215.    The Defund Provision will significantly undermine the benefits of widespread

contraception use by targeting the biggest contraceptive coverage provider nationwide, Planned

Parenthood health centers.  By precluding Planned Parenthood health centers from receiving

federal funds from their care of Medicaid patients, the Defund Provision will necessarily result

in millions being unable to access contraceptive care, resulting in increases in unintended

pregnancies and increased costs to the Plaintiff States that cannot fully fund the Prohibited

Entities with their own state funds.

---

[70] Adolf E. Schindler, *Non-Contraceptive Benefits of Oral Hormonal Contraceptives*, 11
Int'l J. of Endocrinology & Metabolism 41, 41 (Dec. 2012),
https://pmc.ncbi.nlm.nih.gov/articles/PMC3693657/
[71] James Trussell, *The Cost of Unintended Pregnancy in the United States*, 75
Contraception 168, 168 (Mar. 2007), https://pubmed.ncbi.nlm.nih.gov/17303484/
[72] Sonfield et al, *supra* note 63.

216.    These effects are not hypothetical:  Texas, which excluded Planned Parenthood health centers from receiving public funding more than a decade ago, saw significant decreases in claims for long-acting contraceptives, and increases in the number of Medicaid-covered childbirths.[73]

217.    Further exacerbating the negative impacts on those Plaintiff States is the restriction of access to abortion healthcare as a result of the Defund Provision, thereby exacerbating the negative outcomes from diminished access to contraceptive care and the resulting increase in unintended pregnancies.  The Defund Provision is likely to result in the closure of one in four abortion providers nationwide and threatens to shut down half of abortion-providing Planned Parenthood health centers.[74]  More than 90 percent of health center closures would occur in states where abortion is protected and legal.[75]

218.    In sum, the Defund Provision will limit access to contraception for the Plaintiff States' vulnerable residents, resulting in both increased health risks for those residents and increased unintended pregnancies.

219.    As a result, the Plaintiff States that cannot fully fund the Planned Parenthood health centers will face increased healthcare costs as the number of unintended pregnancies increase.

---

[73] Stevenson et al., *supra* note 45.

[74] *Planned Parenthood Action Fund Statement on Senate Republicans' Vote to "Defund" Planned Parenthood*, Planned Parenthood Action Fund (July 1, 2025), https://www.plannedparenthoodaction.org/pressroom/planned-parenthood-action-fund-statement-on-senate-republicans-vote-to-defund-planned-parenthood

[75] *Id.*

## V.    THE DEFUND PROVISION IS AN IMPERMISSIBLY RETROACTIVE CONDITION ON MEDICAID

220.    At the time that the Plaintiff States agreed to participate in Medicaid, and throughout the past seven decades of its administration, Congress has never conditioned Medicaid funding on the exclusion of a particular provider from the program based on their offering abortions or other healthcare services outside of the Medicaid program. Indeed, the only provider exclusions permitted under Medicaid relate to commission of crimes and violation of federal law—neither of which are at issue here.

221.    Such an exclusion, targeting certain family planning providers for their constitutional, legal activities outside of the Medicaid program, is not the type of condition that States could, and should, have expected when they agreed to participate in the Medicaid program. *See Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 523 (2012).

222.    This provision instead "surprises" states with a new condition on Medicaid funds beyond what a state could have anticipated as part of their participation in the program. *Id.* ("A State could hardly anticipate that Congress's reservation of the right to "alter" or "amend" the Medicaid program included the power to transform it so dramatically").

### FIRST CAUSE OF ACTION
### Spending Clause: Lack of Clear Notice
### U.S. Const. art. I, section 8, cl. 1

223.    The Plaintiff States repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

224.    The Defund Provision conditions receipt of federal Medicaid funds for the non-abortion health care services that the Prohibited Entities provide on the Plaintiff States directing

of its Medicaid program enrollees to healthcare providers other than providers who qualify as Prohibited Entities, as defined in the provision.

225.    The Defund Provision does not provide clear notice of the Plaintiff States' obligations to satisfy the conditions to receive the restricted federal Medicaid funding.  *See Pennhurst State School & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("The legitimacy of Congress' power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the 'contract.'")

226.    The Defund Provision is ambiguous about the timing for enforcement of its prohibitions on federal Medicaid funding for Prohibited Entities.  The Defund Provision requires that Prohibited Entities stop receiving federal Medicaid funding as of the date of enactment, which is July 4, 2025.  But the definition of Prohibited Entity turns on whether an entity satisfies all four criteria as of "the first day of the first quarter beginning after the date of enactment of th[e] Act," which is October 1, 2025.  As such, the Defund Provision does not provide the Plaintiff States with clear notice of their obligations to satisfy the conditions necessary to access federal Medicaid funds.

227.    The Defund Provision also is ambiguous because it fails to identify who is to determine which healthcare providers are Prohibited Entities.  The Defund Provision tasks Plaintiff States with excluding Prohibited Entities from their Medicaid programs.  But it is silent as to whether Plaintiff States or CMS will make the initial determination of which entities to exclude.  Plaintiff States also do not have access to claims data for other states, which may be necessary to determine whether multi-state healthcare entities received more than $800,00 in Medicaid payments in fiscal year 2023 where those entities have not received such amount from the Plaintiff State.  Nor do Plaintiff States have access to information concerning the types of

services provided by a multi-state healthcare organization in other states to conclude either that an organization offers abortion care or "primarily engages in" the type of care outlined in the Defund Provision. The Defund Provision, in fact, is silent as to how Plaintiff States will have to determine whether an organization "is primarily engaged in family planning services, reproductive health, and related medical care." As such, the Defund Provision does not provide the Plaintiff States with clear notice of their obligations to satisfy the conditions necessary to access federal Medicaid funds.

228. The Defund Provision further violates the "clear notice" requirement because it constitutes a retroactive condition that Plaintiff States could not have anticipated at the time they joined Medicaid. There has never been a similar restriction prohibiting the expenditure of federal dollars through Medicaid to specific medical providers based solely upon the provision of a certain type of care outside of the Medicaid program. As noted above, since Medicaid's start, States have retained significant discretion to determine which providers participate in their State Plans, with little federal oversight—a feature of the Medicaid system that has existed since enactment.

229. Accordingly, the Defund Provision fails to provide sufficiently clear notice of the Plaintiff States' obligations as to render the provision an unconstitutional exercise of Congress's Spending Clause power.

## SECOND CAUSE OF ACTION
### Spending Clause: Unconstitutional Provisions
### U.S. Const. art. I, section 8, cl. 1

230. The Plaintiff States repeat and incorporate by reference each allegation of the prior paragraphs as if fully set forth herein.

231.    Because Medicaid is a state-federal partnership in which the states administer claims from medical providers for Medicaid reimbursements, the states—not the federal government—would ultimately be required to ensure that the Planned Parenthood health centers are effectively excluded from federal funding under the Defund Provision.

232.    Because the Defund Provision unlawfully targets PPFA for their speech, Defendants are conscripting the States into effectuating this unconstitutional conduct.

233.    The Defund Provision violates the First Amendment of the Constitution by retaliating against PPFA and the Planned Parenthood health centers for their First Amendment-protected speech supporting and advocating for full reproductive rights, including rights to receive abortion care.  The Defund Provision also violates the First Amendment of the Constitution by retaliating against Planned Parenthood health centers for exercising their First Amendment-protected right to associate with PPFA and each to engage in such advocacy.  The Defund Provision also treats Planned Parenthood health centers differently because of their exercise of First Amendment protected rights, thereby violating the Fourteenth Amendment's Equal Protection Clause.  The Defund Provision also punishes PPFA and the Planned Parenthood health centers by prohibiting the Planned Parenthood health centers from receiving federal Medicaid funding, in violation of Article I's prohibition on bills of attainder.  The Defund Provision does not reflect a health policy choice but was drafted to single out PPFA and Planned Parenthood health centers for their abortion advocacy.

234.    The Defund Provision conditions the Plaintiff States' receipt of federal Medicaid funding on the Plaintiff States' willingness to effectuate the Defund Provision's unconstitutional targeting of PPFA and the Planned Parenthood health centers.

235.    Accordingly, the Defund Provision constitutes an "otherwise unconstitutional" exercise of Congress's Spending Clause power.

## PRAYER FOR RELIEF

WHEREFORE, the States respectfully request that this Court:

1.    Declare that the Defund Provision is unconstitutional;

2.    Enter a preliminary and permanent injunction against Defendants and any other agency or employee acting on behalf of Defendants prohibiting enforcement of the Defund Provision;

3.    Award the States' costs, expenses, and reasonable attorneys' fees; and,

4.    Award such other relief as the Court deems just and proper.

Date:  July 29, 2025

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

*/s/ Allyson Slater*
ALLYSON SLATER (BBO No. 704545)
*Director, Reproductive Justice Unit*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2811
Allyson.slater@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

Respectfully Submitted,

**ROB BONTA**
Attorney General
State of California

*/s/ Erica Connolly*
ERICA CONNOLLY*
Deputy Attorney General
NELI PALMA*
Senior Assistant Attorney General
KARLI EISENBERG*
Supervising Deputy Attorney General
1300 I Street
Sacramento, CA 95814
(916) 210-7755
Erica.Connolly@doj.ca.gov
*Attorneys for Plaintiff State of California*

**LETITIA JAMES**
Attorney General
State of New York

 */s/ Galen Sherwin*
GALEN SHERWIN*
Special Counsel for Reproductive Justice
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
IVAN NEVADO*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8059
Galen.Sherwin@ag.ny.gov;
*Attorneys for Plaintiff State of New York*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Alma Nunley*
ALMA NUNLEY*
Special Counsel for Reproductive Rights
JANELLE R. MEDEIROS*
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Alma.Nunley@ct.gov
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: */s/ Vanessa L. Kassab*
VANESSA L. KASSAB*
Deputy Attorney General
IAN R. LISTON*
Director of Impact Litigation
JENNIFER KATE AARONSON*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8803
Jennifer.Aaronson@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**PHILIP J. WEISER**
Attorney General
State of Colorado

*/s/ Nora Q.E. Passamaneck*
NORA Q.E. PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
nora.passamaneck@coag.gov
*Attorneys for Plaintiff State of Colorado*

**BRIAN L. SCHWALB**
Attorney General
District of Columbia

*/s/ Nicole S. Hill*
NICOLE S. HILL*
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

**ANNE E. LOPEZ**
Attorney General
State of Hawaiʻi

*/s/ Kalikoʻonālani D. Fernandes*
KALIKOʻONĀLANI D. FERNANDES*
Solicitor General
DAVID D. DAY*
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawaiʻi*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Caitlyn G. McEllis*
CAITLYN G. MCELLIS*
Senior Policy Counsel
ELIZABETH MORRIS*
Deputy Bureau Chief, Special Litigation
Bureau
SARAH J. GALLO*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. Lasalle Street
Chicago, IL 60603
312-814-3000
Caitlyn.McEllis@ilag.gov
Elizabeth.Morris@ilag.gov
Sarah.Gallo@ilag.gov
*Attorneys for Plaintiff State of Illinois*

**AARON M. FREY**
Attorney General
State of Maine

*/s/ Halliday Moncure*
HALLIDAY MONCURE*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.: 207-626-8800
halliday.moncure@maine.gov
*Attorneys for Plaintiff State of Maine*

**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s/ James C. Luh*
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*

**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Kyla Barranco*
KYLA BARRANCO*
NEIL GIOVANATTI*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
BarrancoK@michigan.gov
GiovanattiN@michigan.gov
*Attorneys for Plaintiff State of Michigan*


**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Katherine J. Bies*
KATHERINE J. BIES*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*

**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Jessica L. Palmer*
JESSICA L. PALMER*
ELIZABETH R. WALSH*
Deputy Attorneys General
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Jessica.Palmer@law.njoag.gov
Elizabeth.Walsh@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*

**RAÚL TORREZ**
Attorney General
State of New Mexico

/s/  Amy Senier
AMY SENIER*
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asenier@nmdoj.gov
*Attorneys for Plaintiff State of New Mexico*

**AARON D. FORD**
Attorney General
State of Nevada

/s/ Heidi Parry Stern
HEIDI PARRY STERN* (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*

**JEFF JACKSON**
Attorney General
State of North Carolina

/s/ Marc D. Brunton
MARC D. BRUNTON*
Assistant Deputy Attorney General
LAURA HOWARD*
Chief Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-0151
mbrunton@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*

**DAN RAYFIELD**
Attorney General
State of Oregon

/s/ Christina L. Beatty-Walters
CHRISTINA L. BEATTY-WALTERS*
Senior Assistant Attorney General
KATE E. MORROW
Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov
Kate.E.Morrow@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

**JOSH SHAPIRO,**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

*/s/ Michael J. Fischer*
MICHAEL J. FISCHER*
Executive Deputy General Counsel
JENNIFER SELBER*
General Counsel
JONATHAN D. KOLTASH*
Deputy General Counsel for Healthcare
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov
*Attorneys for Plaintiff Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General
State of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Dorothea R. Lindquist*
DOROTHEA R. LINDQUIST* (RI Bar No.
6661)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2098
dlindquist@riag.ri.gov
*Attorneys for the Plaintiff State of Rhode
Island*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS* WSBA #53238
WILLIAM MCGINTY* WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Lauryn.Fraas@atg.wa.gov
William.McGinty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

*Application for pro hac vice admission forthcoming*