# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

State of California, et al.,

　　　　　　　*Plaintiffs,*

　　　v.

U.S. Department of Health and Human
Services, et al.,

　　　　　　　*Defendants.*

CA No.: 1:25-cv-12118-TI

Oral Argument Requested

# MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

**Page**

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

    I.     Factual History ..........................................................................................................2

          A.     State Administration of Medicaid ....................................................................2

          B.     The Defund Provision .....................................................................................3

          C.     The Defund Provision's Impact on Plaintiff States ........................................4

    II.    Procedural History .....................................................................................................5

LEGAL STANDARD ............................................................................................................6

ARGUMENT ........................................................................................................................6

    I.     Plaintiff States Are Likely to Succeed on the Merits..............................................6

          A.     The Defund Provision Fails to Provide Clear Notice ..................................7

          B.     The Defund Provision Is an Unprecedented Incursion on State Authority that States Could Not Have Anticipated at the Time They Entered into the Medicaid Program ....................................................11

    II.    Plaintiff States Are Suffering Irreparable Harm ....................................................12

          A.     Plaintiff States' Administrative Costs..........................................................13

          B.     Plaintiff States' Increased Healthcare Costs ...............................................14

    III.   Balance of Equities and Public Interest Support the Plaintiff States' Preliminary Injunction Request .............................................................................19

CONCLUSION....................................................................................................................20

## TABLE OF AUTHORITIES

**Page**

**CASES**

*Alexander v. Choate*
  469 U.S. 287 (1985)....................................................................................2

*Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*
  548 U.S. 291 (2006)............................................................................6, 7, 11

*Barnett v. Short*
  129 F.4th 534 (8th Cir. 2025) ...............................................................12

*Cook Cnty., Ill. v. Wolf*
  962 F.3d 208 (7th Cir. 2020) ...............................................................19

*Cummings v. Premier Rehab Keller, P.L.L.C.*
  596 U.S. 212 (2022)...........................................................................9-10

*De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*
  520 U.S. 806 (1997)...........................................................................11

*Does 1-6 v. Mills*
  16 F.4th 20 (1st Cir. 2021)..................................................................19

*Gregory v. Ashcroft*
  501 U.S. 452 (1991)...........................................................................12

*Harris v. McRae*
  448 U.S. 297 (1980)............................................................................2

*Medina v. Planned Parenthood S. Atlantic*
  606 U.S. ---, 145 S. Ct. 2219 (2025)................................................2, 11, 12

*N.H. Indonesian Community Support v. Trump*
  765 F. Supp. 3d 102 (D.N.H. 2025)................................................. 19-20

*Nat'l Fed'n of Indep. Bus. v. Sebelius*
  567 U.S. 519 (2012)...........................................................................12

*Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*
  407 F. Supp. 2d 323 (D. Mass. 2005) ................................................19

*New York v. McMahon*
  784 F. Supp. 3d 311 (D. Mass. 2025) ...............................................20

## TABLE OF AUTHORITIES
### (continued)

**Page**

*New York v. Trump*
    133 F.4th 51 (1st Cir. 2025)................................................................13

*Ohio v. EPA*
    144 S. Ct. 2040 (2024)................................................................14

*Pennhurst State Sch. & Hosp. v. Halderman*
    451 U.S. 1 (1981)................................................................10, 11

*Rio Grande Cmty. Health Ctr., Inc. v. Rullan*
    397 F.3d 56 (1st Cir. 2005)................................................................13

*Schweiker v. Hogan*
    457 U.S. 569 (1982)................................................................9

*Shurtleff v. City of Bos.*
    928 F.3d 166 (1st Cir. 2019)................................................................6

*State of Tenn. v. Dept. of Educ.*
    104 F.4th 577 (6th Cir. 2024)................................................................13

*Texas v. EPA*
    829 F.3d 405 (5th Cir. 2016)................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*
    555 U.S. 7 (2008)................................................................12

**STATUTES**

2 U.S.C. § 641(e) ................................................................4

19 U.S.C. § 1677(3) ................................................................9

42 U.S.C. § 1320a-7(a) ................................................................3

42 U.S.C. § 1396a(23)(A) ................................................................12

**CONSTITUTIONAL PROVISIONS**

U.S. Const. art. I, § 8, cl. 1 ................................................................5

**COURT RULES**

Fed. R. Civ. P. 65(c) ................................................................20

**TABLE OF AUTHORITIES**
**(continued)**

Page

**OTHER AUTHORITIES**

Pub. L. No. 119-21, § 71113, 139 Stat. 300 (2025)............................................................... *passim*

Pub. L. 94-439, § 209........................................................................................................3

42 C.F.R. § 447.45...........................................................................................................10, 11

45 C.F.R. § 156.235..........................................................................................................3

## INTRODUCTION

As part of the federal budget bill enacted on July 4, 2025, Congress included a provision (the "Defund Provision") to accomplish a long-term goal of abortion opponents:  excluding Planned Parenthood health centers from receiving federal Medicaid reimbursements.  As this Court has already recognized, the Defund Provision impermissibly and unconstitutionally targets Planned Parenthood health centers for their advocacy and their exercise of associational rights.

But the Defund Provision is unconstitutional for another reason:  in crafting a provision that would both target Planned Parenthood health centers and satisfy the budget reconciliation process, Congress ran afoul of limits on its spending power.  The Defund Provision is wholly— and unconstitutionally—ambiguous.[1]  It fails to adequately define the scope of providers who qualify as "prohibited entities"; fails to provide clear notice of the timing of its implementation; and constitutes a change that Plaintiff States could not have anticipated when joining Medicaid.

Plaintiff States seek a preliminary injunction to prevent Defendants Health and Human Services Secretary Robert F. Kennedy and the Department of Health and Human Services (collectively "HHS"), and Centers for Medicare and Medicaid Administrator Dr. Mehmet Oz and the Centers for Medicare and Medicaid (collectively "CMS") (with HHS, "Defendants") from enforcing the Defund Provision against them.  If allowed to stay in effect, the Defund Provision will result in irreparable harm to Plaintiff States.  As such, the balance of equities and the public interest favor Plaintiff States as well.  This Court should grant Plaintiff States' request.

---

[1] Plaintiff States are the States of California, New York, Connecticut, Colorado, Delaware, Hawaii, Illinois, Maine, Maryland, Michigan, Minnesota, Nevada, New Jersey, New Mexico, North Carolina, Rhode Island, Vermont, Washington, and Wisconsin, and the District of Columbia, the Commonwealth of Massachusetts, and the Commonwealth of Pennsylvania.

# BACKGROUND

## I.    FACTUAL HISTORY

### A.    State Administration of Medicaid

"The Medicaid program . . . is a cooperative endeavor in which the Federal Government provides financial assistance to participating States to aid them in furnishing health care to needy persons." *Harris v. McRae*, 448 U.S. 297, 308 (1980).  The Medicaid Act "gives the States substantial discretion to choose the proper mix of amount, scope, and duration limitations on coverage, as long as care and services are provided in 'the best interests of the recipients.'" *Alexander v. Choate*, 469 U.S. 287, 303 (1985).  Because States "have traditionally exercised primary responsibility over 'matters of health and safety,' including the regulation of the practice of medicine," the Supreme Court has emphasized that states enjoy broad discretion to determine which providers "qualify" for the Medicaid program.  *Medina v. Planned Parenthood S. Atlantic*, 145 S. Ct. 2219, 2227 (2025).

Each State designs and operates its own Medicaid program within boundaries set by federal law, established in a State plan that is subject to review and approval by the federal government.  *See id.* at 2226–27.  States administer claims for care from providers or managed care plans, with CMS providing federal funds to States.  *See* Req. for Jud. Notice ("RJN"), Ex. 4, Doc. No. 61-4 at 4-5; Defs. Opp. to Pls.' Mot. for Prelim. Inj., *Planned Parenthood Fed'n of Am., Inc. v. Kennedy*, No. 1:25-cv-11913-IT (hereinafter "PPFA Litigation"), Doc. No. 53 at 41 (July 14, 2025) (hereinafter "PPFA Litigation Doc. No. 53") ("Planned Parenthood receives payment from the states, not the Federal Government.").  It is thus States—not CMS—that determine whether provider claims qualify for payment from state and federal Medicaid funds. Each quarter, States provide CMS with estimates of their Medicaid expenses for that quarter,

and, using those estimates, CMS provides federal matching funds.  Doc. No. 61-4 at 4-5.

Combining those federal funds with state funds, States pay claims to Medicaid providers, with

the federal portion constituting 50-90% of the payments.  *Id.*  Following the end of the quarter,

States report actual expenditures to CMS and engage in a review and reconciliation process

through which States either return overpayments or CMS provides additional funds for

underpayments.  *Id.*

Although Congress has restricted federal Medicaid funds from paying for certain services,

such as abortion care, Pub. L. 94-439, § 209 (initial version of Hyde Amendment), Congress has

never conditioned Medicaid funding on the exclusion of a particular provider based on their

offering any healthcare services *outside* of the Medicaid program.  Indeed, the only provider

exclusions permitted under Medicaid relate to commission of crimes and violation of federal

law—neither of which are at issue here.  *See* 42 U.S.C. § 1320a-7(a).

**B.    The Defund Provision**

The federal budget bill, which was enacted on July 4, 2025, contains the Defund Provision.

The Defund Provision provides that no federal Medicaid funds "shall be used to make payments

to a prohibited entity for items and services furnished during the 1-year period beginning on the

date of the enactment of" the budget bill.  Pub. L. No. 119-21, § 71113, 139 Stat. 300 (2025)

(hereinafter "Section 71113").  It defines the term "prohibited entity" as providers that satisfy

four criteria as of October 1, 2025: 1) being a 501(c)(3) entity; 2) being an "essential community

provider" under 45 C.F.R. § 156.235 that "is primarily engaged in family planning services,

reproductive health, and related medical care"; 3) "provid[ing] for abortions," other than for

pregnancies resulting from rape or incest or where women are "in danger of death unless an

abortion is performed"; and 4) receipt of more than $800,000 in state and/or federal Medicaid

funds in 2023.  Section 71113.

The Defund Provision is the product of a years-long effort to block Planned Parenthood

health centers from receiving federal Medicaid funds.  *See, e.g.*, Declaration of Erica Connolly

("E. Connolly Decl.") Exs. 1, 2, Doc. Nos. 62-1, 62-2; 163 Cong. Rec. H2373, H2409, 2433

(daily ed. Mar. 24, 2017) (statements of Reps. Matt Gaetz, Kevin Brady).  Planned Parenthood

Federation of America ("PPFA") and the Planned Parenthood health centers that constitute its

members have advocated for abortion access for decades, *see, e.g.*, RJN Ex. 1, Doc. No. 61-1 at

5-6, 7, and as a result have long been a political target for those opposed to abortion access, *see,*

*e.g.*, Doc. No. 62-1, 62-2; E. Connolly Decl. Ex. 3, Doc. No. 62-3 at 24.  The Defund Provision

is the fruition of that targeted opposition.

The Defund Provision was included as part of the budget reconciliation process, which

bypasses the filibuster and requires only a simple majority for passage of budget bills.  2 U.S.C.

§ 641(e).  To clear the Defund provision through the narrow budget reconciliation rules,

however, Congress crafted impermissibly ambiguous terms upon which Plaintiff States must

now rely to determine whether they can use federal Medicaid funds to reimburse providers for

family planning and reproductive healthcare services.

### C.    The Defund Provision's Impact on Plaintiff States

The Defund Provision is already impacting Plaintiff States through increased

administrative burdens and compliance costs.  For example, Plaintiff States have had to

restructure their claims-processing infrastructure to try to accommodate the Defund Provision's

requirements.  *See, e.g.*, J. Connolly Decl. (MN), Doc. No. 62-15 at 7; Peterson Decl. (HI), Doc.

No. 62-10 at 5; Phelan Decl. (IL), Doc. No. 62-11 at 4; Probert Decl. (ME), Doc. No. 62-13 at 9;

Adelman Decl. (NJ), Doc. No. 62-18 at 7; Smith Decl. (NM), Doc. No. 62-19 at 9; Morne Decl.

(NY), Doc. No. 62-20 at 7-8; Standridge Decl. (WI), Doc. No. 62-24 at 5.  And the Defund

Provision's ambiguity has resulted in Plaintiff States having to field questions from providers

and draft guidance to try to address the ambiguities.  *See, e.g.*, Gilbert Decl. (CA), Doc. No. 62-6

at 8-9; Doc. No. 62-10 at 5; Doc. No. 62-13 at 9; Doc. No. 62-15 at 7; Doc. No. 62-18 at 7-8;

Doc. No. 62-20 at 8; Sandoe Decl. (OR), Doc. No. 62-21 at 9-10.

In addition to these administrative changes, the Defund Provision will also result in

significant increases in Plaintiff States' healthcare expenses.  By targeting Planned Parenthood

health centers as well as other known (and likely unknown) "prohibited entities," the Defund

Provision intentionally disrupts Plaintiff States' healthcare ecosystems, which will lead to short-

and long-term increases in Plaintiff States' healthcare costs.

## II.  PROCEDURAL HISTORY

On July 29, 2025, Plaintiff States filed their complaint against Defendants, alleging two

causes of action: 1) violation of the Spending Clause due to lack of clear notice; and 2) violation

of the Spending Clause due to the inclusion of unconstitutional provisions.  Doc. No. 1.  Plaintiff

States have served Defendants with the Complaint.  Doc. Nos. 56, 56-1, 56-2.

This case is related to the PPFA Litigation, in which PPFA, on behalf of its members and

alongside two members as plaintiffs, alleged that the Defund Provision unconstitutionally

violated their rights.  Compl., PPFA Litigation, Doc. No. 1 (July 7, 2025).  This Court

preliminarily enjoined the Defund Provision as to the plaintiffs.  *Planned Parenthood Fed'n of*

*Am., Inc. v. Kennedy*, ---F. Supp. 3d---, 2025 WL 2101940 (D. Mass. 2025).  On September 11,

2025, the First Circuit issued an unpublished order granting Defendants' motion to stay the

injunction pending resolution of the appeal of the injunction.  Order, *Planned Parenthood Fed'n*

*of Am., Inc. v. Kennedy*, Nos. 25-1755, 25-1698 (1st Cir. Sept. 11, 2025). The court stated, "we conclude that defendants have met their burden to show their entitlement to a stay of the preliminary injunctions pending the disposition of their appeals of the same" but did not further explain the reasons for that conclusion. *Id.* at *2.

## LEGAL STANDARD

"Before it grants a preliminary injunction, a district court is required to consider (1) the movant's likelihood of success on the merits; (2) the likelihood of the movant suffering irreparable harm; (3) the balance of equities; and (4) whether granting the injunction is in the public interest." *Shurtleff v. City of Boston*, 928 F.3d 166, 171 (1st Cir. 2019).

## ARGUMENT

### I.    PLAINTIFF STATES ARE LIKELY TO SUCCEED ON THE MERITS

The Defund Provision is unconstitutional because it violates Congress' spending powers.[2] Although "Congress has broad power to set the terms on which it disburses federal money to the States," when it "attaches conditions to a State's acceptance of federal funds, the conditions must be set out 'unambiguously.'" *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006). "'[L]egislation enacted pursuant to the spending power is much in the nature of a contract,' and therefore, to be bound by 'federally imposed conditions,' recipients of federal funds must accept them 'voluntarily and knowingly.'" *Id.* "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" *Id.* This Court must "view the [Defund Provision] from the perspective of a state official" and "ask whether

---

[2] Although the Defund Provision unconstitutionally targets Planned Parenthood health centers (the subject of PPFA's litigation and a claim in this case), Plaintiff States are uniquely positioned to raise the Spending Clause claim and move on this basis.

such a state official would clearly understand" the Defund Provision's obligations, i.e., whether the Defund Provision "furnishes clear notice." *Id.*

The Defund Provision conditions receipt of federal Medicaid funds on Plaintiff States not providing those funds to "prohibited entities." Section 71113(A). But the Defund Provision fails to provide clear notice to Plaintiff States in two ways: 1) the definition of "prohibited entities" and the timing of the prohibition on federal reimbursements to such entities is impermissibly ambiguous; and 2) the provision is an unprecedented incursion into Plaintiff States' traditional discretion over the regulation of medicine that Plaintiff States could not have anticipated when joining Medicaid.

### A.    The Defund Provision Fails to Provide Clear Notice

The Defund Provision does not provide clear notice about the scope of providers that qualify as "prohibited entities" or the timing for prohibitions on payments to such "prohibited entities." Although Planned Parenthood health centers are the clear target of the Defund Provision, Congress nevertheless crafted impermissibly ambiguous legislation to comply with the budget reconciliation process. As such, Plaintiff States have no way to determine 1) the full scope of the Defund Provision or 2) how to comply with its timing requirements.

*First*, the Defund Provision fails to provide clear notice to Plaintiff States of which providers qualify as "prohibited entities." Section 71113(b)(1) defines a "prohibited entity" as an "entity" that among other things, is an "essential community provider . . . primarily engaged in family planning services, reproductive health, and related medical care," that "provides for abortions" and received over $800,000 in Medicaid expenditures in 2023. Section 71113(A), (B). The Defund Provision also applies to those providers' "affiliates." *Id.*

The Defund Provision provides no guidance about how Plaintiff States are to determine if a provider is "primarily engaged in family planning services, reproductive health, and related

medical care."  *See, e.g.*, Doc. No. 62-15 at 7;  Doc. No. 62-20 at 8.  For example, details such as what percentage of services renders a provider "primarily" a provider of reproductive health services; what counts as "family planning services"; and whether providers must be evaluated on the basis of patients served or strictly by billing numbers all go unexplained by the Defund Provision, leaving Plaintiff States in the dark as to methods of determination.  Plaintiff States also have no way to know what entities qualify under the criterion for receiving $800,000 in total Medicaid payments in 2023.  Many healthcare providers operate in multiple states and/or may see patients from—and therefore receive Medicaid reimbursements from—multiple states.  But Plaintiff States only track their own Medicaid payments from state and federal funds; they do not track the total amount of Medicaid payments that providers who operate in multiple states may receive.  *See, e.g.*, Doc. No. 62-6 at 9; Doc. No. 62-15 at 7.  The Defund Provision provides no guidance about how the amount of Medicaid payments in 2023 is to be measured.  And if Plaintiff States are wrong in any of their interpretations, they risk Defendants requiring repayment of federal reimbursements that Plaintiff States have already made.  *See* Doc. No. 61-4 at 4-5; *see also* Flores-Brennan Decl. (CO), Doc. No. 62-7 at 10; Doc. No. 62-13 at 9; Doc. No. 62-15 at 7; Doc. No. 62-18 at 8-9.

Further, the Defund Provision sweeps in all "affiliates" of providers that otherwise qualify as "prohibited entities."  But Plaintiff States do not track the "affiliates" of Medicaid providers, particularly if those "affiliates" operate outside of their respective borders.  *See, e.g.*, Doc. No. 62-15 at 7.  Nor could they, given the vagueness of the term "affiliate."  Without further guidance from the provision, Plaintiff States can use only general resources to ascertain who to include as "affiliates."  One dictionary defines "affiliate" expansively.  *Affiliate*, Merriam Webster Dictionary, https://www.merriam-webster.com/dictionary/affiliate (last visited Sept. 12,

2025).  The Defund Provision offers no limitation on the scope of the term nor does it provide

guidance about the form of relationships that qualify.  *Compare* Section 71113 *with* 19 U.S.C. §

1677(33) (defining term "affiliated" and "affiliated persons").

The position taken by Defendants in their litigation with PPFA about the term "affiliate"

further muddles Plaintiff States' obligations.  *See* PPFA Litigation Doc. No. 53.  There,

Defendants argue that PPFA members who do not otherwise qualify as "prohibited entities"

nevertheless could qualify as "affiliates" of qualifying members exclusively through membership

in PPFA.  *Id.* at 27-30.  Defendants contend that they must "probe" the relationship between

PPFA and its members to determine whether there is sufficient "control" for all PPFA members

to qualify as "affiliates" of each other.  *Id.* at 27.  Even if Defendants could make that

determination for PPFA members—the obvious intended target of the Defund Provision, *see*

*supra* Section Background.I.B—that determination says nothing about other potential

"prohibited entities."  This is not information Plaintiff States currently collect.  *See, e.g.*, Doc.

No. 62-15 at 7; Doc. No. 62-18 at 8.  And it would require Plaintiff States to launch intrusive

probes into providers' relationships and services that are wholly unrelated to the purpose of the

Medicaid program, which is the delivery of essential healthcare to needy individuals.  *See*

*Schweiker v. Hogan*, 457 U.S. 569, 590 (1982).

Viewing this provision from the perspective of Plaintiff State officials, the Defund

Provision does not provide adequate notice about the conditions under which they can accept

federal Medicaid reimbursements.  It tasks Plaintiff States with not only examining whether

providers within their boundaries satisfy the criteria—which they cannot do—but also with

determining whether providers have an association with entities that would otherwise qualify as

"prohibited entities"—again, a nearly impossible task.  *See Cummings v. Premier Rehab Keller,*

*P.L.L.C.*, 596 U.S. 212, 219 (2022) ("Recipients cannot 'knowingly accept' the deal with the Federal Government unless they 'would clearly understand … the obligations' that would come along with doing so."); *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.").

   *Second*, the Defund Provision fails to provide clear notice with regard to its irreconcilable timing provisions.  The Defund Provision sets its "effective" date as the date of its enactment (i.e., July 4, 2025) but sets the date for determination of providers' "prohibited entity" status as the "first day of the first quarter after the date" of its enactment (i.e., October 1, 2025).[3]  Section 71113(A)(i)-(iii).  In other words, the Defund Provision prohibits payments to "prohibited entities" as of July 4, despite the status of "prohibited entity" not being set until October 1, 2025. Between July 4 and October 1, however, Plaintiff States are obligated to make payments on providers' claims within thirty days of submission, *see* 42 C.F.R. § 447.45(d), and nothing in the Defund Provision requires CMS to provide notice to Plaintiff States of which providers qualify as "prohibited entities."  As such, Plaintiff States may end up using federal Medicaid funds during this period to reimburse providers that CMS later decides are "prohibited entities"— thereby requiring repayment of those funds.

   Defendants' arguments in the related PPFA litigation only underscore the irreconcilability. *See* PPFA Litigation Doc. No. 53 at 40-41.  They argue that "a Medicaid provider in any given state can generally expect to receive payment from the state within 30 days of submitting a claim," at which point Plaintiff States "incur an expenditure to include in the state's" reporting to

_____

[3] Those three criteria are:  1) being a 501(c)(3) organization; 2) being an essential community provider primarily engaged in family planning services, reproductive health, and related medical care; 3) and providing for abortions.  Section 71113(A)(i)-(iii).

CMS. *Id.* at 40. But Defendants further explain that "under Section 71113, states will not know whether a provider is a prohibited entity until October 1; thus, they will not be able to definitively deny any claims until that date." *Id.* at 41. The only clue Defendants offer about how States should proceed is to contend that CMS will "adjust[]" federal reimbursements by sometime in April 2026. *Id.* at 41 n.3. In other words, if Plaintiff States pay providers who have not yet qualified as "prohibited entities" but ultimately are found to qualify, CMS will expect Plaintiff States to repay those funds. *Id.* at 41 n.3. But, as Defendants acknowledge, definitive information about providers' status cannot be known *until* October 1. *Id.* at 41; *see also* 42 C.F.R. § 447.45. The Defund Provision thus fails to provide Plaintiff States with clear notice of the conditions attached to the funding in question. *See Arlington*, 548 U.S. at 296 ("States cannot knowingly accept conditions of which they are . . . 'unable to ascertain.'"). As such, the Defund Provision unconstitutionally fails to provide clear notice.

**B.    The Defund Provision Is an Unprecedented Incursion on State Authority that States Could Not Have Anticipated at the Time They Entered into the Medicaid Program**

The Defund Provision is unprecedented in the history of the Medicaid program. By restricting the providers who can receive federal Medicaid reimbursements, the Defund Provision steps into Plaintiff States' traditional role governing the medical profession for the very first time. Congress cannot "surprise[e] participating States with post acceptance" conditions that so dramatically change the relationship between States and the federal government. *Pennhurst*, 451 U.S. at 25.

"States have traditionally exercised primary responsibility over 'matters of health and safety,' including the regulation of the practice of medicine." *Medina*, 145 S. Ct. at 2227; *cf. De Buono v. NYSA-ILA Med. & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) ("[T]he historic police powers of the State include the regulation of matters of health and safety"). Consistent

11

with that traditional role, for the past sixty years, the Medicaid program has left to States the determination of which providers "qualify" for Medicaid participation.  42 U.S.C. § 1396a(23)(A); *Medina*, 145 S. Ct. at 2227.

The Defund Provision, however, undercuts Plaintiff States' traditional discretion in determining providers' qualifications and usurped their policy judgments.  *See Medina*, 145 S. Ct. at 2227; *see also Gregory v. Ashcroft*, 501 U.S. 452 (1991) ("[T]he States retain substantial sovereign powers under our constitutional scheme, powers with which Congress does not readily interfere.").  In an unprecedented shift, the Defund Provision requires Plaintiff States to prohibit providers from receiving federal Medicaid reimbursement based on federal criteria that have nothing to do with providers' qualifications, looking instead to unrelated criteria:  their tax status; the types of services they provide, including services that Medicaid does not fund; their funding level from 2023; and their affiliations with other providers.  *See* Section 71113(A), (B).  Given that throughout the sixty-year history of Medicaid, States—not the federal government— have determined whether providers "qualify" for the Medicaid program, Plaintiff States could not have anticipated this type of unprecedented change.  *See Medina*, 145 S. Ct. at 2227.  By deeming a category of providers unfit for federal Medicaid reimbursement, the Defund Provision is wholly unprecedented, not just an "adjustment[] to the Medicaid program as it developed." *Nat'l Fed. of Indep. Bus. v. Sebelius*, 567 U.S. 519, 583 (2012); *see also Barnett v. Short,* 129 F.4th 534, 541 (8th Cir. 2025) ("[W]e consider whether a prospective funding recipient, at the time it decided whether to accept federal dollars, would have been aware" of conditions).

## II.   PLAINTIFF STATES ARE SUFFERING IRREPARABLE HARM

Because of the Defund Provision, Plaintiff States are "likely to suffer irreparable harm in the absence of preliminary relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc*., 875 F.2d 907, 915 (1st Cir. 1989). States' irreparable harm can include "obligation of new debt," "inability to pay existing debt," and "impediments to planning, hiring, and operations." *See New York v. Trump*, 133 F.4th 51, 73 (1st Cir. 2025).

### A.   Plaintiff States' Administrative Costs

Plaintiff States are currently burdened with administrative costs to try to implement the Defund Provision and its wholly ambiguous terms. These kind of "[u]nrecoverable compliance costs" qualify as irreparable harm. *See State of Tenn. v. Dept. of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024); *see also Texas v. EPA*, 829 F.3d 405, 432 (5th Cir. 2016) ("Indeed, 'complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs.'").

For example, Hawaii "has already had to implement billing system changes and finance system holds" and has had to address inquiries due to the Defund Provision's ambiguity. Doc. No. 62-10 at 5. And Wisconsin will "need to update the financial reporting system to appropriately exclude" prohibited entities and "establish a process to identify if any other entity meets the definition." Doc. No. 62-24 at 5. New York is conducting a review of its claims payment and processing system to identify the necessary changes that will have to be made because no infrastructure currently exists to filter out New York providers falling under the definition of "prohibited entities." Doc. No. 62-20 at 7-8. Moreover, New York's data

management information system that handles claims, payments, and other related data for the

state's Medicaid program is extremely difficult to modify, with minor changes often taking over

12 months. *Id.*

Other Plaintiff States similarly are already undertaking, or will shortly have to undertake,

administrative burdens to try to comply. *See, e.g.*, Doc. No. 62-6 at 8-9; Doc. No. 62-7 at 9-10;

Doc. No. 62-11 at 4; Doc. No. 62-13 at 9; Doc. No. 62-15 at 7; Doc. No. 62-18 at 7-8; Doc. No.

62-19 at 9; Doc. No. 62-21 at 9-10; Fotinos Decl. (WA), Doc. No. 62-23 at 7-8. These

administrative burdens cost Plaintiff States staff time and resources that Plaintiff States cannot

recoup from Defendants. *See, e.g.*, Doc. No. 62-6 at 7-8; Doc. No. 62-7 at 9-10; Doc. No. 62-10

at 5; Doc. No. 62-11 at 4; Doc. No. 62-13 at 9; Doc. No. 62-15 at 7-8; Doc. No. 62-18 at 7-8;

Doc. No. 62-19 at 9; Doc. No. 62-20 at 7-8; Doc. No. 62-21 at 9-10; Doc. No. 62-23 at 8 Doc.

No. 62-24 at 5. Plaintiff States can only avoid these costs by this Court enjoining the Defund

Provision while its constitutionality is addressed.

Further, even if Plaintiff States were able to administer the Defund Provision, it interferes

with operation of their Medicaid programs by restricting Plaintiff States' ability to decide which

providers qualify to participate in their State Medicaid programs and restricting States from

directing federal funds to certain providers. Such interference with States' operation of their

own programs qualifies as irreparable harm. *See, e.g., Ohio v. EPA*, 144 S. Ct. 2040, 2053

(2024) (citing States' "sovereign interests in regulating their own industries and citizens").

### B.    Plaintiff States' Increased Healthcare Costs

The Defund Provision also significantly impacts the healthcare ecosystems in Plaintiff

States. By targeting providers who offer essential reproductive and family planning healthcare,

the Defund Provision will cause 1) a material decrease in providers offering such critical care; 2)

leading to overwhelmed alternative health centers that cannot absorb those providers' patients; 3) and those providers' patients not receiving critical care, including screenings for STIs and cancer; 4) resulting in increased short- and long-term healthcare costs to Plaintiff States that constitute irreparable harm.

*First*, by prohibiting federal Medicaid funding for Planned Parenthood health centers and other "prohibited entity" health centers that were swept into Congress' attack on Planned Parenthood, many of those health centers will, at the very least, restrict treatment for Medicaid patients in Plaintiff States. For example, PPFA has stated that the Defund Provision "is already forcing [PPFA] Members to turn away patients enrolled in Medicaid" and will result in its members having "to severely curtail the services they provide to many of their low-income patients." *See* Doc. No. 61-1 at 4; *see also id.* at 17; RJN Exs. 2, 3, Doc. No. 61-2 at 44, Doc. No. 61-3 at 16; Groen Decl. (MI), Doc. No. 62-14 at 7. Indeed, the brief periods when the Defund Provision was in effect before this Court's preliminary injunction already caused the closure of five Planned Parenthood health centers in California. E. Connolly Decl., Ex. 4, Doc. No. 62-4. And Maine Family Planning ("MFP"), which has been swept into the Defund Provision, Doc. No. 62-13 at 7-8, has detailed how its clinics "are no longer accepting new patients enrolled in Medicaid who are seeking primary care" and will stop providing care to Medicaid patients by October 31, 2025. RJN Ex. 5, Doc. No. 61-5 at 11, 12.

*Second*, the loss of services that Planned Parenthood health centers and other "prohibited entities" provide to Medicaid patients will result in significant disruption to the healthcare ecosystems in Plaintiff States. In 2022, Planned Parenthood health centers served up to 72% of patients in Plaintiff States who rely on government funding for seeking sexual and reproductive healthcare. Kavanaugh Decl., Doc. No. 62-5 at 16. In eight of the Plaintiff States, Planned

Parenthood health centers served at least 50% of such patients.[4]  *Id.*  And in Maine, MFP and

Planned Parenthood of Northern New England ("PPNNE") served 43% of all Medicaid patients

receiving family planning or reproductive healthcare.  Doc. No. 62-13 at 8.

Because of the high volume of patients that Planned Parenthood health centers and other

potential "prohibited entities" treat, other healthcare centers not targeted by the Defund Provision

will not be able to care for those patients.  Doc. No. 62-5 at 23-24; *see also* Doc. No. 62-6 at 10,

26-27; Doc. No. 62-7 at 8; Halsey Decl. (CT), Doc. No. 62-8 at 7-8; Wilson Decl. (DE), Doc.

No. 62-9 at 6-7; Doc. No. 62-10 at 5-6; Doc. No. 62-13 at 8-9; Doc. No. 62-14 at 6-7; Woodrich

Decl. (MN), Doc. No. 62-16 at 6; Bush Decl. (NC), Doc. No. 62-17 at 5; Doc. No. 62-18 at 6-7;

Doc. No. 62-21 at 7; Sousa Decl. (RI), Doc. No. 62-22 at 5-6; Doc. No. 62-23 at 7, 9; Doc. No.

62-24 at 4.  These alternative healthcare centers would have to increase their caseloads

significantly:  federally qualified health centers ("FQHCs") by 56%[5]; health departments by

28%; hospitals by 53%; and other miscellaneous sites by 55%.  Doc. No. 62-5 at 23-24.  In seven

of the Plaintiff States, FQHCs would have to increase their caseloads by more than 100% to

absorb the patients no longer treated by Planned Parenthood health centers,[6] and in two other

Plaintiff States, FQHCs would have to increase their caseloads by more than 80%.[7]  *Id.* at 24-25.

In addition, likely "prohibited entities," such as Planned Parenthood health centers, provide

specialized reproductive healthcare that alternative health centers do not.  Doc. No. 62-5 at 17-

---

[4] The eight states are California (49%), Connecticut (72%), Minnesota (66%), New Jersey (58%), Oregon (57%), Vermont (68%), Washington (59%), and Wisconsin (59%).  Doc. No. 62-5 at 16.

[5] FQHCs are "[f]ederally funded nonprofit health centers or clinics that serve medically underserved areas and populations."  *See* Federally Qualified Health Center (FQHC), Healthcare.gov, https://www.healthcare.gov/glossary/federally-qualified-health-center-fqhc/ (last visited Sept. 11, 2025).

[6] Those seven states are Connecticut, Minnesota, New Jersey, Vermont, Washington, and Wisconsin.  Doc. No. 62-5 at 24.

[7] Those two states are California and Maryland.  Doc. No. 62-5 at 24.

18; *see also* Doc. No. 62-7 at 8.  For example, they are more likely than alternative health centers to offer 1) the widest range of contraceptive methods; 2) 12-month supplies of oral contraceptive pills; 3) same-day IUD and contraceptive implant insertion; and 4) cervical cancer screenings, medication for HIV prevention, and HPV vaccination.  Doc. No. 62-5 at 18-21.  Even if alternative health centers could extend their capacity to take up the additional patient caseload, they would not provide the same specialized care to serve those patients' needs.  *Id*.

Third, because of both the restriction of services at Planned Parenthood health centers and other "prohibited entities" and the improbability of alternative health centers absorbing the influx of patients, Medicaid-eligible patients in Plaintiff States are likely to face more barriers to healthcare, which predictably will result in those patients foregoing early screenings and treatments and Plaintiff States facing increased healthcare expenses.  *See, e.g.*, Doc. No. 62-6 at 10-11; Doc. No. 62-7 at 10; Doc. No. 62-8 at 8; Doc. No. 62-9 at 6-7; Doc. No. 62-10 at 5-6; Boyle Decl. (MA), Doc. No. 62-12 at 6; Doc. No. 62-14 at 7-8; Doc. No. 62-13 at 10-11; Doc. No. 62-16 at 6; Doc. No. 62-17 at 6; Doc. No. 62-19 at 7-8; Doc. No. 62-20 at 9-10; Doc. No. 62-21 at 7-8; Doc. No. 62-22 at 6; Doc. No. 62-23 at 9; Doc. No. 62-24 at 4.  After Planned Parenthood health centers lost Title X federal funding following the 2019 Title X Final Rule, their patients were less likely to have received recent contraceptive care and were less likely to report use of a contraceptive method with which they were satisfied.  Doc. No. 62-5 at 26-27.

Both Iowa and Texas have independently excluded Planned Parenthood health centers from their state Medicaid funding, and studies following those decisions demonstrate the likelihood that low-income patients will not get necessary care.  *Id.* at 27-31.  There was an 86% decline in low-income patients served within Iowa's family planning program after the policy change.  *Id.* at 27.  And Iowa saw spikes in cases of gonorrhea, chlamydia, and syphilis in the

year following the policy change.  *Id.* at 34.  Likewise, in Texas, patients had to pay more for

contraceptive services after that state's exclusion of Planned Parenthood health centers from its

Medicaid program, and there was both a significant decrease in the use of long-acting

contraception and a concomitant increase in Medicaid-covered childbirths.  *Id.* at 30-31.

The restriction of services at Planned Parenthood health centers and other potential

"prohibited entities" will also result in patients not receiving critical testing and treatment of

sexually transmitted infections ("STIs") and reproductive cancers.  *Id.* at 31-32; *see also* Doc.

No. 62-21 at 7-8 ("each additional 10 minutes of driving time" "associated with significant

decreases in the receipt of preventive care").  The services that Planned Parenthood health

centers provided in 2023 alone accounted for the prevention of an estimated 82,000 chlamydia

infections; 9,500 cases of pelvic inflammatory disease; 820 ectopic pregnancies; 1,600 cases of

infertility; 130 HIV infections; and 200 cervical cancer cases.  Doc. No. 62-5 at 33.

The decrease in preventative care for these patients will result in increased healthcare costs

for Plaintiff States in both the immediate and longer term.  *See, e.g.*, Doc. No. 62-6 at 10; Doc.

No. 62-16 at 7-8.  For example, a study of Medicaid claims data showed that the cost for

contraception is only 6.6% of the cost for unintended pregnancies.  Doc. No. 62-21 at 9.  Another

study looking at publicly funded family planning services showed that the care patients receive at

those visits results in net government savings of $7.00 for every $1.00 that governments spend.

*Id.*  And treatment for later-stage breast and cervical cancer is much more expensive than

screenings and early or preventative treatment.  RJN Exs. 6, 7, Doc. No. 61-6, Doc. No. 61-7.

*Fourth*, because of the Defund Provision's impact on their healthcare ecosystems, Plaintiff

States must make a difficult choice (if their fiscs even allow them to make this choice) to either:

1) supplement the withheld federal Medicaid funds with money from their own coffers, thereby

not only foregoing federal funds to which they would otherwise be entitled but also diverting resources away from other programs, such schools, transportation funds, and emergency services; or 2) not supplement those funds, with Planned Parenthood health centers and other potential "prohibited entities" predictably not seeing Medicaid patients (or closing altogether), and those Medicaid patients not receiving preventative care that avoids long-term higher healthcare costs.  *See, e.g.*, Doc. No. 62-6 at 11; Doc. No. 62-7 at 11; Doc. No. 62-8 at 8-9; Doc. No. 62-9 at 6-7; Doc. No. 62-10 at 6; Doc. No. 62-13 at 10-11; Doc. No. 62-14 at 8; Doc. No. 62-15 at 6-7; Doc. No. 62-16 at 6-8; Doc. No. 62-17 at 6; Doc. No. 62-18 at 9; Doc. No. 62-19 at 9; Doc. No. 62-20 at 9-10; Doc. No. 62-21 at 8-9; Doc. No. 62-22 at 6; Doc. No. 62-23 at 9; Doc. No. 62-24 at 6.  The Defund Provision thus risks significant irreparable harm to Plaintiff States. *See Cook Cnty., Ill. v. Wolf*, 962 F.3d 208, 233 (7th Cir. 2020) ("significant increase in costs," "higher . . . risk" of "communicable diseases," and having to "divert resources away from existing programs" qualify as irreparable harm).

### III.  BALANCE OF EQUITIES AND PUBLIC INTEREST SUPPORT THE PLAINTIFF STATES' PRELIMINARY INJUNCTION REQUEST

The equities and public interest further favor the Plaintiff States' requested relief.  *See, e.g., Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (these factors "merge when the [g]overnment is the opposing party").  "The public has an important interest in making sure government agencies follow the law."  *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005).  In contrast, CMS has "no interest in enforcing an unconstitutional law, [and] the public interest is harmed by the enforcement of laws repugnant to the United States Constitution."  *N.H. Indonesian Community Support v. Trump*, 765 F. Supp. 3d 102, 112 (D.N.H. 2025) (alteration in original).

Both the balance of equities and the public interest favor Plaintiff States' requested preliminary injunction.[8]  As Plaintiff States explained above, the Defund Provision fails to provide them with clear notice and therefore is an unconstitutional exercise of Congress' spending power.  *See supra* Section Arg.I.A.  And Plaintiff States are already suffering and will continue to suffer irreparable harm in the form of administrative burdens and immediate and longer-term costs to their public fiscs in the form of increased public healthcare costs if the Defund Provision remains in effect.  *See supra* Section Arg.II.

In contrast, a preliminary injunction would not impose monetary harm on the federal government.[9]  Defendants are theoretically willing to fund the underlying care that the "prohibited entities" offer, just not when Planned Parenthood health centers happen to provide it.  And given the disruptions to Plaintiff States' healthcare ecosystems and the resulting negative impact on patient healthcare, *see supra* Section Arg.II.B, the public interest weighs heavily against implementation of the Defund Provision.

## CONCLUSION

This Court should grant Plaintiff States' preliminary injunction request.

---

[8] Nor does the timing of Plaintiff States' motion change the balance of equities.  The Court's preliminary injunction in the PPFA litigation ensured that Plaintiff States could continue providing federal reimbursement to Planned Parenthood health centers that are the targets of the Defund Provision and also provide a significant proportion of Medicaid-funded family planning and reproductive healthcare services in Plaintiff States.  *See supra* Section Arg.II.B.  The First Circuit's stay of that injunction makes even more imminent the potential harms from the Defund Provision, thereby justifying Plaintiff States' motion at this time.

[9] The Court should not require a bond for issuance of the preliminary injunction.  The Federal Rules of Civil Procedure ordinarily require "security in an amount the court considers proper" before a preliminary injunction may issue. Fed. R. Civ. P. 65(c). "However, the First Circuit has recognized an exception to the bond requirement in suits to enforce important federal rights or public interests, as is precisely the case here." *New York v. McMahon*, 784 F. Supp. 3d 311, 373 (D. Mass. 2025).

Date:  September 24, 2025

**ANDREA JOY CAMPBELL**
Attorney General
Commonwealth of Massachusetts

*/s/ Allyson Slater*
ALLYSON SLATER (BBO No. 704545)
*Director, Reproductive Justice Unit*
MORGAN CARMEN (BBO No. Pending)
*Assistant Attorney General*
Office of the Attorney General
One Ashburton Place, 20th Floor
Boston, MA 02108
(617) 963-2811
Allyson.slater@mass.gov
*Attorneys for Plaintiff Commonwealth of Massachusetts*

Respectfully Submitted,

**ROB BONTA**
Attorney General
State of California

*/s/ Erica Connolly*
ERICA CONNOLLY*
Deputy Attorney General
NELI PALMA*
Senior Assistant Attorney General
KARLI EISENBERG*
Supervising Deputy Attorney General
1300 I Street
Sacramento, CA 95814
(916) 210-7755
Erica.Connolly@doj.ca.gov
*Attorneys for Plaintiff State of California*

**LETITIA JAMES**
Attorney General
State of New York

*/s/ Galen Sherwin*
GALEN SHERWIN*
Special Counsel for Reproductive Justice
RABIA MUQADDAM*
Chief Counsel for Federal Initiatives
COLLEEN K. FAHERTY*
Special Trial Counsel
IVAN NEVADO*
Assistant Attorney General
28 Liberty Street
New York, NY 10005
(212) 416-8059
Galen.Sherwin@ag.ny.gov;
*Attorneys for Plaintiff State of New York*

**WILLIAM TONG**
Attorney General
State of Connecticut

*/s/ Alma Nunley*
ALMA NUNLEY*
Special Counsel for Reproductive Rights
JANELLE R. MEDEIROS*
Special Counsel for Civil Rights
165 Capitol Ave
Hartford, CT 06106
(860) 808-5020
Alma.Nunley@ct.gov
Janelle.Medeiros@ct.gov
*Attorneys for Plaintiff State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General
State of Delaware

By: /s/ *Vanessa L. Kassab*
VANESSA L. KASSAB*
Deputy Attorney General
IAN R. LISTON*
Director of Impact Litigation
JENNIFER KATE AARONSON*
Deputy Attorney General
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
302-683-8803
Jennifer.Aaronson@delaware.gov
*Attorneys for Plaintiff State of Delaware*

**PHILIP J. WEISER**
Attorney General
State of Colorado

/s/ *Nora Q.E. Passamaneck*
NORA Q.E. PASSAMANECK*
Senior Assistant Attorney General
Colorado Department of Law
1300 Broadway, 10th Floor
Denver, CO 80203
Phone: (720) 508-6000
nora.passamaneck@coag.gov
*Attorneys for Plaintiff State of Colorado*

**BRIAN L. SCHWALB**
Attorney General
District of Columbia

/s/ *Nicole S. Hill*
NICOLE S. HILL*
Assistant Attorney General
Office of the Attorney General for the District
of Columbia
400 Sixth Street, NW
Washington, D.C. 20001
(202) 727-4171
nicole.hill@dc.gov
*Attorneys for Plaintiff District of Columbia*

**ANNE E. LOPEZ**
Attorney General
State of Hawaiʻi

/s/ *Kalikoʻonālani D. Fernandes*
KALIKOʻONĀLANI D. FERNANDES*
Solicitor General
DAVID D. DAY*
Special Assistant to the Attorney General
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov
*Attorneys for Plaintiff State of Hawaiʻi*

**KWAME RAOUL**
Attorney General
State of Illinois

*/s/ Caitlyn G. McEllis*
CAITLYN G. MCELLIS*
Senior Policy Counsel
ELIZABETH MORRIS*
Deputy Bureau Chief, Special Litigation
Bureau
SARAH J. GALLO*
Assistant Attorney General
Office of the Illinois Attorney General
115 S. Lasalle Street
Chicago, IL 60603
312-814-3000
Caitlyn.McEllis@ilag.gov
Elizabeth.Morris@ilag.gov
Sarah.Gallo@ilag.gov
*Attorneys for Plaintiff State of Illinois*


**ANTHONY G. BROWN**
Attorney General
State of Maryland

*/s/ James C. Luh*
JAMES C. LUH*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us
*Attorneys for Plaintiff State of Maryland*


**AARON M. FREY**
Attorney General
State of Maine

*/s/ Halliday Moncure*
HALLIDAY MONCURE*
Assistant Attorney General
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.: 207-626-8800
halliday.moncure@maine.gov
  *Attorneys for Plaintiff State of Maine*


**DANA NESSEL**
Attorney General
State of Michigan

*/s/ Kyla Barranco*
KYLA BARRANCO*
NEIL GIOVANATTI*
Assistant Attorneys General
Michigan Department of Attorney General
525 W. Ottawa
Lansing, MI 48909
(517) 335-7603
BarrancoK@michigan.gov
GiovanattiN@michigan.gov
*Attorneys for Plaintiff State of Michigan*

**KEITH ELLISON**
Attorney General
State of Minnesota

*/s/ Katherine J. Bies*
KATHERINE J. BIES*
Special Counsel, Rule of Law
445 Minnesota Street, Suite 600
St. Paul, Minnesota, 55101
(651) 300-0917
Katherine.Bies@ag.state.mn.us
*Attorneys for Plaintiff State of Minnesota*


**RAÚL TORREZ**
Attorney General
State of New Mexico

*/s/ Amy Senier*
AMY SENIER
Senior Counsel
New Mexico Department of Justice
P.O. Drawer 1508
Santa Fe, NM 87504-1508
(505) 490-4060
asenier@nmdoj.gov
*Attorneys for Plaintiff State of New Mexico*


**JEFF JACKSON**
Attorney General
State of North Carolina

*/s/ Marc D. Brunton*
MARC D. BRUNTON*
Assistant Deputy Attorney General
LAURA HOWARD*
Chief Deputy Attorney General
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
(919) 716-0151
mbrunton@ncdoj.gov
*Attorneys for Plaintiff State of North Carolina*


**MATTHEW J. PLATKIN**
Attorney General
State of New Jersey

*/s/ Jessica L. Palmer*

JESSICA L. PALMER*
ELIZABETH R. WALSH*
Deputy Attorneys General
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-5279
Jessica.Palmer@law.njoag.gov
Elizabeth.Walsh@law.njoag.gov
*Attorneys for Plaintiff State of New Jersey*


**AARON D. FORD**
Attorney General
State of Nevada

*/s/ Heidi Parry Stern*
HEIDI PARRY STERN* (Bar. No. 8873)
Solicitor General
Office of the Nevada Attorney General
1 State of Nevada Way, Suite 100
Las Vegas, NV 89119
HStern@ag.nv.gov
*Attorneys for Plaintiff State of Nevada*


**DAN RAYFIELD**
Attorney General
State of Oregon

*/s/ Christina L. Beatty-Walters*
CHRISTINA L. BEATTY-WALTERS*
Senior Assistant Attorney General
KATE E. MORROW
Assistant Attorney General
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Tina.BeattyWalters@doj.oregon.gov
Kate.E.Morrow@doj.oregon.gov
*Attorneys for Plaintiff State of Oregon*

24

**JOSH SHAPIRO,**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

*/s/ Michael J. Fischer*
MICHAEL J. FISCHER⚕
Executive Deputy General Counsel
JENNIFER SELBER⚕
General Counsel
JONATHAN D. KOLTASH⚕
Deputy General Counsel for Healthcare
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(717) 831-2847
mjfischer@pa.gov
*Attorneys for Plaintiff Governor Josh Shapiro*

**CHARITY R. CLARK**
Attorney General
State of Vermont

*/s/ Jonathan T. Rose*
JONATHAN T. ROSE*
Solicitor General
109 State Street
Montpelier, VT 05609
(802) 828-3171
jonathan.rose@vermont.gov
*Attorneys for Plaintiff State of Vermont*

**JOSHUA L. KAUL**
Attorney General
State of Wisconsin

*/s/ Faye B. Hipsman*
FAYE B. HIPSMAN*
Assistant Attorney General
Wisconsin Department of Justice
Post Office Box 7857
Madison, Wisconsin 53707-7857
608-264-9487
faye.hipsman@wisdoj.gov
*Attorneys for Plaintiff State of Wisconsin*

**PETER F. NERONHA**
Attorney General
State of Rhode Island

*/s/ Dorothea R. Lindquist*
DOROTHEA R. LINDQUIST*
(RI Bar No. 6661)
Special Assistant Attorney General
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2098
dlindquist@riag.ri.gov
*Attorneys for the Plaintiff State of Rhode Island*

**NICHOLAS W. BROWN**
Attorney General
State of Washington

*/s/ Lauryn K. Fraas*
LAURYN K. FRAAS* WSBA #53238
WILLIAM MCGINTY* WSBA #41868
Assistant Attorneys General
800 Fifth Avenue, Suite 2000
Seattle, WA 98104-3188
(206) 464-7744
Lauryn.Fraas@atg.wa.gov
William.McGinty@atg.wa.gov
*Attorneys for Plaintiff State of Washington*

*Admitted Pro Hac Vice
⚕ Application for pro hac vice admission forthcoming

SA2025303982

25