# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MASSACHUSETTS

STATE OF CALIFORNIA, *et al.*,

                          *Plaintiffs*,

      v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, *et al.*,

                         *Defendants*.

No. 1:25-cv-12118-IT

# DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION
# FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ...................................................................................................................1

BACKGROUND ....................................................................................................................2

I.    The Medicaid Program ...............................................................................................2

II.   Section 71113 of the One Big Beautiful Bill ............................................................3

III.  This Litigation .............................................................................................................4

STANDARD OF REVIEW ....................................................................................................5

ARGUMENT .........................................................................................................................5

I.    Plaintiffs are Unlikely to Succeed on the Merits ......................................................6

     A.    Section 71113 Provides Clear Notice ...........................................................6

     B.    Section 71113 Does Not Intrude on State Authority ....................................9

II.   Plaintiffs Fail to Establish Article III Standing or Irreparable Harm ......................11

     A.    The States' Administrative Costs Are Not Irreparable Harm .......................12

     B.    The States' Contingent Projections About Increases in the Costs of Healthcare Do Not Create Standing or Irreparable Harm ......................................................14

     C.    The States' Significant Delay in Seeking Injunctive Relief Undermines Their Assertion of Irreparable Harm ......................................................................17

III.  The Balance of Equities and the Public Interest Favor the Government ..................18

IV.  A Bond Should Accompany Any Injunctive Relief .................................................19

V.   Any Injunctive Relief Should Be Stayed Pending Appeal .......................................20

CONCLUSION .....................................................................................................................20

## TABLE OF AUTHORITIES

**Cases**

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.,*
    570 U.S. 205 (2013) ....................................................................................................18

*Arizona v. Biden,*
    40 F.4th 375 (6th Cir. 2022) .....................................................................................15

*Ark. Dep't of Health & Hum. Servs. v. Ahlborn,*
    547 U.S. 268 (2006) ....................................................................................................2

*Benning v. Georgia,*
    391 F.3d 1299 (11th Cir. 2004) .................................................................................7

*Bowen v. Kendrick,*
    483 U.S. 1304 (1987) ...........................................................................................18, 19

*Cacchillo v. Insmed, Inc.,*
    638 F.3d 401 (2d Cir. 2011) .....................................................................................12

*Carney v. Adams,*
    592 U.S. 53 (2020) ....................................................................................................11

*Charles v. Verhagen,*
    348 F.3d 601 (7th Cir. 2003) ......................................................................................7

*Charlesbank Equity Fund II v. Blinds To Go, Inc.,*
    370 F.3d 151 (1st Cir. 2004) ...............................................................................11, 17

*Clapper v. Amnesty Int'l USA,*
    568 U.S. 398 (2013) ..................................................................................................16

*CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.,*
    48 F.3d 618 (1995) ....................................................................................................14

*Cook Cnty. v. McAleenan,*
    417 F. Supp. 3d 1008 (N.D. Ill. 2019) .....................................................................17

*Cook Cnty. v. Wolf,*
    962 F.3d 208 (7th Cir. 2020) ...............................................................................16, 17

*Ctr. for Reprod. L. & Pol'y v. Bush,*
    304 F.3d 183 (2d Cir. 2002) .....................................................................................10

*Cutter v. Wilkinson,*
    423 F.3d 579 (6th Cir. 2005) ......................................................................................7

*Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.,*
    526 U.S. 629 (1999) ....................................................................................................7

*Dep't of Educ. v. California,*
    604 U.S. 650 (2025) ..................................................................................................20

*District 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo,*
    18 F.4th 38 (1st Cir. 2021) ........................................................................................18

*Family Planning Ass'n of Me. v. HHS*,
No. 1:25-cv-00364, 2025 WL 2439209 (D. Me. Aug. 25, 2025)......................18

*FDA v. All. For Hippocratic Med.*,
602 U.S. 367 (2024)....................................................................... 13, 17

*Florida v. Mellon*,
273 U.S. 12 (1927)................................................................................15

*Goodwin v. C.N.J., Inc.*,
436 F.3d 44 (1st Cir. 2006)......................................................................9

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*,
959 F.3d 178 (5th Cir. 2020)..................................................................10

*Haaland v. Brackeen*,
599 U.S. 255 (2023)..............................................................................14

*Hilton v. Braunskill*,
481 U.S. 770 (1987)..............................................................................20

*Hochendoner v. Genzyme Corp.*,
823 F.3d 724 (1st Cir. 2016)...................................................................14

*Jackson v. Birmingham Bd. of Educ.*,
544 U.S. 167 (2005)................................................................................7

*Lujan v. Defs. of Wildlife*,
504 U.S. 555 (1992)..............................................................................14

*Maher v. Roe*,
432 U.S. 464 (1977)..............................................................................10

*Matos ex rel. Matos v. Clinton Sch. Dist.*,
367 F.3d 68 (1st Cir. 2004)....................................................................11

*Mayweathers v. Newland*,
314 F.3d 1062 (9th Cir. 2002)...................................................................7

*Medina v. Planned Parenthood S. Atl.*,
145 S. Ct. 2219 (2025)..........................................................................10

*Murthy v. Missouri*,
603 U.S. 43 (2024)...............................................................................11

*Narragansett Indian Tribe v. Guilbert*,
934 F.2d 4 (1st Cir. 1991)......................................................................11

*Nat'l Treasury Emps. Union v. Trump*,
No. 25-5157, 2025 WL 1441563 (D.C. Cir. May 16, 2025)..........................19

*NFIB v. Sebelius*,
567 U.S. 519 (2012).......................................................................10, 11

*Nieves-Marquez v. Puerto Rico*,
353 F.3d 108 (1st Cir. 2003).....................................................................5

*Nken v. Holder,*
    556 U.S. 418 (2009) ................................................................................ 4, 18

*Pennhurst State Sch. & Hosp. v. Halderman,*
    451 U.S. 1 (1981) ................................................................................ 6, 7

*Pennsylvania v. New Jersey,*
    426 U.S. 660 (1976) ................................................................................ 16

*Rust v. Sullivan,*
    500 U.S. 173 (1991) ................................................................................ 10, 19

*Sierra Club v. Larson,*
    769 F. Supp. 420 (D. Mass. 1991) .......................................................... 13

*Sindicato Puertorriqueño de Trabajadores v. Fortuño,*
    699 F.3d 1 (1st Cir. 2012) ....................................................................... 5

*Summers v. Earth Island Inst.,*
    555 U.S. 488 (2009) ................................................................................ 16

*Town of Milton v. FAA,*
    87 F.4th 91 (1st Cir. 2023) ................................................................ 14, 16, 17

*TransUnion LLC v. Ramirez,*
    594 U.S. 413 (2021) ................................................................................ 15

*Turner Broad. Sys., Inc. v. FCC,*
    507 U.S. 1301 (1993) .............................................................................. 18

*U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.,*
    775 F.3d 128 (2d Cir. 2014) ................................................................... 19

*United States v. Texas,*
    599 U.S. 670 (2023) ....................................................................... 12, 13, 15

*Van Wyhe v. Reisch,*
    581 F.3d 639 (8th Cir. 2009) ................................................................... 7

*Whitmore v. Arkansas,*
    495 U.S. 149 (1990) ................................................................................ 16

*Winter v. Nat. Res. Def. Council, Inc.,*
    555 U.S. 7 (2008) ................................................................................ *passim*

**Statutes**

42 U.S.C. § 1304 ................................................................................................ 3, 10

42 U.S.C. § 1320b-2(a) ..................................................................................... 3

42 U.S.C. § 1396a ............................................................................................. 2, 7, 9

42 U.S.C. § 1396a(a)(23)(A) ............................................................................ 9

42 U.S.C. § 1396b(a)(1) ................................................................................... 2

One Big Beautiful Bill Act, Pub. L. No. 119-21, 139 Stat. 72 (2025) .............. *passim*

**Rules**

Fed. R. Civ. P. 65(c)......................................................................................... 19, 20

**Regulations**

42 C.F.R. § 430.30(d)(3) ........................................................................................2

42 C.F.R. § 433.15.................................................................................................13

45 C.F.R. § 95.19...................................................................................................3

**Other Authorities**

11A Wright & Miller's Federal Practice & Procedure § 2948.1 (3d ed.)................17

Black's Law Dictionary (12th ed. 2024) ...............................................................8

Federal Practice & Procedure § 2948.1................................................................18

## INTRODUCTION

Both houses of Congress passed a budget reconciliation bill—the One Big Beautiful Bill—and the President signed that bill into law. Among many other decisions about how to allocate limited federal funds, one provision of the bill restricts the types of entities that may receive federal Medicaid funds. That provision directs that certain tax-exempt organizations and their affiliates may not receive federal Medicaid funds for a one-year period if they continue to provide elective abortions.

All three democratically elected components of the Federal Government collaborated to enact that provision consistent with their electoral mandates from the American people as to how they want their hard-earned taxpayer dollars spent. But Plaintiffs—twenty-two States and the District of Columbia—now want this Court to reject that judgment and supplant duly enacted legislation with their own policy preferences as to how Congress should allocate federal funds. Indeed, they belatedly demand emergency injunctive relief forcing the Government to continue to provide prohibited entities with federal taxpayer funds. That request is not only legally groundless and untimely—it is inconsistent with the First Circuit's stay of this Court's preliminary injunction granting similar relief in a challenge brought by Planned Parenthood. *See Planned Parenthood v. Kennedy*, No. 25-1698 (1st Cir. Sept. 11, 2025) (Stay Order).

In their preliminary injunction motion, the States seek to facially invalidate the so-called "Defund Provision," arguing that it violates the Spending Clause in two ways: first, by failing to provide clear notice, and second, by intruding upon State authority in a way that States could not have anticipated when they entered the Medicaid program. Those claims are utterly meritless and lack any foundation in law or fact—as the States' barebones briefing illustrates. The statute makes clear that States have an obligation not to dispense federal Medicaid funds to prohibited entities, which is all that the Spending Clause requires in terms of clarity. And its restriction on recipients of federal funds does not intrude on any cognizable aspect of State authority. Indeed, the States' wholly unsupported legal claims attempt to intrude on *federal* authority—at bottom, they ask this Court to displace federal authority over federal funds in the name of state policy preferences. That request, which would turn federalism on its head, plainly fails on the merits.

1

Beyond the futility of the claims on the merits, Plaintiff States fail to demonstrate Article III standing to bring those claims, let alone imminent irreparable harm to justify an injunction. Their only asserted injuries are vague and unsupported compliance costs and highly speculative downstream harm to their state budgets from the Federal Government's decision not to fund third parties. Neither comes close to warranting the extraordinary relief of a preliminary injunction. And as the First Circuit's grant of a stay in the *Planned Parenthood* litigation reflects, the balance of the equities and public interest firmly favor the Government's interest in enforcing a statute duly enacted by Congress and signed by the President. Plaintiffs' request for a preliminary injunction should be denied.

## BACKGROUND

### I.    The Medicaid Program

Enacted in 1965, Medicaid is a cooperative federal-state program in which the Federal Government supplies funding to States to assist them in providing medical assistance to specified categories of low-income individuals. 42 U.S.C. §§ 1396 *et seq.* Each State that elects to participate must submit a plan to the Secretary of Health and Human Services ("HHS"), who has delegated his authority under the Medicaid statute to the Centers for Medicare & Medicaid Services ("CMS"), for approval. *Id.* §§ 1396, 1396a; *Ark. Dep't of Health & Hum. Servs. v. Ahlborn*, 547 U.S. 268, 275 (2006). If the plan is approved, the State is entitled to Medicaid funds from the Federal Government for a percentage of the money spent by the State in providing covered medical care to eligible individuals. 42 U.S.C. § 1396b(a)(1).

Medicaid provider payment occurs at the state level. Declaration of Anne Marie Costello ¶ 7 ("Costello Decl."). In general, CMS does not pay providers directly. *Id.* Rather, providers seek reimbursement from the States, or, in the case of a managed care delivery system, from a health plan the State has contracted with, and States receive federal funding from the Government. *Id.* ¶¶ 3–4, 15, 17–19. Federal funding for Medicaid, called federal financial participation (or "FFP"), is partly paid to the States through "initial grant awards" at the beginning of each quarter, in advance of any services provided, based on CMS-reviewed state expenditure estimates. *Id.* ¶ 3. Once the advanced funding request is approved, the State can draw down the federal advance for the allotted amount as costs are

incurred. 42 C.F.R. § 430.30(d)(3). Those initial awards are later reconciled to actual state expenditures, which States provide through a quarterly statement called Form CMS-64. Costello Decl. ¶ 5. Form CMS-64 is a summary of actual expenditures. *Id.* ¶ 6. It does not include individual claims-level expenditures. *Id.* After receiving the Form CMS-64 from the States, CMS takes up to six months to reconcile the initial grants provided to States and state draw-downs from that amount with the quarterly state submissions. *See id.* ¶¶ 5, 13.

Although States provide the Form CMS-64 on a quarterly basis, the Social Security Act allows States to claim FFP for Medicaid expenditures within two years of the date of the expenditure. *Id.* ¶ 14; *see also* 42 U.S.C. § 1320b-2(a). There are also exceptions to that two-year deadline, including for claims that result from a court-ordered retroactive payment and claims for which the Secretary determines there was good cause for the state's failure to file a claim within the two-year time period. Costello Decl. ¶ 14; 45 C.F.R. § 95.19.

## II.    Section 71113 of the One Big Beautiful Bill Act

In enacting Medicaid, Congress reserved the "right to alter, amend, or repeal any provision" of the program. 42 U.S.C. § 1304. Since then, Congress has periodically enacted new legislation to align the Medicaid program with new priorities and to account for changes in the marketplace.

Congress once again amended the Medicaid program as part of the One Big Beautiful Bill Act, which President Trump signed into law on July 4, 2025. Pub. L. No. 119-21, 139 Stat. 72 (2025). Specifically, Section 71113 directs that no federal Medicaid funds "shall be used to make payments to a prohibited entity for items and services furnished during the 1-year period beginning on the date of the enactment of this Act[.]" *Id.* at 300. A "prohibited entity" is "an entity, including its affiliates, subsidiaries, successors, and clinics—

(A)    [T]hat, as of [October 1, 2025],

(i)    is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code;

(ii)    is an essential community provider described in section 156.235 of title 45, Code of Federal Regulations . . . ., that is primarily engaged in family planning services, reproductive health, and related medical care; and

3

> (iii)    provides for abortions, other than an abortion—
>
> > (I)    if the pregnancy is the result of an act of rape or incest; or
> >
> > (II)    in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life-endangering physical condition caused by or arising from the pregnancy itself, that would, as certified by a physician, place the woman in danger of death unless an abortion is performed; and
>
> (B)    for which the total amount of Federal and State expenditures under the Medicaid program under title XIX of the Social Security Act for medical assistance furnished in fiscal year 2023 made directly, or by a covered organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000.

*Id.*

## III.    This Litigation

On July 29, 2025, Plaintiff States filed this action challenging Section 71113. *See* Compl., Doc. No. 1. The Complaint asserted two causes of action under the Spending Clause—one alleging that Section 71113 fails to provide clear notice of the obligations it imposes on the Plaintiff States, and the second alleging that Section 71113 is an otherwise unconstitutional exercise of Congress's Spending Clause power because it purportedly targets Planned Parenthood in violation of the Constitution's First Amendment, Fourteenth Amendment, and Bill of Attainder Clause. *See id.* Nearly two months later (and thirteen days after the First Circuit stayed the preliminary injunction in Planned Parenthood's parallel challenge to the law), on September 24, 2025, Plaintiffs moved for a preliminary injunction on their first cause of action, arguing that Section 71113 fails to provide clear notice and is an unprecedented incursion on state authority that States could not have anticipated when they entered into the Medicaid program. *See* Declaration of Erica Connolly in Supp. of Pls.' Mot. for Prelim. Inj., Doc. No. 62; Mem. in Supp. of Pls.' Mot. for Prelim. Inj., Doc. No. 63. Plaintiffs seek to preliminarily enjoin Defendants from implementing or enforcing Section 71113 pending a final ruling on the merits of this case. Pls.' Mot. for a Prelim. Inj., Doc. No. 60 (States' Mot.).

## STANDARD OF REVIEW

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). A "plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Id.* at 20. The third and fourth factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). The plaintiff bears the burden of demonstrating those requirements. *Nieves-Marquez v. Puerto Rico*, 353 F.3d 108, 120 (1st Cir. 2003). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (citation omitted). The Supreme Court has also instructed that a preliminary injunction cannot issue on the basis of speculative or possible injury. Rather, the moving party must establish that irreparable harm is "*likely* in the absence of an injunction." *Winter*, 555 U.S. at 22.

## ARGUMENT

The First Circuit recently considered a parallel challenge to Section 71113 and concluded that the Federal Government should be permitted to enforce the statute while the court conducts merits review. In that case, Planned Parenthood raised various constitutional challenges to Section 71113, including a claim that the statute was impermissibly vague. *See* Compl. at 48, *Planned Parenthood v. Kennedy*, No. 25-cv-11913 (D. Mass. July 7, 2025). After this Court preliminarily enjoined the statute's enforcement, the government appealed and requested a stay. The First Circuit granted that request, explaining that "defendants have met their burden to show their entitlement to a stay of the preliminary injunctions pending the disposition of their appeals of the same." Stay Order at 2. Section 71113 is therefore in effect notwithstanding the *Planned Parenthood* plaintiffs' challenge.

There is no basis for a different result here. If anything, the Federal Government's position here is even stronger than in the *Planned Parenthood* case. On the merits, Plaintiff States offer a theory of the Spending Clause that is utterly untethered from both basic principles of constitutional law and

the facts of Section 71113's operation. Section 71113 provides sufficient notice that States are required to comply with its terms, and those terms do not directly require the States to spend any of their own funds or otherwise invade any State prerogative. The States' claims thus fail on the merits. Plaintiffs have also failed to establish irreparable harm, asserting only vague and unsupported allegations of compliance costs and highly speculative downstream harm to their state budgets. As in *Planned Parenthood*, the balance of equities and public interest also favor the Government in this case. And the First Circuit's recent (and unanimous) stay order in *Planned Parenthood* further provides a sufficient basis for denying the motion for a preliminary injunction here.

## I.    Plaintiffs are Unlikely to Succeed on the Merits

### A.    Section 71113 Provides Clear Notice

Plaintiffs first argue that Section 71113 fails to provide clear notice in violation of the Spending Clause. Doc. No. 63 at 7–11. They claim that States have no way to determine whether a provider is primarily engaged in family planning services, received more than $800,000 in Medicaid payments in 2023, or is an affiliate of a prohibited entity, and thus lack clear notice of which providers are "prohibited entities." *Id.* at 7–8. But Plaintiffs' arguments misunderstand the nature of the constitutional inquiry.

To comply with the clear notice requirement of Spending Clause jurisprudence, Congress must only make clear that acceptance of federal funds obligates States to comply with a condition. *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 18 (1981). In *Pennhurst*—the origin of the Spending Clause clear notice requirement—the Supreme Court held that "if Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously." *Id.* at 17. There, the statute provided money to States and contained a "bill of rights" provision specifying that mentally disabled citizens "have a right to appropriate treatment, services, and habilitation for such disabilities" to be provided "in the setting that is least restrictive of the person's personal liberty." *Id.* at 13. The Court asked whether, through that language, Congress imposed an obligation on the States or "spoke merely in precatory terms," *id.* at 18. It held that Congress had done the latter after finding that the statements "represent general statements of federal policy, not newly created legal duties" and "in no way suggests

that the grant of federal funds is 'conditioned' on a State's funding the rights described therein." *Id.* at 23. The *Pennhurst* Court then explicitly recognized that a State's obligations under a Spending Clause program may be "largely indeterminate," so long as Congress gives "clear notice to the States that they, by accepting funds under the Act, would indeed be obligated to comply with" the condition. *Id.* at 24–25.

Numerous Spending Clause cases all confirm that States make an "informed choice" when Congress simply makes clear that acceptance of federal money obligates the States to comply with a condition. *Id.* at 25. The Supreme Court itself has repeatedly affirmed that "there [i]s sufficient notice under *Pennhurst* where a statute ma[kes] clear that some conditions [a]re placed on the receipt of federal funds." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 183 (2005); *Davis ex rel. Lashonda D. v. Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 650 (1999). And the courts of appeals have done the same, holding that the Spending Clause is satisfied where a "statute's *intention to impose a condition* is expressed clearly," even though the operation of a funding condition "is perhaps unpredictable." *Mayweathers v. Newland*, 314 F.3d 1062, 1067 (9th Cir. 2002); *Cutter v. Wilkinson*, 423 F.3d 579, 586 (6th Cir. 2005) ("Nothing more is required under *Pennhurst*, which held that Congress need provide no more than 'clear notice' to the States that funding is conditioned upon compliance with certain standards."); *Charles v. Verhagen*, 348 F.3d 601, 607–08 (7th Cir. 2003) ("[T]he exact nature of the conditions may be 'largely indeterminate,' provided that the existence of the conditions is clear . . . ."); *Benning v. Georgia*, 391 F.3d 1299, 1307 (11th Cir. 2004) ("The federal law in *Pennhurst* was unclear as to whether the [S]tates incurred any obligations at all by accepting federal funds, but [the statute at issue] is clear that [S]tates incur an obligation when they accept federal funds, even if the method for compliance is left to the [S]tates."); *Van Wyhe v. Reisch*, 581 F.3d 639, 650–51 (8th Cir. 2009) ("[S]etting forth every conceivable variation in the statute is neither feasible nor required."). Congress must only "make the existence of the condition itself—in exchange for the receipt of federal funds—explicitly obvious." *Mayweathers*, 314 F.3d at 1067.

Here, Section 71113 leaves no doubt that States receiving federal Medicaid funds are required to comply with its terms, and that provision operates prospectively. *See* Section 71113. The Spending

Clause demands no more. Indeed, States that choose to participate in the Medicaid program must comply with many other statutory requirements as well. *See* 42 U.S.C. § 1396a.

Even on its own terms—unsupported as they are—the States' argument that they have no way to determine which entities are prohibited entities fails. Indeed, the States' own declarations documenting steps they've taken to comply with Section 71113 undermine their contention that compliance is unworkable. For example, California issued a notice to providers informing them that "providers that meet the definition of 'prohibited entity' should" not submit claims for services rendered on or after July 4, 2025. *See* Exh. A, Decl. of Sarah Gilbert at 16, Doc. No. 62-6. And while the States' motion claims they have no way to know which entities are "affiliates" of prohibited entities, the States' declarants were readily able to identify Planned Parenthood affiliates operating in their Medicaid programs. *See, e.g.*, Decl. of Sarah Adelman ¶ 18, Doc. No. 62-18 ("There are two Planned Parenthood affiliates in New Jersey[.]"); Decl. of Joanne Morne ¶ 14, Doc. No. 62-20 ("There are five Planned Parenthood affiliates in [New York State.]"). Various other declarations make it obvious that the States can identify at least some entities that fall within the provision's scope. *See* Flores-Brennan Decl. ¶ 29, Doc. No. 62-7 (Colorado reimburses Planned Parenthood of the Rocky Mountains between $4.5 million to $6 million per year for services provided to Colorado Medicaid members); Groen Decl. ¶ 19, Doc. No. 62-14 (Planned Parenthood of Michigan "qualifies as a prohibited entity"); Bush Decl. ¶ 16, Doc. No. 62-17 ("Overall Medicaid-funded visits in SFY 2023 to Planned Parenthood health centers in North Carolina totaled $890,819,86."); Adelman Decl. ¶ 21 ("The two New Jersey Planned Parenthood affiliates collectively billed $6.9 million to NJ FamilyCare in FY 2023 for fee-for-service and managed care services."); Smith Decl. ¶ 22, Doc. No. 62-19 (acknowledging that Planned Parenthood of the Rocky Mountains "will no longer be compensated for treating" Medicaid patients "under the One Big Beautiful Bill Act"); Sandoe Decl. ¶ 22, Doc. No. 62-21 ("PPCW and PPSO are the only providers in Oregon that are affected by Section 71113"); Fotinos Decl. ¶ 23, Doc. No. 62-23 (acknowledging that "Planned Parenthood will not be compensated under section 71113"). Moreover, "affiliate" is a known legal term of art, *see* AFFILIATE, Black's Law Dictionary (12th ed. 2024), and HHS is developing guidance regarding

affiliate determinations. *See Planned Parenthood v. Kennedy*, No. 25-1698 (1st Cir. Oct. 3, 2025) (status report). In any event, in granting a stay in *Planned Parenthood*, the First Circuit necessarily rejected this argument by finding that Defendants were likely to succeed against the plaintiffs' claim that the statute's reference to "affiliates" was unconstitutionally vague under the Fifth Amendment. *See* Stay Order at 2.

Thus, Plaintiffs' claim that Section 71113 is not sufficiently clear in violation of the Spending Clause fails.[1]

### B.    Section 71113 Does Not Intrude on State Authority

Plaintiffs next argue that Section 71113 usurps the States' traditional role governing the medical profession. Doc. No. 63 at 11. Plaintiffs' purported injury to their authority is again wholly incompatible with both the facts and the law, as Section 71113 does no such thing.

First, Plaintiffs claim that States have traditionally exercised discretion in determining medical providers' qualifications. They further contend that, consistent with that role, "the Medicaid program has left to States the determination of which providers 'qualify' for Medicaid participation." Doc. No. 63 at 12 (citing 42 U.S.C. § 1396a(a)(23)(A)). At the outset, Plaintiffs misread 42 U.S.C. § 1396a. That statute sets forth eighty-nine requirements for a State's "plan for medical assistance." *Id.* § 1396a(a). States submit their plans to the Secretary of Health and Human Services for approval in order to participate in the Medicaid program. One of those requirements, sometimes called the any-qualified-provider provision, requires State Medicaid plans to allow an individual to obtain care from any provider who is "qualified to perform the service . . . who undertakes to provide him such services,"

---

[1] Plaintiffs also argue that Section 71113 is unclear with respect to timing because "definitive information about providers' status cannot be known until October 1." Doc. No. 63 at 11. For the same reasons explained above, this is not the sort of claim that is cognizable under the Spending Clause, as the existence of the condition is clear under federal law. Further, as it is now past October 1, and so prohibited entity status is ascertainable, this claim is moot. *See Goodwin v. C.N.J., Inc.*, 436 F.3d 44, 48 (1st Cir. 2006) ("A case becomes moot if, at some time after the institution of the action, the parties no longer have a legally cognizable stake in the outcome."). And in any event, the law's application to entities based on their status as of a particular, specified date did not make it unclear; rather, it permitted entities to cease providing abortions to remain eligible for Medicaid funding.

subject to certain exceptions. *See Id.* § 1396a(a)(23)(A); *id.* § 1396a(a)(23)(B). The provision "speaks only to a State's duties to the federal government," *Medina v. Planned Parenthood S. Atl.*, 145 S. Ct. 2219, 2235 (2025). It does not impose a duty on the Federal Government or somehow restrict Congress's ability, in subsequent statutes, to exercise its authority over federal funds.  *See* 42 U.S.C. § 1304 (reserving "right to alter, amend, or repeal any provision" of the program).  Nor does it define which providers are qualified to perform services, likely because the States have traditionally regulated the practice of medicine. *See Medina*, 145 S. Ct. at 2227. None of that has changed. Section 71113 does not determine who is qualified to practice medicine in a given State—it simply places a restriction on the use of federal Medicaid funds by providing that those funds cannot go to certain providers. Prohibited entities are prohibited from receiving federal Medicaid dollars, not practicing medicine. The States undoubtedly understand this—after all, they have not sought to strip medical licenses from providers they assert here are prohibited entities.

Moreover, contrary to Plaintiffs' argument that Section 71113 usurps their policy judgments, Doc. No. 63 at 12, Congress has full "authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" *NFIB v. Sebelius*, 567 U.S. 519, 580 (2012); *see also Rust v. Sullivan*, 500 U.S. 173, 192–93 (1991) ("[T]he government may 'make a value judgment favoring childbirth over abortion, and . . . implement that judgment by the allocation of public funds.'" (quoting *Maher v. Roe*, 432 U.S. 464, 474 (1977)). Indeed, Congress and the President have repeatedly determined that the public interest disfavors federal funding for abortion, and courts have repeatedly upheld those determinations. *See Rust*, 500 U.S. at 192–93; *Ctr. for Reprod. L. & Pol'y v. Bush*, 304 F.3d 183, 190, 198 (2d Cir. 2002) (Sotomayor, J.).

That is what Congress has done here: restricted the payment of federal Medicaid funds to abortion providers. It has not, as Plaintiffs appear to suggest, "pressur[ed] the States to accept policy changes" independent of the federal funds. *NFIB*, 567 U.S. at 580; *see also Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 183 (5th Cir. 2020) (explaining that direct restrictions on how a State uses federal funds are constitutional because they "ensure[] that the funds

are spent according to [Congress's] view of the 'general Welfare.'" (quoting *NFIB*, 567 U.S. at 580)). States need not ban abortion to receive federal Medicaid funds in light of Section 71113. The statute has no bearing on States' abortion policy whatsoever. States are free to create new funding streams for Section 71113's prohibited entities using their state tax revenues—indeed, they may even continue providing their own funds to any providers they choose, including those who are ineligible for federal Medicaid funds under Section 71113. Any claim that Section 71113 usurps state authority is therefore utterly meritless.

## II.    Plaintiffs Fail to Establish Article III Standing or Irreparable Harm

Plaintiffs' motion should also be denied because they have failed to demonstrate Article III standing, much less irreparable harm. A "plaintiff bears the burden of establishing standing as of the time [it] brought the lawsuit and maintaining it thereafter." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (quoting *Carney v. Adams*, 592 U.S. 53, 59 (2020)). "At the preliminary injunction stage," that means "the plaintiff must make a 'clear showing' that [it] is 'likely' to establish each element of standing": "that [it] [1] has suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; [2] fairly traceable to the challenged action; and [3] redressable by a favorable ruling." *Id.* at 57.

Independent of standing, a plaintiff must also show that a preliminary injunction is needed "to prevent a real threat of [irreparable] harm." *See Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004); *see also Winter*, 555 U.S. at 22 (a party "seeking preliminary relief [must] demonstrate that irreparable injury is *likely* in the absence of an injunction"). In other words, "speculative injury" is not enough. *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6–8 (1st Cir. 1991) (cleaned up).

Significantly, the States do not claim that Section 71113 reduces the amount of money they are entitled to be reimbursed by the Federal Government. Nor could they, as the provision places no new aggregate limits on federal reimbursements, so long as the claims for FFP submitted by the States

are for services provided to eligible beneficiaries by eligible providers for eligible services. The States also do not contend that they face irreparable harm if they seek federal reimbursement for payments they make to entities that are later determined to be prohibited entities. Any such contention would also fail, as nothing in Section 71113 compels States to separately finance services provided by prohibited entities or limits States' ability to recover reimbursements improperly claimed by those entities. Instead, the States rely on two theories of injury: the administrative costs of complying with Section 71113 and the increased healthcare costs the States might eventually incur if certain providers stop accepting Medicaid patients. Neither of those theories of harm satisfy Article III standing, let alone the stricter standard for showing irreparable harm.

### A.    The States' Administrative Costs Are Not Irreparable Harm

The States first contend that they are harmed through the costs they incur in complying with Section 71113. This claim fails. As an initial matter, six States fail to provide *any* evidence of actual administrative expenditures. Decl. of William Halsey, Doc. No. 62-8 (Connecticut); Decl. of Andrew Wilson, Doc. No. 62-9 (Delaware); Decl. of Sharon Boyle, Doc. No. 62-12 (Massachusetts); Decl. of Meghan Groen, Doc. No. 62-14 (Michigan); Decl. of Melanie Bush, Doc. No. 62-17 (North Carolina); Decl. of Kristin Pono Sousa, Doc. No. 62-22 (Rhode Island).[2] Other States simply cite alleged "operational uncertainty" or unquantified "inquiries" and changes to billing systems without providing evidence of likely administrative expenses. *See* Decl. of Judy Mohr Peterson ¶ 17–19, Doc. No. 62-10 (Hawai'i); Decl. of Laura Phelan, Doc. No. 62-11 ¶ 8 (Illinois). None of those declarations say anything about administrative costs those States have incurred or are likely to incur. Those States have thus failed to carry their burden at this stage of the proceedings. *See, e.g.*, *Cacchillo v. Insmed, Inc.*, 638 F.3d 401, 404 (2d Cir. 2011) ("[T]o establish standing for a preliminary injunction, a plaintiff cannot rest on . . . mere allegations, as would be appropriate at the pleading stage." (cleaned up)).

The sixteen other States and the District of Columbia offer sparse and largely conclusory assertions of the costs of compliance.  But even assuming such costs both constitute cognizable injury

---

[2] Plaintiffs notably do not cite any of these six States' declarations in support of their argument that they face irreparable compliance costs. *See* Doc. No. 63 at 13–14.

and can be irreparable in the abstract, the threadbare assertions that those other jurisdictions must update their systems and respond to inquiries about Section 71113 are not enough to warrant the "extraordinary remedy" of a preliminary injunction. *Winter*, 555 U.S. at 22; *see United States v. Texas*, 599 U.S. 670, 680 n.3 (2023). The States already incur administrative costs in administering their Medicaid programs, some of which are subsidized by the Federal Government. 42 C.F.R. § 433.15. And certainly, none of the States' many declarations establishes that the alleged incidental burdens of complying with Section 71113 are sufficiently weighty to constitute irreparable harm. *See Sierra Club v. Larson*, 769 F. Supp. 420, 422 (D. Mass. 1991) ("To establish irreparable harm there must be an actual, viable, presently existing threat of *serious* harm.") (emphasis added).

Indeed, the States' own declarations show that any administrative cost separately attributable to Section 71113 is exceedingly minimal. Take California, for example. That State simply published a notice informing providers "that meet the definition of 'Prohibited Entity'" that they should not submit claims for Medicaid-reimbursable services unless they were subject to a court order granting relief. Doc. No. 62-6 at 16. And none of the other States establish that the claimed costs of updating eligibility systems or analyzing the scope of prohibited entities has meaningfully increased the expense of operating their Medicaid programs. *Cf. FDA v. All. For Hippocratic Med.*, 602 U.S. 367, 390 (2024) (doctors failed to show increase in patients and "diversion of doctors' time and resources"). The States are not entitled to a preliminary injunction merely to avoid such *de minimis* costs.

To the extent the States attempt to rely on their sovereign interest in regulating healthcare providers operating inside their jurisdictions, Doc. No. 63 at 14, that assertion of irreparable harm similarly fails. Nothing in Section 71113 hinders States' ability to decide who may provide healthcare services to their citizens; rather, that sovereign power remains entirely intact. Section 71113 simply determines which entities the Federal Government is unwilling to finance with federal Medicaid dollars. States remain free to determine Planned Parenthood or any other provider may furnish services to Medicaid-eligible individuals via self-pay or even at *state* expense, so long as States do not claim federal reimbursement for services provided by prohibited entities. *Id.* And States have no interest in "directing federal funds" to providers that Congress has determined should not receive

them. *Id.* That argument, if accepted, would conscript the Federal Government into funding state policy preferences against Congress's express judgment. The States cite no authority warranting that result, which would significantly impede the Federal Government's sovereign interests.

**B.    The States' Contingent Projections About Increases in the Costs of Healthcare Do Not Create Standing or Irreparable Harm**

The States next argue that they suffer irreparable harm in the form of "increased healthcare costs." *Id.* at 14. Section 71113 does not impose any healthcare costs directly on States, as the States themselves effectively concede. *See id.* at 14–15. Rather, their theory of harm depends on a long chain of contingencies. *Id.* As the States have it, Section 71113 will harm their budgets because it may result in fewer providers offering covered services, which may lead to alternative providers being unable to accept additional patients, which may cause those patients to skip certain preventative screenings and early treatments, which may result in "increased short-and long-term healthcare costs to Plaintiff States that constitute irreparable harm." *Id.* This argument simply does not work—for several reasons.

Initially, the States cannot rely on harms that Section 71113 might inflict on others, including their citizens, Planned Parenthood, or alternative healthcare providers. Article III requires that "a plaintiff must 'be himself among the injured.'" *Hochendoner v. Genzyme Corp.*, 823 F.3d 724, 734 (1st Cir. 2016) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 563 (1992)). A preliminary injunction "requires a showing of irreparable harm *to the movant* rather than to one or more third parties." *CMM Cable Rep., Inc. v. Ocean Coast Properties, Inc.*, 48 F.3d 618, 622 (1995). And the Supreme Court has made clear that States cannot sue the Federal Government on behalf of their citizens as parens patriae; after all, the Federal Government is also parens patriae to its citizenry. *See Haaland v. Brackeen*, 599 U.S. 255, 295 (2023); *Town of Milton v. FAA*, 87 F.4th 91, 96 n.1 (1st Cir. 2023).

So the States cannot establish Article III standing or irreparable harm by relying on injuries or harms allegedly suffered by their citizens, Planned Parenthood, or other health care providers not before this Court in this action. Yet the States' brief relies nearly exclusively on those alleged harms. *See* Doc. No. 63 at 14–19. The States may not rely on, for example, assertions regarding patients'

14

inability to find convenient providers or burdens on providers absorbing the caseload of prohibited entities. *Id.* at 14–17. None of those alleged harms are harms *to the States* themselves.

Instead, the States assert that they will be injured by the downstream harms to state budgets of the increased healthcare costs of missed preventative care or the increased cost of funding prohibited entities with state funds. *See* Doc. No. 63 at 18–19. But that theory is foreclosed by *United States v. Texas* and *Florida v. Mellon*, 273 U.S. 12 (1927). In *Texas*, two States challenged a federal immigration policy they asserted would "impose[] costs on the States" by forcing them to spend State money to "supply social services such as healthcare and education." 599 U.S. at 675. The Supreme Court held the States lacked standing, explaining that "federal courts must remain mindful of bedrock Article III constraints in cases brought by States against an executive agency or officer." *Id.* at 680 n.3. The Court emphasized that "in our system of dual federal and state sovereignty, federal policies frequently generate indirect effects on state revenues or state spending." *Id.* And the States' theory of standing based on those "indirect effects" was too "attenuated" to amount to a constitutionally sufficient injury. *Id.*; *accord, e.g.*, *Arizona v. Biden*, 40 F.4th 375, 386 (6th Cir. 2022) (rejecting contention that any federal policy that "imposes peripheral costs on a State creates a cognizable Article III injury"). The Court's holding in *Texas*—that the States lacked standing—comported with its earlier holding in *Florida*, which also emphasized that a plaintiff State must show a "direct injury" when challenging a federal policy. *Florida*, 273 U.S. at 18.

Similarly here, the States assert that Congress's funding decisions have inflicted downstream harms on the States' budgets and resources. They assert, for example, that preventing Medicaid beneficiaries from receiving services from prohibited entities such as Planned Parenthood would increase healthcare costs and may cause the States to spend more money providing that healthcare to their citizens. Doc. No. 63 at 18–19. Those speculative alleged injuries are "at most, only remote and indirect," *Florida*, 273 U.S. at 18; they therefore are not cognizable injuries-in-fact, *see Texas*, 599 U.S. at 674, 680 n.3, let alone irreparable harm that would support a preliminary injunction.

The States' downstream-harm theory also fails because those alleged harms—to the extent they will materialize at all, which is dubious—are not imminent. *See TransUnion LLC v. Ramirez*, 594

U.S. 413, 435 (2021). Again, the States' theory of harm is that they will face increased healthcare costs if (1) Section 71113 causes a decrease in providers offering reproductive and family planning healthcare; (2) alternative providers are unable to absorb additional patients; (3) those additional patients fail to find other providers for certain screenings; (4) some percentage of those missed screenings ultimately require costlier treatment that could have been avoided with earlier intervention, and (5) the States have to finance the costlier treatment. *See* Doc. No. 63 at 14–15. But this multi-step chain of possibilities depends on the independent actions of third parties that may or may not occur: patients declining to seek preventive care and providers failing to ramp up capacity (or draw new entrants into the healthcare market), to name just two steps in the chain. These predictions of attenuated harm are insufficient to establish Article III injury, and they certainly do not demonstrate irreparable harm. *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013); *see also Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (rejecting a standing theory premised on a speculative chain of possibilities); *Whitmore v. Arkansas*, 495 U.S. 149, 157–60 (1990) (same).

Next, the States assert that they will suffer irreparable harm if they replace federal funding with state subsidies for prohibited entities. Doc. No. 63 at 18–19. To be sure, the States may make that policy choice. But those voluntary expenditures would not be irreparable harm; rather the costs States may incur from choosing to provide such subsidies would be the result of those policy choices, not Section 71113, which requires no State spending. *See Town of Milton*, 87 F.4th at 98–99 (rejecting municipality's argument that it was injured by diverting public resources to combat effects of federal policy); *accord Pennsylvania v. New Jersey*, 426 U.S. 660, 664 (1976) ("The injuries to the plaintiffs' fiscs were self-inflicted, resulting from decisions by their respective state legislatures. . . . No State can be heard to complain about damage inflicted by its own hand.").

The weakness of the States' claim of irreparable harm from increased healthcare costs is apparent from their failure to provide legal support for their claims. Indeed, the *only* authority on which the States rely to support their claim of increased healthcare costs—a single out-of-circuit decision—does not help them. *See* Doc. No. 63 at 19 (citing *Cook Cnty. v. Wolf*, 962 F.3d 208, 233 (7th Cir. 2020)). In that case, a municipality claimed that a federal agency's rule would increase costs to a

hospital the municipality itself operated. *Cook Cnty. v. McAleenan*, 417 F. Supp. 3d 1008, 1017 (N.D. Ill. 2019). The municipality thus claimed a direct harm from increased costs its own hospital faced. *Cook Cnty.*, 962 F.3d at 218. But the States do not assert that they will be forced to provide care for patients that prohibited entities no longer serve, and that they will not be paid for those services, so *Cook County*'s reasoning does not apply. And while the Seventh Circuit also concluded that the municipality's diversion of resources from other public policy goals constituted Article III injury and irreparable harm, *id.*, the First Circuit has squarely rejected that theory, holding that state entities cannot rely on diversion of public money to establish Article III standing. *See Town of Milton*, 87 F.4th at 98–99 (rejecting municipal government's reliance on diversion-of-resources theory). Even if that were not enough, the diversion of state resources theory on which the States seek to rely depends on a standing doctrine that has since been significantly cabined by the Supreme Court. *See All. for Hippocratic Med.*, 602 U.S. at 393–96 (rejecting association's reliance on diversion-of-resources theory of standing).

## C.    The States' Significant Delay in Seeking Injunctive Relief Undermines Their Assertion of Irreparable Harm

The best evidence that the States will not be irreparably harmed by Section 71113's application is their own litigation conduct. A "delay between the institution of an action and the filing of a motion for preliminary injunction, not attributable to intervening events, detracts from the movant's claim of irreparable harm." *Blinds To Go, Inc.*, 370 F.3d at 163. And here, the States waited nearly two months after filing their Complaint—and more than 80 days after Section 71113's enactment—to move for preliminary relief. *See* Compl.; States' Mot. The States contend that they had no need for their own injunction while this Court's *Planned Parenthood* injunction was in effect. *See* Doc. No. 63 at 20 n.8. But that injunction applied only to Defendants' enforcement of Section 71113 against Planned Parenthood entities. Putting aside the States' apparent ability to determine that certain entities are within the scope of Section 71113, *see* supra pp. 8–9 (citing declarations), that injunction thus offered the States no protection from the purported administrative costs of identifying non-Planned Parenthood entities on which they rely here, and minimal if any protection from the harm to their sovereign interests or

increased future healthcare costs that now feature in their briefing. The States' failure to seek prompt relief from those alleged harms "may be taken as an indication that the harm would not be serious enough to justify a preliminary injunction." 11A Wright & Miller's Federal Practice & Procedure § 2948.1 (3d ed.).

## III.    The Balance of Equities and the Public Interest Favor the Government

Plaintiffs' proposed injunction threatens significant and irreparable harm to the Government and public, *see Nken*, 556 U.S. at 435, which greatly outweighs any claimed injury to Plaintiffs. There is a strong "presumption of constitutionality which attaches to every Act of Congress." *Bowen v. Kendrick*, 483 U.S. 1304, 1304 (1987) (Rehnquist, C.J., in chambers) (cleaned up). "Any time a government is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *District 4 Lodge of the Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo*, 18 F.4th 38, 47 (1st Cir. 2021) (cleaned up). Thus, the Supreme Court has traditionally presumed that "all Acts of Congress . . . 'should remain in effect pending a final decision on the merits by [the Supreme] Court.'" *Turner Broad. Sys., Inc. v. FCC*, 507 U.S. 1301, 1301 (1993) (Rehnquist, C.J., in chambers). The First Circuit applied that principle when it stayed the preliminary injunction in *Planned Parenthood*. Stay Order at 2.

These harms are especially serious given Section 71113's subject matter. An injunction would trench on Congress's "broad discretion" under Article I of the Constitution to determine how federal taxpayer dollars are spent. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 213 (2013). And the spending determination at issue here reflects the elected Branches' adoption of a policy against allocating federal taxpayer dollars to providers of abortion—conduct that many Americans find abhorrent or otherwise do not wish to subsidize. That policy is freighted with moral and political significance, and if it is enjoined, it would inflict grave injury by "prevent[ing] the Government from enforcing its policies" in this sensitive area. *CASA*, 606 U.S. at 859. In weighing the equities and publich interest, it "would be a special kind of judicial hubris to declare that the public interest has been undermined by the public." *Family Planning Ass'n of Me. v. HHS*, No. 1:25-cv-00364, 2025 WL 2439209, at *8 (D. Me. Aug. 25, 2025).

By contrast, the States point to nothing sufficient to justify enjoining the enforcement of an Act of Congress. The States blithely argue that the public's interest is "in making sure government agencies follow the law." Doc. No. 63 at 19. But it is the States that ask this Court to prohibit the defendant agencies from implementing a democratically enacted congressional Act—an Act entitled to a heavy presumption of constitutionality. *See Bowen*, 483 U.S. at 1304 (Rehnquist, C.J., in chambers) (the presumption of constitutionality "is not merely a factor to be considered in evaluating success on the merits, but an equity to be considered in favor of [the government] in balancing hardships").

Contrary to the States' argument, a preliminary injunction manifestly would harm the Federal Government's sovereign and monetary interests. Congress has made a judgment about which entities it wishes to benefit from federal funds. That judgment incentivized providers who would otherwise be prohibited entities to cease providing abortions by October 1, and barred those providers who continued providing abortions from receiving federal funds. A preliminary injunction would upend that federal policy choice. At bottom, the States simply desire to advance their own policy judgments concerning abortion using federal funds. But the federal "government may 'make a value judgment favoring childbirth over abortion, and implement that judgment by the allocation of public funds,'" by "declining to 'promote or encourage abortion.'" *Rust*, 500 U.S. at 192–93. If the States wish to make a different value judgment, they may finance that policy with their own funds. Accordingly, the States have not—and indeed, cannot—overcome the strong presumption of the statute's constitutionality, and the balance of equities and public interest make preliminary injunctive relief inappropriate.

## IV.    A Bond Should Accompany Any Injunctive Relief

If the Court were to grant Plaintiffs' motion, the Government respectfully requests that any injunctive relief be accompanied by a bond under Fed. R. Civ. P. 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *See also U.S. D.I.D. Corp. v. Windstream Commc'ns, Inc.*, 775 F.3d 128, 135 (2d Cir. 2014) (explaining that the bond's purpose is to protect

defendants who "may have already suffered harm while the TRO was in effect even if the TRO is subsequently dissolved"). "[I]njunction bonds are generally required." *Nat'l Treasury Emps. Union v. Trump*, No. 25-5157, 2025 WL 1441563, at *3 n.4 (D.C. Cir. May 16, 2025) (per curiam). If the Court were to enter an injunction, the Government asks that the bond amount reflect the amount of funding affected by Plaintiffs' requested relief—that is, the costs and damages that would be sustained by the Government, because an injunction would require the Government to make specific payments it is not legally obligated to make, and which may not be fully recoverable. *Cf. Dep't of Educ. v. California*, 604 U.S. 650, 652 (2025) (staying district court injunction requiring payment of federal funds in part because the district court "declined to impose bond"). To effectuate the purposes behind Rule 65(c), the Court should determine how much security is necessary based on the amount of federal Medicaid reimbursements flowing to prohibited entities in each of the Plaintiff States. At the very least, the bond should be no less than $7.2 million annually (or $600,000 per month the injunction is in place). That figure reflects a conservative estimate of $800,000 in annual federal expenditures for each entity the Plaintiff States identify as likely to meet the definition of a prohibited entity. *See* Doc. No. 62-7 at 8; Doc. No. 62-14 at 4–5; Doc. No. 62-17 at 5; Doc. No. 62-18 at 6; Doc. No. 62-19 at 7; Doc. No. 62-21 at 6; Doc. No. 62-23 at 6–7.

## V.    Any Injunctive Relief Should Be Stayed Pending Appeal

To the extent the Court issues any injunctive relief, the Government respectfully requests that such relief be stayed pending the disposition of any appeal that is authorized. *See Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). For the reasons explained above, the Government has made a strong showing that it is likely to succeed on the merits and will be irreparably injured absent a stay. *See id.* The public interest strongly favors giving effect to a provision enacted by the American people's democratically elected representatives. *See id.* Those factors outweigh any injury Plaintiffs might suffer.

## CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion.

Dated: October 15, 2025

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

YAAKOV M. ROTH
Principal Deputy Assistant Attorney General
Civil Division

ERIC J. HAMILTON
Deputy Assistant Attorney General
Civil Division

EMILY M. HALL
ELIZABETH HEDGES
TIBERIUS DAVIS
Counsel to the Assistant Attorney General
Civil Division

MICHELLE R. BENNETT
Assistant Director
Federal Programs Branch

JACOB S. SILER
Trial Attorney
Federal Programs Branch

/s/  Elisabeth J. Neylan
ELISABETH J. NEYLAN
Trial Attorney (N.Y. Bar Reg. No. 6125736)
Federal Programs Branch
1100 L Street NW
Washington, DC 20005
Phone: (202) 616-3519
Elisabeth.J.Neylan@usdoj.gov

*Attorneys for Defendants*

21

## **CERTIFICATE OF SERVICE**

I hereby certify that on October 15, 2025, the foregoing pleading was filed electronically through the CM/ECF system, which causes all parties or counsel to be served by electronic means as more fully reflected on the Notice of Electronic Filing.

*/s/ Elisabeth J. Neylan*
Elisabeth J. Neylan
Trial Attorney
United States Department of Justice
