UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| STATE OF CALIFORNIA, et al., | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | Civil Action No. 1:25-cv-12118-IT |
| | * | |
| UNITED STATES DEPARTMENT OF | * | |
| HEALTH AND HUMAN SERVICES, et al., | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM AND ORDER

December 2, 2025

TALWANI, D.J.

This is one of two actions filed in this court against Defendants United States Department of Health and Human Services ("HHS"), Secretary of HHS Robert F. Kennedy, Jr., Centers for Medicare & Medicaid Services ("CMS"), and CMS Administrator Mehmet Oz[1] challenging Section 71113 of An Act to provide for reconciliation pursuant to Title II of H. Con. Res. 14, Pub. L. No. 119-21, 139 Stat. 72, 300-01 (July 4, 2025) ("Section 71113" of the "Budget Reconciliation Act"). Section 71113 prohibits Medicaid funding for Medicaid-covered services to "prohibited entities."

In the first action, discussed further below, Planned Parenthood Federation of America, Inc. ("Planned Parenthood Federation") and two Planned Parenthood members (collectively, the "Planned Parenthood Plaintiffs") claimed that Section 71113 specifically targeted entities associated with Planned Parenthood Federation, in violation of the Bill of Attainder Clause of, and the First and Fifth Amendments to, the United States Constitution. Planned Parenthood

---

[1] The individual Defendants are sued in their official capacity only.

1

Fed'n of Am., Inc. v. Kennedy, Civil Action 1:25-cv-11913 (the "Planned Parenthood

litigation"). In the action now before the court, twenty-two States[2] and the District of Columbia

(the "Plaintiff States") claim, inter alia, that Section 71113 failed to provide clear notice to States

that participate in the joint Federal / State Medicaid program, as required by the Spending Clause

of the United States Constitution.

Pending before the court is the Plaintiff States' Motion for Preliminary Injunction [Doc.

No. 60] seeking to enjoin Defendants from implementing or enforcing Section 71113 pending a

final ruling on the merits of this case. For the reasons stated infra, Plaintiff States have standing

to bring this action and have demonstrated a substantial likelihood of success on their claim that

Section 71113 fails to provide clear notice as required by the Spending Clause of the United

States Constitution. Accordingly, the Plaintiff States' Motion for Preliminary Injunction [Doc.

No. 60] is GRANTED, as set forth below.

### I.    Background[3]

#### A.  Medicaid

Medicaid is a joint state and federal program for medical assistance. See Medicaid Primer

at 2 [Doc. 61-4]; CMCS Decl. ¶ 2 [Doc. No. 73-1] ("Medicaid is a joint state/federal

---

[2] The twenty-two Plaintiff States are: the States of California, Connecticut, Colorado, Delaware, Hawai'i, Illinois, Maine, Maryland, Michigan, Minnesota, New York, Nevada, New Jersey, New Mexico, North Carolina, Oregon, Rhode Island, Vermont, Washington, and Wisconsin; the Commonwealth of Massachusetts; and Josh Shapiro, in his official capacity as Governor of the Commonwealth of Pennsylvania.

[3] The factual record before the court is undisputed. The Plaintiff States have submitted a declaration setting forth the opinions of a research scientist on the impact of Section 71113 and declarations detailing the Medicaid program managed by each of the Plaintiff States. See Decl. of Megan Kavanaugh ("Research Scientist Decl.") [Doc. No. 62-5]; Decl. of Sarah Gilbert ("California Decl.") [Doc. No. 62-6]; Decl. of Adela Flores-Brennan ("Colorado Decl.") [Doc. No. 62-7]; Decl. of William Halsey ("Connecticut Decl.") [Doc. No. 62-8]; Decl. of Andrew Wilson ("Delaware Decl.") [Doc. No. 62-9]; Decl. of Judy Mohr Peterson ("Hawai'i Decl.")

partnership."). The Medicaid program was established by Title XIX of the Social Security Amendments of 1965. See Social Security Amendments of 1965, Pub. L. No. 89-97, § 121, 79 Stat. 286, 343–44 (1965). "Congress created Medicaid . . . to subsidize state efforts to provide healthcare to families and individuals 'whose income and resources are insufficient to meet the costs of necessary medical services.'" Medina v. Planned Parenthood South Atlantic, 606 U.S. 357, 363 (2025) (quoting Armstrong v. Exceptional Child Center, Inc., 575 U.S. 320, 323 (2015)).

---

[Doc. No. 62-10]; Decl. of Laura Phelan ("Illinois Decl.") [Doc. No. 62-11]; Decl. of Sharon Boyle ("Massachusetts Decl.") [Doc. No. 62-12]; Decl. of Michelle Probert ("Maine Decl.") [Doc. No. 62-13]; Decl. of Meghan Groen ("Michigan Decl.") [Doc. No. 62-14]; Decl. of John Connolly ("First Minnesota Decl.") [Doc. No. 62-15]; Decl. of Noya Woodrich ("Second Minnesota Decl.") [Doc. No. 62-16]; Decl. of Melanie Bush ("North Carolina Decl.") [Doc. No. 62-17]; Decl. of Sarah Adelman ("New Jersey Decl.") [Doc. No. 62-18]; Decl. of Alex Castillo Smith ("New Mexico Decl.") [Doc. No. 62-19]; Decl. of Johanne Morne ("New York Decl.") [Doc. No. 62-20]; Decl. of Emma Sandoe ("Oregon Decl.") [Doc. No. 62-21]; Decl. of Kristin Pono Sousa ("Rhode Island Decl.") [Doc. No. 62-22]; Decl. of Charissa Fotinos ("Washington Decl.") [Doc. No. 62-23]; Decl. of Debra Standridge ("Wisconsin Decl.") [Doc. No. 62-24]; Decl. of Sally A. Kozak ("Pennsylvania Decl.") [Doc. No. 62-25]; Decl. of Melisa Byrd ("District of Columbia Decl.") [Doc. No. 62-26]. Plaintiff States also have submitted a Notice of Supplemental Facts [Doc. No. 81] concerning statements made by counsel for the same Defendants during oral argument before the First Circuit in Planned Parenthood Federation of America, Inc. v. Kennedy, Nos. 25-1698 and 25-1755.

Plaintiff States' Request for Judicial Notice [Doc. No. 61] is unopposed and is allowed. The court takes judicial notice of the Declaration of Kimberly Custer ("Planned Parenthood Federation Decl.") [Doc. No. 61-1]; the Declaration of Dominique Lee ("Planned Parenthood Massachusetts Decl.") [Doc. No. 61-2]; the Declaration of Jenna Tosh ("Planned Parenthood California Central Coast Decl.") [Doc. No. 61-3]; the U.S. Gov't Accountability Office, GAO-20-571R, Medicaid: Primer on Financing Arrangements (2020) ("Medicaid Primer") [Doc. No. 61-4]; the Declaration of Evelyn Kieltyka ("Maine Family Planning Decl.") [Doc. No. 61-5]; the National Center for Chronic Disease Prevention and Health Promotion, Health and Economic Benefits of Breast Cancer Interventions (August 15, 2025) [Doc. No. 61-6]; and the National Center for Chronic Disease Prevention and Health Promotion, Health and Economic Benefits of Cervical Cancer Interventions (August 15, 2025) [Doc. No. 61-7].

Defendants have submitted the Declaration of Center for Medicaid and CHIP Services Deputy Director Anne Marie Costello ("CMCS Decl.") [Doc. No. 73-1] describing federal funding to state Medicaid programs and a Notice of Supplemental Facts [Doc. No. 82] attaching a November 21, 2025 e-mail concerning Section 71113 sent by CMS to State Medicaid Directors ("CMS Email") [Doc. No. 82-1].

"Today, all 50 States participate in Medicaid." Id. To participate, a State must submit a plan addressing its unique needs and circumstances to the Secretary of HHS for approval. See 42 U.S.C. §§ 1396a(a), (b). States are given flexibility to determine what populations may enroll in their Medicaid program, which services are covered, and how much to reimburse providers. See Arkansas Dep't of Health & Hum. Servs. v. Ahlborn, 547 U.S. 268, 275–76 (2006) (describing the Medicaid program); see also CMCS Decl. ¶ 2 [Doc. No. 73-1] ("States design their Medicaid programs including determining which delivery system(s) to utilize for providing care to Medicaid beneficiaries and which benefits are offered in each delivery system."). States can also innovate, creating new health care delivery models to better serve their populations, by applying to waive federal requirements. See 42 U.S.C. § 1315(a). "To win the Secretary's approval, that plan must satisfy more than 80 separate conditions Congress has set out in [42 U.S.C.] § 1396a(a)." Medina, 606 U.S. at 363; see also CMCS Decl. ¶ 2 [Doc. No. 73-1] ("The federal government outlines Medicaid program requirements and reviews and approves many components of a state's Medicaid program, such as underlying authorities for benefits, eligibility, [Medicaid fee-for-service] provider reimbursement rates, managed care, and managed care contracts and rates.").

Congress has long prohibited the use of any federal funds to reimburse the cost of abortions under the Medicaid program except in limited circumstances. See Harris v. McRae, 448 U.S. 297, 302–03 (1980). At the same time, family planning services and supplies are a mandatory Medicaid benefit under Section 1905(a)(4)(C) of the Social Security Act. CMCS Decl. ¶ 8 [Doc. No. 73-1]. "Federal Medicaid requirements mandate 'freedom of choice' of providers for family planning services." Wisconsin Decl. ¶ 8 [Doc. No. 62-24].

Under Title XIX, Congress has authorized annual appropriations for each fiscal year in "a sum sufficient" to carry out the purposes of the program, which "shall be used" for making payments to participating States. 42 U.S.C. § 1396-1. "Historically, the federal government has provided on average about 57% of the funds required to implement Medicaid, and States have supplied the balance." Medina, 606 U.S. at 364 (citing Congressional Research Service, R43357, Medicaid: An Overview 21 (2025)).

"Once the Secretary approves a plan, federal funds begin flowing to help the State execute it." Id. at 363; see also CMCS Decl. ¶ 3 [Doc. No. 73-1] ("Federal law and regulations require that CMS issue advanced funding (through 'initial grant awards') to states at the beginning of each quarter based on CMS-reviewed state expenditure estimates."); 42 C.F.R. § 430.30(a)(1) ("Once CMS has approved a State plan, it makes quarterly grant awards to the State to cover the Federal share of expenditures for services, training and administration.").

States receive claims for reimbursement from Medicaid providers and pay out those claims, pursuant to the details specified in the Medicaid state plan. See Medicaid Primer at 2 [Doc. No. 61-4]; see also CMCS Decl. ¶ 4 [Doc. No. 73-1] ("Once the advanced funding request is approved, the state can draw down the federal advance for the allotted amount as costs are incurred.") (citing 42 C.F.R. § 430.30(d)(3)). States "must generally pay 90 percent of . . . claims that can be processed without obtaining additional information [] within 30 days of the date of receipt." CMCS Decl. ¶ 7 [Doc. No. 73-1] (citing 42 C.F.R. §§ 447.45(d)(2), 447.46(c)).

States report their costs to CMS, and both undertake a settlement process to reconcile the state's actual expenditures against previously provided federal funds. See Medicaid Primer at 5 [Doc. No. 61-4]; CMCS Decl. ¶ 5 [Doc. No. 73-1]. To claim federal funds, the state must certify

that its expenditures are allowable under federal requirements. CMCS Decl. ¶ 10 [Doc. No. 73-1].

### B.  Plaintiff States' Medicaid Plans

Each Plaintiff State provides health insurance to a significant portion of its population through its respective Medicaid program. See, e.g., Oregon Decl. ¶ 6  [Doc. 62-21] ("32% (about 1.4 million people) have Medicaid coverage through [the Oregon Health Plan]"); Pennsylvania Decl. ¶ 4 [Doc. 62-25] ("In state fiscal year 2024-25, approximately [23 %] of [Pennsylvania's] population was covered under [Medicaid]."); District of Columbia Decl. ¶ 5 [Doc. 62-26] ("As of July 2025, approximately 273,000 District residents were enrolled in DC Medicaid – representing 39 percent of District's population."). Through Medicaid, Plaintiff States ensure that their residents receive comprehensive healthcare from providers. See, e.g., Connecticut Decl. ¶ 5 [Doc. 62-8] ("Covered services [under the Connecticut Medicaid program] generally include medically necessary medical, behavioral health, dental and non-emergency transportation services.").

In addition to their general Medicaid programs, Plaintiff States also provide specific family-planning programs, providing coverage for services like reproductive health; contraception; breast and cervical cancer screenings; and screening, diagnosis, and treatment of sexually transmitted diseases. See, e.g., First Minnesota Decl. ¶¶ 9, 12–14 [Doc. 62-15] (describing the "Minnesota Family Planning Program"). For many family planning services, CMS supplies a particularly high federal match. See id. ¶ 15. Whereas the federal government's standard match rate for Medicaid services is 50%, for family planning services, the federal government will pay as high as 90% of the cost of the services. See, e.g., New Jersey Decl. ¶ 13 [Doc. 62-18] ("[F]or those medical exams, procedures, or other services for those covered by NJ FamilyCare, the federal government pays 90% and [New Jersey] pays the remainder.").

### C. Section 71113

Section 71113 was enacted on July 4, 2025, as part of the Budget Reconciliation Act.

Section 71113(a) provides that "[n]o Federal funds that are . . . provided to carry out a State

[Medicaid plan] . . . shall be used to make payments to a prohibited entity for items and services

furnished during the 1-year period beginning on the date of the enactment of this Act[.]" Pub. L.

No. 119-21, § 71113(a), 139 Stat. 72, 300-01 (July 4, 2025). Section 71113(b)(1) defines

"prohibited entity" as:

> an entity, including its affiliates, subsidiaries, successors, and clinics–
>
>> (A) that, as of [October 1, 2025]–
>>
>>> (i) is an organization described in section 501(c)(3) of the Internal Revenue Code of 1986 and exempt from tax under section 501(a) of such Code;
>>>
>>> (ii) is an essential community provider described in section 156.235 of title 45, Code of Federal Regulations (as in effect on the date of enactment of this Act), that is primarily engaged in family planning services, reproductive health, and related medical care; and
>>>
>>> (iii) provides for abortions, other than an abortion [permitted under the Hyde Amendment]; and
>>
>> (B) for which the total amount of Federal and State expenditures under the Medicaid program under title XIX of the Social Security Act for medical assistance furnished in fiscal year 2023 made directly, or by a covered organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity, or made to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000.

Id. § 71113(b)(1).[4]

_____

[4] The court uses the term "elective abortions" to refer to abortions for which providers may not receive Medicaid reimbursement under the Hyde Amendment. See also Harris, 448 U.S. at 302 ("Since September 1976, Congress has prohibited—either by an amendment to the annual appropriations bill . . . or by a joint resolution—the use of any federal funds to reimburse the cost of abortions under the Medicaid program except under certain specified circumstances.") (footnote omitted); see, e.g., Further Consolidated Appropriations Act, Pub. L. No. 118-47, §§ 506, 507(a), 138 Stat. 460, 703 (2024) (providing that "[n]one of the funds appropriated in this

### D.  The Planned Parenthood Litigation in this District Court

The Planned Parenthood litigation was filed just days after Section 71113 was enacted. In that action, the Planned Parenthood Plaintiffs claimed that Section 71113 was specifically directed at them. <u>See</u> Planned Parenthood litigation, Compl. ¶ 2, docket entry 1 (July 7, 2025) ("The clear purpose of [Section 71113] is to categorically prohibit health centers associated with Planned Parenthood from receiving Medicaid reimbursements."). They sought preliminary relief, arguing that the legislation targeted entities in violation of the United States Constitution based on their association with Planned Parenthood Federation (which is not itself a health care provider and does not participate in Medicaid). <u>See</u> Planned Parenthood litigation, Mem. ISO Pls.' Emergency Mot. for a TRO and Prelim. Injunc. 1-2, docket entry 5 (July 7, 2025).

 This court considered whether Section 71113 was directed at entities because they provide elective abortions in addition to their Medicaid covered services, as Defendants claimed, or whether Section 71113 targeted entities because of their association with Planned Parenthood Federation, as the Planned Parenthood Plaintiffs claimed. <u>Planned Parenthood Fed'n of Am., Inc.</u> <u>v. Kennedy</u>, 792 F. Supp. 3d 227, 239 (D. Mass. July 28, 2025). Based on the preliminary injunction record, the court made several findings that supported the Planned Parenthood Plaintiffs' claim that they had been targeted by the legislation.

First, the legislative backdrop demonstrated that, over the last several legislative sessions, members of Congress had repeatedly and explicitly proposed legislation targeting Planned Parenthood Federation and its members. <u>Id.</u> at 248–51 (citations omitted). Second, the minority

---

Act . . . shall be expended for any abortion" except "(1) if the pregnancy is the result of an act of rape or incest" or "(2) in the case where a woman suffers from a physical disorder, physical injury, or physical illness, including a life endangering physical condition caused by or arising from the pregnancy itself, that would . . . place the woman in danger of death unless an abortion is performed.").

report accompanying the House version of the Budget Reconciliation Bill that included the

language that became Section 71113 clearly identified Planned Parenthood and its members as

the target:

> [the legislation] would prohibit federal Medicaid funding for Planned Parenthood and its affiliates across the country. [It] creates a specific and narrow definition intended to target certain providers in the Medicaid program that separately, and without federal Medicaid funding, provide abortion services . . . . Even in the nearly two-dozen states that have outlawed or severely restricted abortion care, Medicaid beneficiaries would be unable to seek [other] care at Planned Parenthood as a result of this provision. Millions of Medicaid beneficiaries would be left without the ability to seek care from their provider of choice solely because of . . . hostility towards Planned Parenthood and the ability for women to seek comprehensive reproductive care.

Id. at 251 (quoting H.R. Rep. No. 119-106, pt. 1, at 635 (2025)). Third, while ten Planned

Parenthood entities either did not provide abortion services or did not themselves meet other

Section 71113 criteria, CMS would not say in connection with the preliminary injunction

briefing whether these entities would be considered "prohibited entities." Id. at 246–47. Fourth,

in July 2025, when the court was considering the Planned Parenthood Plaintiffs' motion, CMS

had identified only two non-Planned Parenthood entities that met the definition of "prohibited

entities," id. at 246, while the legislative history supported the Planned Parenthood Plaintiffs'

contention that the inclusion of these two entities was no more than "collateral damage" arising

from the design of Section 71113's criteria to specifically target Planned Parenthood members,

id. at 250–51, 257–58. Finally, while Section 71113 allowed for-profit entities, entities that were

not essential community health care providers, and entities that were not primarily engaged in

family planning services, reproductive health, and related medical care, to continue performing

elective abortions without losing Medicaid Funds, and, although Section 71113 purported to

allow entities that did meet those criteria to avoid losing Medicaid funds by not performing

abortions after October 1, 2025, Section 71113's "affiliate" language ensured that Planned

Parenthood members that did not perform abortions would still lose funding unless they also ceased membership in Planned Parenthood Federation. Id. at 258.

The court found the Planned Parenthood Plaintiffs' argument persuasive and granted "preliminary relief that prevents Defendants from targeting a specific group of entities—Planned Parenthood Federation Members—for exclusion from reimbursements under the Medicaid program where [the Planned Parenthood Plaintiffs] have established a substantial likelihood that they will succeed in establishing that such targeted exclusion violates the United States Constitution[.]" Id. at 241.

Defendants appealed this court's preliminary injunctions and sought a stay. On September 11, 2025, the First Circuit granted a stay, explaining only that Defendants "had met their burden to show their entitlement to a stay of the preliminary injunctions pending the disposition of their appeals of the same." Planned Parenthood Fed'n of Am., Inc. v. Kennedy, No. 25-1698, at *2 (1st Cir. Sept. 11, 2025).

### E. The Present Litigation

The Plaintiff States filed their Complaint [Doc. No. 1] on July 29, 2025, while the court's preliminary injunction in the Planned Parenthood litigation was in place.[5] Two weeks after the First Circuit stayed that preliminary injunction, the Plaintiff States filed the pending Motion [Doc. No. 60] requesting that the court "preliminarily enjoin Defendants from implementing or enforcing Section 71113 . . . pending a final ruling on the merits of this case." Id. at 1. The Plaintiff States argue that Section 71113 is unconstitutional because it violates Congress'

---

[5] The action was filed as related to the Planned Parenthood litigation. See Civil Cover Sheet [Doc. No. 1-1]; Category Form [Doc. No. 1-2]; see also Local Rules of the United States District Court for the District of Massachusetts, Rule 40.1(g).

spending powers by attaching conditions to federal funding without clear notice to the States.
Pls.' Mem. ISO Mot. for Prelim. Injunc. 6 [Doc. No. 63].

### F. Further Proceedings in the First Circuit in the Related Case

Merits briefing has concluded on the appeal before the First Circuit of the preliminary injunctions entered in the Planned Parenthood litigation. At oral argument on November 12, 2025, Defendants' counsel stated that HHS still "has not yet made the determination" as to whether Planned Parenthood Federation members were affiliates of each other. See Pls.' Notice of Suppl. Facts 2 [Doc. No. 81]. Defendants' counsel stated further that "it may be the states that have to make a judgment in the first instance when they're deciding whether or not to provide funds that they're requesting federal reimbursement for to a Planned Parenthood affiliate" and that counsel could not "prejudge how the states are going to look at that or how ultimately the agency is going to look at that[.]" Id. (emphasis added) (quotation omitted).

### G. CMS's Directive to the States

On November 20, 2025, CMS sent an email with State Medicaid Directors "blind copied" concerning the implementation of Section 71113. Defs.' Not. of Supp. Facts 1 [Doc. No. 82]. The following morning, CMS sent a corrected version of this email, with State Medicaid Directors again "blind copied." Id. The CMS Email asserted that "State Medicaid agencies are responsible for identifying the prohibited entities enrolled in their Medicaid program for purposes of ensuring compliance with Section 71113." CMS Email 2 [Doc. No. 82-1]. CMS also notified the states that "at any time, CMS may require a state to provide its list of prohibited entities to validate the state's claims for [Federal Financial Participation ("FFP")]." Id. The agency detailed the implications for those states who have managed care programs, including capitation rate adjustments and contract revision. Id. CMS also announced changes to Medicaid expenditure

claiming and reporting, which occur quarterly, to include a new certification process to verify compliance with Section 71113. Id.

The CMS Email instructs the states to review "readily available information . . . including claims data," when determining whether an entity is prohibited under Section 71113, and to "contact the entity directly to obtain any additional information necessary[.]" Id. The CMS Email provides as an example that, if a particular entity does not meet the $800,000 threshold for Medicaid reimbursements from the state for Fiscal Year 2023, that state should contact that entity to determine applicable expenditures made to "[t]he entity by other states"; "[t]he entity's affiliates, etc. by the state or other states"; "[t]he entity as part of a nationwide health care provider network"; and "[t]he entity's affiliates, subsidiaries, successors, or clinics as part of a nationwide health care provider network." Id. The CMS Email also notified states that CMS interprets Section 71113's term "affiliate," as "a corporation that is related to another corporation by shareholdings or other means of control; a subsidiary, a parent, or a sibling corporation." Id. (citing Black's Law Dictionary (emphasis added)). The CMS Email stated further that CMS defines "'control' as: 'the direct or indirect power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, or otherwise; the power or authority to manage, direct, or oversee," Id. (citing Black's Law Dictionary (emphasis added)).

The CMS Email provided further that:

> States must ensure their managed care programs comply with section 71113 and applicable requirements under 42 CFR Part 438. States and their actuaries should evaluate whether implementation of section 71113 necessitates adjustments to Medicaid capitation rate development or constitutes a material adjustment requiring an amended rate certification. Additionally, states should review any [state directed payments ("SDPs")] to determine whether revisions are required and how such SDPs are accounted for in capitation rate development and rate certifications.

States must also ensure that all Medicaid managed care contracts comply with all applicable federal and state laws, including Section 71113 of WFTC legislation.[8] To ensure clarity, states should assess if their managed care contracts should be revised to detail the requirements of section 71113. For example, states may wish to specify in their managed care contracts that payments to prohibited entities are not allowable expenditures of Federal funds under section 71113(a), and that any expenditures to such entities made by [covered organizations] are not eligible for [federal financial participation].

Id. The CMS Email also directed each State that if it "has already claimed or has drawn down FFP on or after July 4, 2025[,] for payments to entities identified as prohibited entities as of October 1, 2025, it should promptly withdraw or correct the claim, or return FFP, as required by applicable statutory and regulatory requirements." Id.

### H.  Impact of Section 71113 and CMS's Directive on Plaintiff States

The Plaintiff States describe being unprepared and ill-equipped to determine who qualifies as a prohibited entity and how to exclude those providers from their billing systems. See, e.g., New Jersey Decl. ¶¶ 30–31 [Doc. No. 62-18] (describing the "state employee time" necessary to "scope, design, and oversee the [system] changes; contractor time to code, test, and deploy the [system] changes; and leadership time to monitor outcomes and ensure accurate deployment . . . . New Jersey has not budgeted for these contingencies."); Pennsylvania Decl. ¶¶ 19–20 [Doc. 62-25] (describing the substantial "infrastructure changes" necessary to exclude prohibited entities from Pennsylvania's Medicaid program).

The Plaintiff States also declare that most Medicaid-required family-planning related health services are provided by the health centers of a Planned Parenthood entity in that State. See, e.g., First Minnesota Decl. ¶ 11 [Doc. 62-15] ("[I]n 2021, one in six female Minnesota Medicaid enrollees aged 15 to 49 who received family planning services received care at Planned Parenthood."); Wisconsin Decl. ¶ 18 [Doc. 62-24] (Planned Parenthood of Wisconsin, Inc.'s

health centers "provide a substantial portion, about 75 percent, of all Wisconsin Medicaid-funded reproductive health care and family planning services.").

In light of Planned Parenthood's outsized presence in some states, if a Planned Parenthood entity in those states is no longer able to provide Medicaid-covered services, other health facilities within a state's care system would need to drastically expand their coverage to meet demand, which, in some instances, state systems are unequipped to do. Research Scientist Decl. ¶¶ 42–44 [62-5]; id. ¶ 44 ("[I]n seven Plaintiff States (CT, MN, NJ, OR, VT, WA, and WI), [Federally qualified health centers ("FQHCs")] and other publicly supported clinics would need to increase their caseloads by more than 100% to provide care for patients currently served by Planned Parenthood."); California Decl., ¶ 25 [Doc. No. 62-6] ("[The California Primary Care Association] does not believe that California has sufficient Medicaid provider capacity to absorb the patients that Planned Parenthood will no longer be compensated for treating under H.R.1."); Id. ¶ 29 [Doc. No. 62-6] ("[M]ore patients may experience avoidable health crises, increasing reliance on costly emergency and hospital care and straining California's healthcare infrastructure and state budget."); Colorado Decl. ¶ 31 [Doc. No. 62-7] ("Colorado does not have Medicaid providers who can absorb the patients that will be displaced if Planned Parenthood can no longer be compensated for treating under [Section 71113].").

## II.    Standing

Defendants contend that neither of the Plaintiff States' theories of injury – namely, "the administrative costs of complying with Section 71113 and the increased healthcare costs the States might eventually incur if certain providers stop accepting Medicaid patients"– satisfy Article III standing. Defs.' Opp'n 11 [Doc. No. 73].

To satisfy Article III's standing requirements, an injury must be "concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable

ruling." Clapper v. Amnesty Int'l USA, 568 U.S. 398, 409 (2013) (quoting Monsanto Co. v. Geertson Seed Farms, 561 U.S. 139, 149 (2010)). "At the preliminary injunction stage . . . the plaintiff must make a clear showing that she is likely to establish each element of standing." Murthy v. Missouri, 603 U.S. 43, 58 (2024) (quotations omitted).

To establish injury in fact, a plaintiff must demonstrate "an invasion of a legally protected interest" that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992). "The particularization element of the injury-in-fact inquiry reflects the commonsense notion that the party asserting standing must not only allege injurious conduct attributable to the defendant but also must allege that he, himself, is among the persons injured by that conduct." Hochendoner v. Genzyme Corp., 823 F.3d 724, 731–32 (1st Cir. 2016).

Defendants first contend that the alleged increased administrative costs "separately attributable to Section 71113 is exceedingly minimal," especially where the Plaintiff States already incur such costs in administering their Medicaid programs as a matter of course. Defs.' Opp'n 13 [Doc. No. 73]. But the magnitude of an alleged "injury in fact" does not by itself negate the sufficiency of the injury for the purpose of standing. See Massachusetts v. U.S. Dept. of Health and Human Servs., 923 F.3d 209, 222 (1st Cir. 2019) ("[I]t is a bedrock proposition that a relatively small economic loss – even an identifiable trifle – is enough to confer standing" (quotation omitted)). In the First Circuit "it is well-settled . . . that the injury required for standing need not be substantial, it need only exist." Rental Housing Ass'n of Greater Lynn, Inc. v. Hills, 548 F.2d 388, 390 (1st Cir. 1977) (citing United States v. SCRAP, 412 U.S. 669, 689 n.14 (1973)). Where the Plaintiff States have put forth specific costs that would not be incurred but for Section 71113's requirements, they have identified a particular fiscal injury sufficient to

assert standing. See, e.g., First Minnesota Decl. ¶¶ 18–23 [Doc. No. 62-15]; New York Decl. ¶¶ 20–28 [Doc. No. 62-20]; Wisconsin Decl. ¶¶ 21–24 [Doc. No. 62-24].

Moreover, CMS's November 21, 2025 Email underscores the administrative costs at issue here. In the CMS Email, the agency directs Plaintiff States to, among other things, review information "readily available to the state, including claims data" as to potential "prohibited entities"; where the state's records are insufficient, "contact the entity directly to obtain any additional information necessary to determine if [Section 71113's] conditions are met"; and be prepared to "provide its list of prohibited entities to validate the state's claim" for Federal Financial Participation "at any time." CMS Email [Doc. No. 82-1]. Defendants' suggestion that these administrative burdens do not provide the Plaintiff States with standing is frivolous.

Defendants next contend that the Plaintiff States lack standing as *parens patriae* to bring suit against the federal government on behalf of "their citizens, Planned Parenthood, or other health care providers not before this Court in this action." Defs.' Opp'n 14 [Doc. No. 73]. Defendants are correct that the Plaintiff States may not bring this claim as *parens patriae*, but they are incorrect to characterize the Plaintiff States' claim in this way. The Plaintiff States have identified not only the increased administrative costs discussed above, but also the increased healthcare costs that they will accrue as a result of Section 71113's enforcement.

The Plaintiff States have already developed, and received CMS approval for, state-specific Medicaid plans that include contraceptive coverage, as required by law, and have determined the provider rates and other details contained within those plans. If Section 71113 diverts Medicaid funding away from "prohibited entities"—who by definition are non-profits, serving underserved, low-income communities—despite these entities being part of the Plaintiff States' previously-approved Medicaid plans, the Plaintiff States will be burdened by increased

healthcare costs necessary both to cover those services and to address the short and long-term costs associated with, inter alia, reduced contraceptive care, less frequent screenings for sexually transmitted infections, and delayed treatment for certain cancers. See Mem. ISO Pls.' Mot. for Prelim. Injunc. 16–19 [Doc. No. 63]; see also, e.g., California Decl. ¶ 29 [Doc. No. 62-6] ("Without access to timely services [provided by 'prohibited entities'] . . . more patients may experience avoidable health crises, increasing reliance on costly emergency and hospital care and straining California's healthcare infrastructure and state budget.").

The Plaintiff States have also declared that they will have to substitute impacted entities' federal Medicaid funding with state funding. See, e.g., Colorado Decl. ¶ 41 [Doc. No. 62-7] (such funding substitution would "require Colorado to use funds that could have otherwise covered other public services for Coloradans in a time when Colorado is already facing a significant state budget deficit."); North Carolina Decl. ¶ 22 [Doc. No. 62-17] ("To avoid these negative outcomes, either the federal government would need to again fund the Planned Parenthood health centers in North Carolina . . . or the State of North Carolina would need to pay the former federal share of that healthcare."). And although Defendants contend that these would be voluntarily assumed costs, the Plaintiff States, as Medicaid providers, are required by law to provide this funding. 42 U.S.C. §§ 1396a(a)(10), 1396d(a)(4)(C). In sum, the Plaintiff States have identified a sufficient risk of imminent fiscal injury to assert standing. See Massachusetts, 923 F.3d at 223 (imminent fiscal injury shown where Commonwealth "established a substantial likelihood" that some women who would lose contraceptive coverage under federal policy "will then obtain stated-funded contraceptive services or prenatal and postnatal care for unintended pregnancies, and thus that the Commonwealth will incur costs as a result").

Finally, Defendants assert that, under <u>United States v. Texas</u>, 599 U.S. 670 (2023), the Plaintiff States cannot rely on "indirect" and "downstream harms" to states' budgets and resources to establish the requisite injury-in-fact for Article III standing.[6] Defs.' Opp'n 15–16 [Doc. No. 73]. But Defendants' reliance on <u>United States v. Texas</u> for this argument, as another session of this court has previously explained, is misplaced. <u>See</u> <u>Doe v. Trump</u>, 766 F. Supp. 3d 266, 276 n.8 (D. Mass. 2025) (federal government's characterization of <u>United States v. Texas</u> "verges on misleading"). Although some indirect effects are too attenuated to support Article III standing, it is inaccurate to conclude that <u>all</u> such effects are insufficient. <u>See e.g.</u>, <u>Biden v. Nebraska</u>, 600 U.S. 477, 489-92 (2023) (affirming state's standing to challenge federal government action affecting instrumentality of state where government's discharge of federal student loans would deprive instrumentality of revenue derived from fees on such loans); <u>New York v. Kennedy</u>, 155 F.4th 67, 73 (1st Cir. 2025) (holding that plaintiff states had Article III standing to challenge government agency's reduction-in-force where plaintiffs alleged "myriad injuries to the states themselves," including "increased costs and burdens on the state agencies' operations" due to cessation in certain federal services).

In short, the Plaintiff States have standing to bring this action challenging Section 71113.

## III.    Standard for Preliminary Relief

The issuance of a preliminary injunction before a trial on the merits can be held is an "extraordinary remedy" that shall enter only if a plaintiff makes a clear showing of entitlement to

---

[6] The court also notes that Defendants' assertion as to Plaintiffs lack of standing in this case is in tension with Defendants' position as to States' standing as articulated in the Planned Parenthood litigation. For example, at oral argument before the First Circuit on November 12, 2025, when responding to a question from the panel regarding Massachusetts' attempts to supplement funds to "prohibited entities" in light of the Section 71113 bar, Defendants' counsel stated that such supplementary payments "could potentially moot Planned Parenthood's claim, maybe the state would have a claim." Pls.' Notice of Supp. Facts 3 [Doc. No. 81] (quotations omitted).

such relief. Winter v. Natural Res. Def. Council, Inc., 555 U.S. 7, 22 (2008). In evaluating a motion for a preliminary injunction, the court considers four factors:

> (1) the likelihood of success on the merits; (2) the potential for irreparable harm [to the movant] if the injunction is denied; (3) the balance of relevant impositions, i.e., the hardship to the nonmovant if enjoined as contrasted with the hardship to the movant if no injunction issues; and (4) the effect (if any) of the court's ruling on the public interest.

Esso Standard Oil Co. v. Monroig–Zayas, 445 F.3d 13, 17–18 (1st Cir.2006) (quoting Bl(a)ck Tea Soc'y v. City of Boston, 378 F.3d 8, 11 (1st Cir. 2004)). When seeking preliminary relief, a harm must be likely, rather than merely possible. Winter, 555 U.S. at 22 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is likely in the absence of an injunction.").

The first factor is the most important: if the moving party cannot demonstrate a likelihood of success on the merits, "the remaining become matters of idle curiosity." New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 9 (1st Cir. 2002). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success—rather, they must establish a 'strong likelihood' that they will ultimately prevail." Sindicato Puertorriqueño de Trabajadores v. Fortuño, 699 F.3d 1, 10 (1st Cir. 2012) (quoting Respect Maine PAC v. McKee, 622 F.3d 13, 15 (1st Cir. 2010)).

## IV.    Likelihood of Success on the Merits

Plaintiff States argue that Section 71113 unconstitutionally fails to provide clear notice to the States. More specifically, they contend that Section 71113 fails to provide clear notice because: (1) the definition of "prohibited entities" and the timing of the prohibition on federal reimbursements to such entities is impermissibly ambiguous; and (2) Section 71113 is an "unprecedented incursion" into States' "traditional discretion over the regulation of medicine that Plaintiff States could not have anticipated when joining Medicaid." Pls.' Mem. ISO Mot. for

Prelim. Injunc. 7 [Doc. No. 63]. The court considers first the clear notice requirement under the

Spending Clause before turning to Plaintiff's arguments as to why Section 71113 fails to meet

that requirement.

As discussed below, the Plaintiff States have demonstrated a strong likelihood of success

on the merits of their claim that Section 71113 fails to provide states with clear notice, in

violation of the Spending Clause, where it is impermissibly ambiguous as to some prohibited

entities and where Plaintiff States, as to others, could not have anticipated this broad prohibition,

made without prior notice, of the use of health care providers who served substantial numbers of

Medicaid beneficiaries in the States' previously approved Medicaid plans .

### A. The Clear Notice Requirement

Congress may undoubtedly "set the terms on which it disburses federal money to the

States." Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy, 548 U.S. 291, 296 (2006). When

Congress enacts legislation under its spending power, however, it does so "much in the nature of

a contract: in return for federal funds, the States agree to comply with federally imposed

conditions." Pennhurst State School & Hospital v. Halderman, 451 U.S. 1, 17 (1981). As the

Supreme Court has explained, "the legitimacy of Congress' power to legislate under the spending

power thus rests on whether the State voluntarily and knowingly accepts the terms of the

'contract.'" Id. But a state cannot knowingly accept the terms of the "contract" if it is "unaware

of the conditions or is unable to ascertain what is expected of it." Id. Thus, "if Congress intends

to impose a condition on the grant of federal moneys, it must do so unambiguously." Id.; see also

Arlington Cent. Sch. Dist. Bd. of Educ., 548 U.S. at 296 ("[W]hen Congress attaches conditions

to a State's acceptance of federal funds, the conditions must be set out unambiguously[.]").

Defendants' contrary characterization of the notice requirement is unavailing. Defendants

assert that "Congress must only make clear that acceptance of federal funds obligates States to

comply with a condition." Defs.' Opp'n 6 [Doc. No. 73] (citing Pennhurst, 451 U.S. at 18).

Defendants argue that, under Pennhurst, States' obligations "may be 'largely indeterminate,'" id.

at 7 (quoting Pennhurst, 451 U.S. at 24), "so long as Congress gives 'clear notice to the States

that they, by accepting funds under the Act, would indeed be obligated to comply with' the

condition." Id. (quoting Pennhurst, 451 U.S. at 25). But these selective quotes ignore the Court's

discussion of what it meant by "clear notice":

> Congress must express clearly its intent to impose conditions on the grant of federal
> funds so that the States can knowingly decide whether or not to accept those
> funds. . . . The crucial inquiry . . . is not whether a State would knowingly undertake
> that obligation, but whether Congress spoke so clearly that we can fairly say that
> the State could make an informed choice.

Pennhurst, 451 U.S. at 24–25.

Defendants contend that the Court has "repeatedly affirmed" that mere notice of a fund

recipient's need to comply with a condition is sufficient. Defs.' Opp'n 7 [Doc. No. 73] (citing

Jackson v. Birmingham Bd. of Educ., 544 U.S. 167 (2005), and Davis ex rel. Lashonda D. v.

Monroe Cnty. Bd. of Educ., 526 U.S. 629 (1999)). In the cases to which Defendants cite for this

proposition, the Court did conclude that Congress could not be required to "list" all "specific

discriminatory practices" in setting out Title IX's prohibition against discrimination. See

Jackson, 544 U.S. at 175. But the Court did not find the clear notice requirement was therefore

eviscerated; instead, the Court concluded that the school boards had clear notice that they could

be held liable for the particular intentional conduct at issue. See id. at 183 ("Pennhurst does not

bar a private damages action under Title IX where the funding recipient engages in intentional

conduct that violates the clear terms of the statute." (quoting Davis, 526 U.S. at 642) (emphasis

added)); see also id. at 183–84 (where the regulations implementing Title IX clearly prohibit

retaliation and have been on the books for nearly thirty years, and where the Courts of Appeals

that had considered the question at the time had already interpreted Title IX to cover retaliation,

"[t]he Board could not have realistically supposed that . . . it remained free to retaliate against those who reported sex discrimination").

Defendants' construct also ignores later case law. In <u>Arlington Central School District Board of Education</u>, the Supreme Court firmly reiterated that "States cannot knowingly accept conditions of which they are 'unaware' or which they are 'unable to ascertain.'" 548 U.S. at 296 (quoting <u>Pennhurst</u>, 451 U.S. at 17).

Anchored to the proper inquiry, the court turns to Plaintiff States' argument that they are likely to succeed on the merits of their claim that Section 71113 fails to provide clear notice and therefore violates the Spending Clause. In doing so, the court "must view [Section 71113] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [the affected] funds and the obligations that go with those funds." <u>Id.</u> From that perspective, the court "must ask whether such a state official would clearly understand" a state's obligations under Section 71113. <u>Id.</u> "In other words, [the court] must ask whether [Section 71113] furnishes clear notice" to the States. <u>Id.</u>

### B. Section 71113's Notice to the States

Plaintiff States argue that Section 71113 fails to provide clear notice in two ways: first, they contend that the definition of a "prohibited entity," together with the provision's effective date, imposes vague and contradictory conditions on them; and second, they argue that removing "prohibited entities" from health care providers eligible to provide care for Medicaid participants is a retroactive condition that the Plaintiff States could not have anticipated when they joined Medicaid. The court considers each argument in turn.

#### 1. "Prohibited Entities"

In considering whether Section 71113 provides clear notice as to the meaning of "prohibited entities," "we begin with the text." <u>Arlington Cent. Sch. Dist. Bd. of Educ.</u>, 548 U.S.

at 296. Section 71113 defines a "prohibited entity" as an entity, including its affiliates, subsidiaries, successors, and clinics, that, as of October 1, 2025: (1) is a tax-exempt organization under 26 U.S.C. § 501(c)(3); (2) is an "essential community provider," as defined under 45 C.F.R. § 156.235[7]; (3) is "primarily engaged in family planning services, reproductive health, and related medical care"; (4) "provides for abortions," other than abortions under the Hyde Amendment; and (5) the "total amount of Federal and State expenditures under the Medicaid program . . . in fiscal year 2023 made directly, or by a covered organization, to the entity or to any affiliates, subsidiaries, successors, or clinics of the entity as part of a nationwide health care provider network, exceeded $800,000." Pub. L. No. 119-21, § 71113, 139 Stat. 300 (2025).

Plaintiff States contend that Section 71113 fails to lay out with sufficient clarity how a state is to determine whether a provider is "primarily engaged in family planning services, reproductive health, and related medical care" where the statutory language does not define these services and medical care, does not set forth a quantifiable standard on which to decide if a provider is "primarily engaged" in the listed care types, and does not specify the basis on which a provider's engagement in such services should be measured. Pls.' Mem. ISO Mot. for Prelim. Injunc. 7–8 [Doc. No. 63]. Plaintiff States also take issue with the $800,000 Medicaid expenditure threshold, as Section 71113 does not explain how states should calculate Medicaid expenditures on in-state entities that are part of multistate organizations where Plaintiff States only track their own Medicaid expenditures. Id. Finally, Plaintiff States note that Section 71113's

---

[7] "An essential community provider is a provider that serves predominantly low-income, medically underserved individuals, including [certain health care providers defined under the Public Health Service ('PHS') Act and other federal laws]; or a State-owned family planning service site, or governmental family planning service site, or not-for-profit family planning service site that does not receive Federal funding under special programs, including under Title X of the PHS Act, or an Indian health care provider." 45 C.F.R. § 156.235(c).

reference to "affiliates" is undefined and out of alignment with Plaintiff States' Medicaid
tracking capabilities, as Plaintiff States "do not track the 'affiliates' of Medicaid providers,
particularly if those 'affiliates' operate outside of their respective borders." Id. at 8.

Defendants point the court to Plaintiff States' own declarations, which, Defendants assert,
demonstrate that Plaintiff States have so far been able to identify "at least some entities that fall
within the provision's scope." Defs.' Opp'n 8 [Doc. No. 73]. The court agrees that, as of October
1, 2025, Plaintiff States are able to identify some entities that are covered by Section 71113. That
group is limited, however, to entities within a particular state that (1) are tax-exempt
organizations under 26 U.S.C. § 501(c)(3); (2) are "essential community providers" as defined
under 45 C.F.R. § 156.235; (3) self-identify as "primarily engaged in family planning services,
reproductive health, and related medical care"; (4) provide abortions, other than abortions under
the Hyde Amendment; and (5) the total amount of Federal and State expenditures from that
state's Medicaid program in fiscal year 2023 made directly to the entity exceeded $800,000. See
Pub. L. No. 119-21, § 71113, 139 Stat. 300 (2025).

Defendants' position that notice is sufficient as to all other entities, however, is
unconvincing. In the Planned Parenthood litigation, Defendants have refused to address "any
dispute over whether [Section 71113] applies to particular entities," finding the question
"premature" where "[t]he Government has yet to construe or apply the provision. . . ." Planned
Parenthood Litigation, Opp'n 2, docket entry 53 (July 14, 2025); see also id. at 24 (as to Planned
Parenthood members that do not perform abortions, "CMS . . . has had no opportunity to analyze
the legal and factual questions that it must consider to construe and apply the statute"); id. at 25
("HHS and CMS have had no opportunity to opine on the scope of Section 71113's application to
affiliates. . . . The [non-abortion performing affiliates] can only speculate that HHS and CMS . . .

24

will interpret the statute to apply to them and deny payment or reimbursement."); Pls.' Notice of
Suppl. Facts 2 [Doc. No. 81] (at oral argument before the First Circuit, counsel for Defendants
stated that "it may be the states that have to make a judgment in the first instance when they're
deciding whether or not to provide funds that they're requesting federal reimbursement for to a
Planned Parenthood affiliate" and that counsel could not "prejudge how the states are going to
look at that or how ultimately the agency is going to look at that[.]"). Defendants have left open
the question of whether Planned Parenthood members are affiliates within the meaning of
Section 71113 despite an uncontroverted record that the members are separately incorporated and
independently governed entities, each with its own CEO and board of directors. See Planned
Parenthood Federation Decl. ¶¶ 9, 11 [Doc. No. 61-1].

In this litigation, Defendants have glibly suggested that States' declarants "were readily
able to identify Planned Parenthood affiliates," see Defs.' Opp'n 8 [Doc. No. 73]. But this bare
assertion does not help to ascribe meaning to "affiliates" as that term is used in Section 71113,
nor does it explain the meaning of "affiliates" outside of the universe of Planned Parenthood
entities – which Defendants have maintained are not the sole targets of Section 71113. See, e.g.,
Planned Parenthood Fed'n of Am., Inc., 792 F. Supp. 3d at 256 ("Defendants argue that Section
71113 is not a bill of attainder because it applies to at least two entities that are not Planned
Parenthood members. . . ."); Defs.' Opp'n 13 [Doc. No. 73] ("States remain free to determine
Planned Parenthood or any other provider may furnish services to Medicaid-eligible individuals
via self-pay or even at state expense. . . ." (emphasis added)).  In a colloquial sense, Planned
Parenthood members are certainly "affiliates" in that they are associated with one other. As this
court pointed out in the Planned Parenthood litigation, however, that has created a First
Amendment problem, where Planned Parenthood members are being punished for their

association with Planned Parenthood Federation. See Planned Parenthood Fed'n of Am., Inc., 792 F. Supp. 3d at 267-68.

Defendants have also asserted that "HHS is developing guidance regarding affiliate determinations." Defs.' Opp'n 8–9 [Doc. No. 73]. Plaintiff States point to these unresolved issues in asserting that Section 71113 "fails to provide clear notice to Plaintiff States of which providers qualify as 'prohibited entities.'" Pls.' Mem. ISO Mot. for Prelim. Injunc. 7 [Doc. No. 63]. The court agrees. "By insisting that Congress speak with a clear voice, we enable the States to exercise their choice knowingly, cognizant of the consequences of their participation." Pennhurst, 451 U.S. at 17. Precedential case law clearly and consistently affirms that, where states are "unaware" of or "unable to ascertain" federally imposed conditions on their receipt of federal funds, states "cannot knowingly accept [such] conditions." Arlington Cent. Sch. Dist. Bd. of Educ., 548 U.S. at 296 (quotations omitted). See Cummings v. Premier Rehab Keller, P.L.L.C., 596 U.S. 212, 220 (2022); South Dakota v. Dole, 483 U.S. 203, 207 (1987); Pennhurst, 451 U.S. at 17.

That Plaintiff States may have been able to partially divine the meaning of Section 71113 is also insufficient as to satisfaction of the clear notice requirement where Plaintiffs face significant financial consequences for violations of the provision. If Medicaid claims are submitted by "prohibited entities" under Section 71113, states must return the federal funds used to pay such claims and, in turn, shoulder the costs of such claims. See, e.g., Colorado Decl. ¶ 37 [Doc. No. 62-7] ("Failure to incorporate the necessary infrastructure changes [to comply with Section 71113] would result in Colorado being at risk of having to return any federal funds used to pay claims submitted by entities defined under [Section 71113], thereby placing the costs directly onto Colorado and reducing federally provided matching Medicaid funds."); Hawai'i

Decl. ¶ 18 [Doc. No. 62-10] (asserting the same for Hawaiʻi); Maine Decl. ¶ 29 [Doc. No. 62-13] (asserting the same for Maine); New Jersey Decl. ¶ 26 [Doc. No. 62-18] (asserting the same for New Jersey); Wisconsin Decl. ¶ 23 [Doc. No. 62-24] (asserting the same for Wisconsin). For the purposes of clear notice, that a state is on notice as to some, but not all, entities "prohibited" under Section 71113 matters little when states must return funds in connection with every violation of the provision. See Pennhurst, 451 U.S. at 17 (not possible for state to knowingly accept conditions of funding if the state "is unable to ascertain what is expected of it"). See also Cummings, 596 U.S. at 219 (where states may be held liable for money damages, "we . . . construe the reach of Spending Clause conditions with an eye toward ensuring that the receiving entity of federal funds had notice that it will be liable" (quotations and citation omitted)).

Defendants contend that the November 20, 2025 CMS Email sent to State Medicaid Directors provided "information regarding state identification of prohibited entities under Section 71113." Defs.' Notice of Supp. Facts 1 [Doc. No. 82]. But the CMS Email only makes clear the agency's position that "[s]tate Medicaid agencies are responsible for identifying the prohibited entities enrolled in their Medicaid program for purposes of ensuring compliance with Section 71113," that "States must . . . ensure that all Medicaid managed care contracts comply with . . . Section 71113," and that they "should expect to provide assurances that claims for FFP are only for Medicaid expenditures permitted by law." CMS Email 3 [Doc. No. 82-1]. What is actually required for compliance with Section 71113 remains a mystery.

As to how states should go about identifying "prohibited entities," the CMS Email directs States back to Section 71113's statutory text and sets forth steps that States should take to gather information regarding entities that may be prohibited under the provision. The interpretation of "affiliate" for the purposes of Section 71113 offered in the CMS Email, however, is unhelpful.

This interpretation does introduce the concept of "control," which is not in the statutory language, but it leaves open how "control" would be determined where CMS's definition of "affiliate" includes open-ended terms: "a corporation that is related to another corporation by shareholdings <u>or other means of control</u>; a subsidiary, parent or sibling corporation." <u>Id</u>. (emphasis added). CMS's definition of "control" similarly relies on several nebulous terms: "the direct <u>or indirect</u> power to govern the management and policies of a person or entity, whether through ownership of voting securities, by contract, <u>or otherwise</u>; the power or authority to manage, direct, or oversee." <u>Id.</u> (emphases added).

CMS's new guidance also does not provide states with a process for calculating expenditures relative to Section 71113's $800,000 Medicaid expenditure threshold, beyond effectively directing states to conduct their own ad hoc investigation into the out-of-state expenditures received by potential in-state "prohibited entities."  <u>See id.</u> ("For example, if a state's own records indicate that an entity meets [Section 71113's] first three conditions, but has only $700,000 in applicable expenditures made by the state and its covered organizations, it should contact the entity to determine any additional applicable expenditures made to: [t]he entity by other states; [t]he entity's affiliates, etc. by the state or other states; [t]he entity as part of a nationwide health care provider network; [t]he entity's affiliates, subsidiaries, successors, or clinics as part of a nationwide health care provider network."). Nor does the CMS Email provide details as to what services should be considered and on what basis entities engaged in such services should be measured in determining if an entity and its clinics or "affiliates" are "primarily engaged in family planning services, reproductive health, and related medical care." <u>See generally</u> <u>id.</u> For example, is a State precluded from reimbursing maternity services at a non-

profit hospital's birthing center using federal Medicaid funds if the hospital provides elective abortions on its main campus?

But even if CMS's guidance sufficiently clarified states' obligations under Section 71113, such post hoc administrative interpretation cannot cure the provision's deficiencies under the Spending Clause's clear notice requirement. In Texas v. Yellen, 105 F.4th 755 (5th Cir. 2024), for example, the Fifth Circuit held that a provision of the American Rescue Plan Act ("ARPA") requiring states to certify that federal funds would not be used to "directly or indirectly offset" reduced state tax revenue could not be brought into compliance with the Spending Clause's clear statement requirement by a rule subsequently promulgated by the United States Department of Treasury (the "Treasury"). See id. at 771–74. As the Fifth Circuit explained, "[i]n arguing that statutory ambiguity can be vitiated by regulatory enactments in the context of the Spending Clause," the government "claim[s] a remarkably broad power for federal administrative agencies. But this claim is remarkably wrong." Id. at 773. The regulations accompanying ARPA thus suffered from an "inescapable dilemma," as such clarifying regulations could not reasonably flow from the ambiguous statutory language they sought to distill. See id. ("[R]egulations cannot divest a statute of the very feature that permitted those regulations in the first place."). See also Kentucky v. Yellen, 54 F.4th 325, 354 (6th Cir. 2022) ("When . . . a clear-statement rule is in play, it is insufficient merely that an agency reasonably liquidated ambiguities in the relevant statute. Rather, in such circumstances, Congress itself must have spoken with a clear voice." (citations omitted)); Texas Educ. Agency v. U.S. Dep't of Educ., 992 F.3d 350, 361 (5th Cir. 2021) ("Relying on regulations to present the clear condition . . . is an acknowledgement that Congress's condition was not unambiguous, so that method of analysis would not meet the requirements of Dole."). So, too, here: Section 71113's failure to provide states with clear notice

cannot be repaired by CMS statements that purport to interpret the provision's unascertainable

scope. See Texas, 105 F.4th at 773; West Virginia ex rel Morrisey v. U.S. Dep't of the Treasury,

59 F.4th 1124, 1147 (11th Cir. 2023) ("[T]he needed clarity under the Spending Clause must

come directly from the statute" (quotations omitted)).

The CMS Email also brings into focus Plaintiff States' second argument as to Section

71113's failure to satisfy the clear notice requirement with respect to "prohibited entities":

Section 71113 sets forth "irreconcilable timing provisions." Pls.' Mem. ISO Mot. for Prelim

Injunc. 10 [Doc. No. 63]. See Pub. L. No. 119-21, § 71113, 139 Stat. 300 (2025). Turning again

to the text of the provision, see Arlington Cent. Sch. Dist. Bd. of Educ., 548 U.S. at 296, Section

71113 took effect "beginning on the date of the enactment of" the federal budget bill, or July 4,

2025. Pub. L. No. 119-21, § 71113(a), 139 Stat. 300 (2025). But Section 71113 is structured such

that whether an entity is a "prohibited entity" is determined relative to its status as of October 1,

2025. See id. § 71113(b)(1)(A) ("The term 'prohibited entity' means an entity . . . that, as of the

first day of the first quarter beginning after the date of enactment of this Act . . . ."); see also

Planned Parenthood Litigation, Opp'n 2, docket entry 53 (July 14, 2025) ("whether any

particular entity is 'prohibited' under the statute cannot even be determined until October 1,

2025.").

Plaintiff States contend that, because they "are obligated to make payments on providers'

claims within thirty days of submission" under 42 C.F.R. § 447.45(d), these competing timing

provisions necessarily create a situation in which Plaintiff States may have used federal Medicaid

funds to pay pre-October 1, 2025 claims submitted by entities that became "prohibited entities"

on October 1, 2025. Pls.' Mem. ISO Mot. for Prelim. Injunc. 10 [Doc. No. 63]. Stated differently,

Plaintiff States assert that they were effectively required to make payments between July 4, 2025,

and October 1, 2025, to entities that they could not have known were "prohibited entities" under

Section 71113. See id. The CMS Email appears to confirm Plaintiff States' interpretation: "If a

state has already claimed or has drawn down [Federal Financial Participation ("FFP")] on or

after July 4, 2025, for payments to entities identified as prohibited entities as of October 1, 2025,

it should promptly withdraw or correct the claim, or return FFP, as required by applicable

statutory and regulatory requirements." CMS Email 3 [Doc. No. 82-1].

Defendants respond that (1) "this is not the sort of claim that is cognizable under the

Spending Clause, as the existence of the condition is clear under federal law"; (2) the claim was

rendered moot after October 1, 2025; and (3) "the law's application to entities based on their

status as of a particular, specified date did not make it unclear; rather, it permitted entities to

cease providing abortions to remain eligible for Medicaid funding." Defs.' Opp'n 9 n.1 [Doc. No.

73]. None of these arguments address the lack of clarity in Section 71113's timing provisions.

As to Defendants' assertion of mootness, Plaintiff States argue that where States have

made or are making payments for services rendered between July 1, 2025, and October 1, 2025,

pursuant to 42 C.F.R. § 447.45(d), see Plaintiff States' Reply 2 n.2 [Doc. No. 76], "[t]he risk of

Defendants clawing back Medicaid funds for those payments persist." Id. The court agrees.

Moreover, the October 1, 2025 date for application of Section 71113's abortion criterium

still does not resolve the lack of clarity. If an entity is performing abortions after that date,

Plaintiff States must still determine if the entity meets the other criteria of the statute, including

determining whether the entity is "primarily" engaged in "family planning, reproductive health,

or related medical care" and how much it received last year from Medicaid in any states in which

it or its affiliates operated. And if an entity does not perform abortions as of October 1, 2025,

Plaintiff States must still determine whether the entity has any "affiliates" that do perform abortions.

For the reasons stated above, viewing Section 71113 from the perspective of a state official "engaged in the process of deciding whether the State should accept [the impacted] funds and the obligations that go with those funds," <u>Arlington Cent. Sch. Dist. Bd. of Educ.</u>, 548 U.S. at 296, Section 71113 does not furnish states with clear notice as to the meaning and application of Section 71113's criteria for designating "prohibited entities" other than those that, <u>without regards to affiliates, successors, or clinics</u>, are themselves (1) tax-exempt organizations under 26 U.S.C. § 501(c)(3); (2) "essential community providers" as defined under 45 C.F.R. § 156.235; (3) self-identify as "primarily engaged in family planning services, reproductive health, and related medical care"; (4) provide abortions, other than abortions under the Hyde Amendment; and (5) directly received more than $800,000 in total federal and state expenditures from that state's own Medicaid program in fiscal year 2023. <u>See</u> Pub. L. No. 119-21, § 71113, 139 Stat. 300 (2025).

### 2.    Design of Medicaid Plan

The court considers next Plaintiffs' argument that by restricting the providers who can receive Medicaid reimbursements, Section 71113 has improperly "surpris[ed] participating States with post acceptance conditions that . . . dramatically change the relationship between States and the federal government." Pls.' Mem. ISO Mot. for Prelim. Injunc. 11 [Doc. No. 63] (quotations omitted).

Plaintiff States argue that "throughout the sixty-year history of Medicaid, States—not the federal government—have determined whether providers 'qualify' for the Medicaid program," and that they could not have anticipated the "unprecedented shift" requiring them to exclude

providers from their Medicaid programs based on criteria unrelated to "qualifications." <u>Id.</u> at 12. Defendants respond that Congress has full "authority to condition the receipt of funds on the States' complying with restrictions on the use of those funds, because that is the means by which Congress ensures that the funds are spent according to its view of the 'general Welfare.'" Defs.' Opp'n 10 [Doc. No. 73] (citing <u>NFIB v. Sibelius</u>, 567 U.S. 519, 580 (2012)). In Defendants' view, Congress has "restricted the payment of federal Medicaid funds to abortion providers" through Section 71113, but it has not "'pressure[ed] the States to accept policy changes' independent of the federal funds." <u>Id.</u> (citing <u>NFIB</u>, 567 U.S. at 580).

The problem posed by Section 71113 for States is not merely that Congress has changed what providers are eligible for Medicaid funds, which Congress may well be entitled to do with clear notice. Instead, the problem is that Congress has made these substantial changes— excluding those "essential community providers . . .  primarily engaged in family planning services, reproductive health, and related medical care," who provided Medicaid services at a volume sufficient to receive over $800,000 in Medicaid reimbursement in the prior fiscal year, who chose to continue providing elective abortion after October 1, 2025, as well as other, not yet defined "affiliates[,]" <u>see</u> Pub. L. No. 119-21, § 71113, 139 Stat. 300 (2025)—without giving the States time to redesign their previously approved Medicaid programs so that they can meet all of the program obligations, including the federal mandate that Medicaid benefits include family planning services and supplies, without these newly prohibited providers. <u>See</u> CMCS Decl. ¶ 8 [Doc. No. 73-1]; 42 U.S.C. § 1396d(a)(4)(C).

The <u>CMCS Declaration</u> [Doc. No. 73-1] submitted by the Defendants is informative in this regard. It makes clear that, although "[t]he federal government outlines Medicaid program requirements and reviews and approves many components of a state's Medicaid program," States

"design their Medicaid programs including determining which delivery system(s) to utilize for providing care to Medicaid beneficiaries and which benefits are offered in each delivery system." Id. ¶ 2. "Family planning services and supplies are a mandatory Medicaid benefit," and "[f]amily planning services must also be provided to individuals receiving Medicaid services through an Alternative Benefit Plan." Id. ¶ 8. For many Medicaid beneficiaries, managed care programs, through which States contract with health plans that in turn contract with a provider network, are the primary vehicles through which Medicaid benefits are accessed. See, e.g., California Decl. ¶ 7 [Doc. No. 62-6] ("Care under Medi-Cal is provided through a combination of managed care and fee-for-service delivery systems, with the majority of members receiving care through managed care plans."); New Jersey Decl. ¶ 14 [Doc. No. 62-18] ("Care under NJ FamilyCare is provided by a predominantly managed care system."); Delaware Decl. ¶ 8 [Doc. No. 62-19] ("Care under Delaware's Medicaid program is provided predominantly under a managed care system."); New York Decl. ¶ 6 [Doc. No. 62-20] ("The majority of NYS Medicaid members are covered under Medicaid Managed Care."); Oregon Decl. ¶ 9 [Doc. No. 62-21] ("Approximately 92% of [Oregon's Medicaid program] members are enrolled in a [managed care entity]. . . ."); Pennsylvania Decl. ¶ 7 [Doc. No. 62-25] ("Most . . . beneficiaries receive services, including sexual and reproductive health care services, through a managed care plan under Pennsylvania's statewide mandatory managed care program."). Section 71113 thus removes major providers from established health delivery systems that are operating under Medicaid plans already approved by the federal government, reliant on contracts already in place with health plans and providers, and subject to beneficiary plan selections that have already been made.

Even assuming that Congress's decision to disqualify certain providers of elective abortions from Medicaid is otherwise constitutional, the decision to do so after the State has

received CMS approval for its Medicaid plan and entered into managed care plans with health plans, and _after_ those managed care plans have entered into contracts with providers and enrolled Medicaid beneficiaries, does not withstand scrutiny. Plaintiff States are thus likely to succeed on their claim that Section 71113 "constitutes an unconstitutional retroactive condition that Plaintiff States could not have anticipated when they joined Medicaid." Plaintiff States' Reply 6 [Doc. No. 76]; see Pennhurst, 451 U.S. at 25 ("Though Congress' power to legislate under the spending power is broad, it does not include surprising participating States with post acceptance or 'retroactive' conditions").

### C. Irreparable Harm

Plaintiff States have also demonstrated that irreparable harm is likely to occur should the court deny Plaintiff States' Motion for Preliminary Injunction [Doc. No. 60].

"'Irreparable injury' in the preliminary injunction context means an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 76 (1st Cir. 2005). "[T]he measure of irreparable harm is not a rigid one; it has been referred to as a sliding scale, working in conjunction with a moving party's likelihood of success on the merits." Vaqueria Tres Monjitas, Inc. v. Irizarry, 587 F.3d 464, 485 (1st Cir. 2009). "[T]he issuance of a preliminary injunction requires a showing of irreparable harm to the movant rather than to one or more third parties." CMM Cable Rep., Inc. v. Ocean Coast Props., Inc., 48 F.3d 618, 622 (1st Cir. 1995) (emphasis omitted). And "plaintiffs seeking preliminary relief [are required] to demonstrate that irreparable injury is likely in the absence of an injunction." Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7, 22 (2008) (emphasis omitted).

Plaintiff States contend that they are likely to experience irreparable harm due to increased administrative costs and healthcare costs. Mem. ISO Pls.' Mot. for Prelim. Injunc. 13

[Doc. No. 63]. Plaintiff States allege that the implementation of Section 71113, particularly in light of the provision's ambiguous terms, will require systems updates and pose other administrative burdens. Id. at 13-14. Defendants argue that such administrative costs do not constitute irreparable harm. Defs.' Opp'n 12–13 [Doc. No. 73]. Specifically, Defendants contend that some Plaintiff States fail to provide any evidence of administrative expenditures while the remaining states only "offer sparse and largely conclusory assertions of the cost of compliance." Id. at 12. Where Plaintiff States do allege they will incur costs, Defendants contend that such costs are de minimis and cannot support a finding of irreparable harm. Id. at 13.

The costs States may incur to comply with new federal policies can constitute irreparable harm. Doe v. Trump, 157 F.4th 36, 79 (1st Cir. 2025) (holding district court did not abuse discretion when it determined State-plaintiffs would face irreparable harm stemming from having to overhaul verification systems as required by new federal policy); New York v. United States Dep't of Homeland Sec., 969 F.3d 42, 86 (2d Cir. 2020) (irreparable harm found where "States allege[d] that they will be required to undertake costly revisions to their eligibility systems to ensure that non-citizens are not automatically made eligible for or enrolled in benefits they may no longer wish to receive after the Rule's implementation."); New York v. U.S. Dep't of Just., 2025 WL 2618023, at *22 (D.R.I. Sept. 10, 2025) (finding that compliance costs for states to implement a new immigration status screening system constitute irreparable injury).

Implementation of Section 71113 requires that the Plaintiff States expend resources to make changes to existing procedures and systems to comply with the law. Hawai'i Decl. ¶ 17 [62-10]. Because Section 71113's verification requirements are new, Plaintiff States, for the first time, must screen all providers within their borders to determine which providers constitute a "prohibited entity" or "affiliate," and will face inquiries from potentially affected providers as to

whether the new law applies to them. New York Decl. ¶¶ 22–24 [Doc. No. 62-20]; California Decl. ¶ 22 [Doc. No. 62-6] ("[The California Department of Health Care Services] has conducted extensive work to try to understand if any non-Planned Parenthood providers may meet the definition of Prohibited Entity in California as of October 1, 2025."). The challenge of identifying whether a provider is a prohibited entity or affiliate is further amplified by the ambiguous requirements set out by the law, as discussed supra. Illinois Decl. ¶ 8 [Doc. No. 62-11] (noting the Illinois Department of Healthcare and Family Services "is working to identify changes to its systems and processes that will be needed to comply with section 71113, but the lack of clarity in the statutory text . . . make[s] it exceptionally challenging to align on an implementation approach.").

Once "prohibited entit[ies]" are identified, Plaintiff States may also need to make changes to payment and processing systems to filter out such providers. New York Decl. ¶ 25 [Doc. No. 62-20]; Maine Decl. ¶ 28 [Doc. No. 62-13] (noting implementation of Defund Provision has required changes to billing and payment processes). In the case of New York, which currently does not have a system in place to exclude only certain providers from Medicaid participation, a change to the state's system could take over 12 months. New York Decl. ¶ 25 [Doc. No. 62-20]. The CMS Email only underscores the administrative burden placed on States to determine whether an entity, including its "affiliates" and clinics, is a "prohibited entity" and later adjust their Medicaid infrastructure accordingly. See generally CMS Email [Doc. No. 82-1].

The court finds that such costs alone constitute an irreparable harm that would be likely to occur in the absence of a preliminary injunction.

Plaintiff States further contend that Section 71113 will causer irreparable injury by reducing the number of providers offering reproductive and family planning healthcare, resulting

in fewer patients receiving treatment and consequently increasing Plaintiff States' healthcare

costs. Defendants argue that this "theory of harm depends on a long chain of contingencies" and

therefore cannot support a finding of irreparable harm. Defs.' Opp'n 14 [Doc. No. 73].

"As a preliminary injunction requires only a likelihood of irreparable injury, Damocles's

sword does not have to actually fall on all appellants before the court will issue an injunction."

League of Women Voters of United States v. Newby, 838 F.3d 1, 8–9 (D.C. Cir. 2016). For the

purposes of an irreparable harm analysis, "the only relevant harms are those which affect the

parties directly. Injury that might occur to third parties is not probative." California v. Kennedy,

No. 2025 WL 2807729, at *5 (D. Mass. Oct. 1, 2025). Injury to a State can occur, however, even

if a federal policy poses harms to other parties as well. See New York v. Kennedy, 789 F. Supp.

3d 174, 195–97 (D.R.I. 2025); New York v. United States Dep't of Homeland Sec., 969 F.3d 42,

86 (2d Cir. 2020) (finding irreparable harm for plaintiff States where "implementation of [the

Department of Homeland Security's] Rule will result in reduced Medicaid revenue and federal

funding and a greater number of uninsured patients seeking care, putting public hospitals that are

already insufficiently funded at risk of closure"). In New York v. Kennedy, the closing of

laboratories at the CDC pursuant to federal policy was an irreparable harm to the States that

depended on the laboratories. 789 F. Supp. 3d at 211–12. The closing of the labs resulted in

States needing to turn to commercial labs for testing that did not follow the same requirements.

Id. This constituted irreparable harm because the decision would "impact the States' ability to

compare and track results, potentially leading to outbreaks involving multiple jurisdictions." Id.

The court finds that the injuries presented by Plaintiff States are imminent and are not so

conjectural to belie a finding of irreparable harm. Section 71113 prohibits the use of federal

Medicaid funding to reimburse states for claims paid to "prohibited entities."  Pub. L. No. 119-

21, § 71113(a), 139 Stat. 72, 300–01. "Prohibited entities," by definition, are "essential community providers" that "serve[] predominantly low-income, medically underserved individuals. Id. From this starting point, it is not unreasonable to conclude that excluding these providers from Medicaid funding will result in low-income, medically underserved individuals not receiving necessary care. In some states, entities that may qualify as "prohibited entities" are some of the largest, if not the largest, family planning services providers in their respective states. Massachusetts Decl. ¶ 17 [Doc. No. 62-12] (Planned Parenthood health centers provide over 50% of Medicaid-funded reproductive health care and family planning services delivered by MassHealth family planning providers); Michigan Decl. ¶ 22 [Doc. No. 62-14] ("[Planned Parenthood of Michigan] provided 53.4 % of the total family planning services performed within Medicaid-enrolled family planning clinics in Michigan."); Maine Decl. ¶ 25 [Doc. No. 62-13] (Planned Parenthood of Northern New England (PPNE) and Maine Family Planning (MFP) together service 43% of MaineCare members receiving family planning or reproductive health care).

Plaintiff States also allege that, at this time, certain state systems would not be able to absorb all of the patients seeking reproductive healthcare and family planning services should prohibited entities decrease service to Medicaid patients or cease to serve such patients altogether. See, e.g., California Decl. ¶ 25 [Doc. No. 62-6] ("[The California Primary Care Association] does not believe that California has sufficient Medicaid provider capacity to absorb the patients that Planned Parenthood will no longer be compensated for treating. . . ."); Hawai'i Decl. ¶ 21 [Doc. No. 62-10] ("Because capacity is already limited, the health care system in Hawai'i will be unable to fully compensate for the loss of Planned Parenthood as a Medicaid provider."); Maine Decl. ¶ 33 [Doc. No. 62-13] ("Because capacity does not exist in the health

care system in Maine to compensate for the loss of [Planned Parenthood of Northern New England ("PPNE")] and/or [Maine Family Planning ("MFP")] as Medicaid providers, it is inevitable that some proportion of patients of PPNNE and MFP will be unable to find a provider for reproductive healthcare and family planning services."); Michigan Decl. ¶ 25 [Doc. No. 62-14] ("It is therefore inevitable that some proportion of patients of Planned Parenthood will be unable to find a provider for reproductive healthcare and family planning services, and, in turn, Michigan will lose federal Medicaid funds for such lost services.").

Where a State system is already at capacity, a loss one of the State's largest providers of care for Medicaid patients would mean that at least some of these patients will not be able to access a new provider for family planning services, reproductive care, and related medical care. It is therefore not speculative to conclude that enforcing Section 71113 would increase the percentage of patients unable to receive birth control and preventive screenings, thereby prompting an increase in States' healthcare costs. See, e.g., California Decl. ¶ 29 [Doc. No. 62-6]; Hawaiʻi Decl. ¶ 22 [Doc. No. 62-10].

Furthermore, Defendants' arguments rest on incorrect assumptions. Defendants argue that it is possible that such events will not occur, that patients may not decline to seek preventive care, and that providers may not fail to ramp up capacity.[8] Defs.' Opp'n 16 [Doc. No. 73]. Under this set of inferences, any harm would not be imminent. See id. Yet, as noted, Plaintiffs'

---

[8] Defendants also assert that Plaintiff States' "significant delay" in seeking injunctive relief is "[t]he best evidence that the States will not be irreparably harmed by Section 71113's application." Defs.' Opp'n 17 [Doc. No. 73] (citing Charlesbank Equity Fund II v. Blinds To Go, Inc., 370 F.3d 151, 163 (1st Cir. 2004)). But Plaintiff States did not seek injunctive relief in a dilatory manner. To the contrary, Plaintiff States filed for a preliminary injunction a mere two weeks after the First Circuit lifted the stay on implementation of Section 71113 in the related Planned Parenthood litigation. See Planned Parenthood Fed'n of Am., Inc., No. 25-1698, at *2 (1st Cir. Sept. 11, 2025) (lifting the stay issued by this court on September 11, 2025).

declarations indicate that, in certain states, there is no current capacity should prohibited entities

stop providing treatment at their current rate. In such cases, it would not be up to patients to

"declin[e] to seek preventive care[.]" Rather, patients will not be able to <u>access</u> care in a system

that does not have capacity. Relatedly, while other providers may certainly increase capacity, and

"new entrants" may be drawn into the healthcare market, <u>see</u> Defendants' Opposition 16 [Doc.

No. 73], such arguments fail to address that, at least in the immediate short-term, individuals

would lose access to care, and Plaintiff States' health care costs will rise.

Where Plaintiff States will experience both increased administrative costs and health care

costs as a result of Section 71113, the court finds the irreparable harm requirement is satisfied.

### D.  Balance of Equities and the Public Interest

The balance of equities and public interest factors "merge when the Government is the

party opposing the preliminary injunction." <u>Massachusetts v. Nat'l Insts. of Health</u>, 770 F. Supp.

3d 277, 295 (D. Mass. 2025) (citing <u>Nken v. Holder</u>, 556 U.S. 418, 435 (2009)). Plaintiff States

argue that these factors favor preliminary injunctive relief, as Section 71113 is an

unconstitutional exercise of Congress's spending power under which Plaintiff States "are already

suffering and will continue to suffer" short and long-term harms to their public fiscs. Pls.' Mem.

ISO Mot. for Prelim. Injunc. 20 [Doc. No. 63]. Defendants contend that such relief "threatens

significant and irreparable harm to the Government and public" where it would tread on

Congress's broad discretion to allocate federal funding and prevent the government from

enforcing its policies in a particularly sensitive area. Defs.' Opp'n 18 [Doc. No. 73].

Defendants are correct in their assertion that both the public and the government have a

significant interest in the implementation of duly enacted statutes. <u>See, e.g.</u>, <u>Dist. 4 Lodge of the</u>

<u>Int'l Ass'n of Machinists & Aerospace Workers Loc. Lodge 207 v. Raimondo</u>, 18 F.4th 38, 47

(1st Cir. 2021) ("Any time a government is enjoined by a court from effectuating statutes enacted

41

by representatives of its people, it suffers a form of irreparable injury." (cleaned up)). But such injury in this case is minimal where the preliminary injunction sought by Plaintiff States will only maintain the status quo: Defendants will face no additional Medicaid costs relative to the pre-July 4, 2025 environment, and Plaintiff States will continue to seek reimbursement only for those health care services deemed reimbursable under the existing statutory and regulatory schemes. Without preliminary injunctive relief, however, Plaintiff States have demonstrated that their respective state fiscs will materially suffer.

That the public interest favors injunctive relief is underscored by the reality that the entities to which Section 71113 attaches are those that serve "predominantly low-income, medically underserved individuals" See 45 C.F.R. § 156.235(c) (defining "essential community provider," as incorporated by reference in Section 71113(b)(1)(A)(ii)). Where Plaintiff States have demonstrated that, absent an injunction, a reduction in the relevant health services available to Medicaid patients is likely to materialize, the public also has a strong interest in avoiding the associated adverse health outcomes. See Rio Grande Cmty. Health Ctr., Inc. v. Rullan, 397 F.3d 56, 77 (1st Cir. 2005) ("fully agree[ing]" with district court's consideration of the adverse effects faced by hundreds of Medicaid patients if injunction preventing closure of a health center did not enter); Nat'l Insts. of Health, 770 F. Supp. 3d at 326 ("Courts have consistently held there is a strong public interest in health and safety.").

Accordingly, the court finds that the balance of equities and the public interest weigh in favor of preliminary injunctive relief. At the same time, "[i]n ordering relief, the court is not enjoining the federal government from regulating abortion and is not directing the federal government to fund elective abortions[] or any healthcare service not otherwise eligible for

Medicaid coverage." Planned Parenthood Fed'n of Am., Inc., 792 F. Supp. 3d at 240 (footnote omitted).

### E.  Defendants' Bond Request

Defendants request that any injunctive relief granted by the court be accompanied by a bond "no less than $7.2 million annually (or $600,000 per month the injunction is in place)[,]" which reflects "a conservative estimate of $800,000 in annual federal expenditures for each entity the Plaintiff States identify as likely to meet the definition of a prohibited entity." Defs.' Opp'n 20 [Doc. No. 73].

Under Federal Rule of Civil Procedure 65(c), the court "may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The First Circuit has noted the "ample authority for the proposition that the provisions of Rule 65(c) are not mandatory and that a district court retains substantial discretion to dictate the terms of an injunction bond." Int'l Ass'n of Machinists & Aerospace Workers v. Eastern Airlines, Inc., 925 F.2d 6, 9 (1st Cir. 1991).

The court considers the costs and damages Defendants would sustain if they were wrongfully enjoined. Defendants do not contend that the Medicaid program will have to reimburse more services because of the injunction, but only that the reimbursement will be to disfavored providers rather than other providers. The court thus finds that, where injunctive relief will not cause monetary harm to Defendants, only a nominal bond of $100 need be posted while a preliminary injunction is in place.

### F.  Defendants' Stay Request

Defendants further request that any injunctive relief be stayed pending appeal. Defs.' Opp'n 20 [Doc. No. 73]. A district court may stay injunctive relief while an appeal is pending.

43

Fed. R. Civ. P. 62(d). "A stay is not a matter of right, even if irreparable injury might otherwise result." Nken, 556 U.S. at 433 (citation omitted).

> In determining whether to stay an order pending appeal, courts consider
>
> (1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether Issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies.

Id. at 426. "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." Id. at 433–34. "The first two factors . . . are the most critical. It is not enough that the [applicant's] chance of success on the merits be 'better than negligible.'" Id. at 434 (quoting Sofinet v. INS, 188 F.3d 703, 707 (7th Cir. 1999)).

Here, Defendants have not shown that they are likely to prevail on appeal where Plaintiff States, as discussed at length above, have shown a substantial likelihood of success on their Spending Clause claim. Accordingly, a stay pending appeal is DENIED.

To assist in orderly review, however, the court finds it prudent to administratively stay the injunctive relief granted herein for seven days, to allow Defendants, if they so choose, to file an appeal and seek a stay on the merits in the appellate court. See Fed. R. Civ. P. 62(d).

## V.    Conclusion

For the foregoing reasons, Plaintiff States' Motion for Preliminary Injunction [Doc. No. 60] is GRANTED.

It is hereby ORDERED that:

1. Defendants, their agents, employees, appointees, successors, and anyone acting in concert or participation with Defendants are hereby enjoined from enforcing, retroactively enforcing, or otherwise applying the provisions of Section 71113 of "An Act to provide for reconciliation pursuant to title II of H. Con. Res. 14," against the Plaintiff States.

2.   Defendants, their agents, employees, appointees, successors, and anyone acting in concert or participation with Defendants shall take all steps necessary to ensure that Medicaid funding continues to be disbursed in the customary manner and timeframes to Plaintiff States to reimburse claims without regard to whether the claims were filed by entities that may be "prohibited entities" as of October 1, 2025, under Section 71113.

3.   Defendants shall provide a copy of this Order to all personnel within the Department of Health and Human Services and all state agencies involved with the disbursement of Medicaid funding.

4. Plaintiff States shall within seven days post a nominal $100 bond, to be held by the court as the bond in this matter.

IT IS SO ORDERED.

December 2, 2025                                    /s/ Indira Talwani
                                                   United States District Judge